# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DELSIE E. BROOKENS,                  )
                                     )
                                     )    Civil Action No. 07-387 (JJF)
      Plaintiff,                 )
                                     )
vs.                                  )
                                     )
GENERAL MOTORS CORPORATION, a )
Delaware Corporation, GENERAL        )
MOTORS CORPORATION, Plan             )
Administrator, and GM HOURLY-RATE    )
EMPLOYEES PENSION PLAN, an           )
employee pension benefit plan,       )
                                     )
      Defendants.                )

## <u>ADMINISTRATIVE RECORD</u>

## REDACTED VERSION

ECKERT SEAMANS CHERIN & MELLOTT, LLC

<u>/s/Margaret F. England</u>
Margaret F. England (DE Bar No.: 4248)
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801
(302) 425-0430
(302) 425-0432 (fax)

Attorney for Defendants, General Motors
Corporation, et al.

Date: February 6, 2008

U0011675

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

DELSIE E. BROOKENS,

                Plaintiff,

                                       Case No. 07-387

vs.

                                       Hon. Joseph J. Farnan, Jr.

GENERAL MOTORS CORPORATION,
a Delaware corporation; GENERAL MOTORS
CORPORATION, Plan Administrator, and
GM HOURLY-RATE EMPLOYEES PENSION
PLAN, an employee pension benefit plan,

                Defendants.

---

| | |
|---|---|
| John M. Stull (Del Bar #568) | David M. Davis (P24006) |
| Attorney for Plaintiff | Attorney for Defendants |
| 1300 North Market Street | Hardy, Lewis & Page, P.C. |
| Suite 700 | 401 South Old Woodward Avenue |
| P.O. Box 1947 | Suite 400 |
| Wilmington, Delaware 19899 | Birmingham, Michigan 48009 |
| Telephone: (302) 654-0399 | Telephone: (248) 645-0800 |

---

## INDEX TO ADMINISTRATIVE RECORD

| Document | Pages |
|---|---|
| General Motors Hourly Rate Employee Pension Plan dated September 17, 1990 | 1-65 |
| Summary Plan Description dated September 17, 1990 | 66-142 |
| CMS Pension Case Notes | 143-146 |
| Documents re: Plaintiff's submission of a qualifying QRDO | 147-207 |

LAW OFFICES
HARDY, LEWIS
& PAGE, P.C.
01 S. OLD WOODWARD AVE.
SUITE 400
RMINGHAM, MI 48009-6629

(248) 645-0800



*Supplemental*
*Agreement*

Covering

PENSION PLAN

Exhibit A
to
AGREEMENT
between
GENERAL MOTORS CORPORATION
and
UAW
dated
September 17, 1990

# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Index to Exhibit A and Exhibit A-1 | (ii) |
| Exhibit A — Supplemental Agreement Between General Motors Corporation and the UAW (Pension Plan) | (1) |
| Exhibit A-1 — The General Motors Hourly-Rate Employes Pension Plan | 1 |

(i)

# INDEX TO

**EXHIBIT A** — Supplemental Agreement Between General Motors Corporation and the UAW (Pension Plan)

**EXHIBIT A-1** — The General Motors Hourly-Rate Employes Pension Plan

Page No.

Actuary:
Appointment of .................. (3)
Certification by ................. (3)
Administration, General .......... (11), 50
Amendment, Provision for ......... (2), 60
Appendix A — Benefit Class Codes ....... 69-70
Appendix B — Foundry Jobs ........ 71-76
Appendix C — Asbestos Jobs ....... 77
Approval of Plan
(See "Plan, Approval of") .......
Asbestos Jobs:
Definition of .................... 77
Asbestos Service,
Credited Service for ............. 46
Base Hourly Rate ................. 66-67
Basic Benefit .................... 67
Basic Benefit Applicable to:
Benefits Commencing Prior to
October 1, 1990 ............... 19-28
Deferred Pensions ............. 53-57
Early Retirement .............. 6-9
ERISA Minimum ................. 8
Normal Retirement ............. 6
Total and Permanent Disability
Retirement .................. 6
Benefit Class Code ............... 6
Benefit Class Code ............... 69-70

# INDEX — Cont'd.

Page No.

Board of Administration:
Applicability of 3(c) Agreement ..... (10)-(11)
Appointment of Members ........... (5)
Functions ........................ (9)-(9)
Information Furnished by Corporation .... (6)-(9)
Liability ........................ (11)
Pay and Expenses of Members ...... (6)
Retroactive Adjustments .......... (9)
Time of Meeting .................. (6)
Voting ........................... (6)
Chairman, Impartial:
Appointment of ................... (10)
Compensation of .................. (10)
Term of Office ................... (10)
Voting ........................... (10)
Contributions:
General Provisions ............... (3)-(5),48-49
Service, Current ................. (3)-(4)
Service, Prior ................... (4)
Time of Payment .................. (3)-(5)
Credited Service, Subsequent to
Effective Date of Plan:
Computation ................... 34-39
During Layoff or Disability Leave .... 35-36, 38-39
Limitation of ................. 39
Military Service .............. 37
Occupational Disability Absences ... 36
Prior Service as Salaried Employe ... 36
Reinstatement of .............. 40
Credited Service, Asbestos ....... 46
Credited Service, Credit Union ... (12)
Credited Service, Equal to Seniority .... 39
Credited Service, Foreign Subsidiary .... 40-41

## INDEX — Cont'd.

|  | Page No. |
|---|---|
| Credited Service, Foundry | (14), 41-43 |
| Credited Service, Loss of | 40 |
| Credited Service, Reinstatement of | 40 |
| Credited Service, Union Leaves of Absence | (12) |
| Deduction For: | |
| Benefit Plan(s) Overpayments | 58 |
| Dependent Life Insurance | 58 |
| Income Tax | 58 |
| Medical Expense Coverage | 57-58 |
| Optional Life Insurance | 58 |
| Union Dues | (13)-(14) |
| Deferred Pension: | |
| Benefits, Determination of | 53-57 |
| Eligibility | 53-54 |
| If Reemployed | 56 |
| Minimum Vesting Standards-ERISA | 43-46 |
| Definitions | 64-68 |
| Dependent Life Insurance | 58 |
| Discharged Employe | 9, 13 |
| Disciplinary Action (See "Employment Rights") | |
| Duration of Agreement | (14)-(15) |
| Employe, Definition of | 64-65 |
| Employment Rights | (12)-(13), 59 |
| Establishment of Fund | (3) |
| Establishment of Plan (See "Plan, Establishment of") | |
| Federal Social Security Benefit: Definition of | 66 |
| Fiduciary, Named-ERISA | 60 |

(iv)

## INDEX — Cont'd.

|  | Page No. |
|---|---|
| Financing | (3)-(5), 48-49 |
| Foundry Jobs: | |
| Designation of | 71-76 |
| Foundry Service, Credited Service for | 41-43 |
| Guaranteed Income Stream Benefits | 53 |
| Grievance Procedure: | |
| Non-Applicability of | (11)-(12) |
| Income Tax (See "Plan, Approval of; Internal Revenue Service") | |
| Insurance Company or Trustee: | |
| Definition of | 65 |
| Designation of | (3) |
| Insured Fund, Definition of | 66 |
| Layoff or Disability Absence: Credited Service During | |
| Leaves of Absence: | |
| Union | 35-36, 38-39 |
| Military Service | (12) |
| Letter Agreements | 37 |
| Liability of Corporation | 87-96 |
| Limitation of Benefits | (5), 48-49 |
| Lump-Sum Payment | 60 |
| Medical Expense Benefit Coverages | 90-91 |
| Merger or Consolidation-ERISA | 57-58 |
| Military Service, Credited Service for | 64 |
| Modification, Provision for | 37 |
| Optional Life Insurance | (1)-(2), 60-61 |
| Pension Fund, Definition of | 58 |
| | 66 |

(v)

# INDEX — Cont'd.

|  | Page No. |
|---|---|
| Pension Payments: | |
| General Provisions | 50-53 |
| Non-Alienation of | 57-58 |
| To Persons Other Than Pensioners | 52 |
| Plan, Approval of: | |
| Board of Directors | (1)-(3), 60 |
| Internal Revenue Service | (1)-(2), 59 |
| Plan, Duration of | (14)-(15) |
| Plan, Establishment of | (1)-(3), 3 |
| Plan, Termination of | 61-64 |
| Pre-Retirement Survivor Coverage-REA: | |
| Duration | 32-33 |
| Effective Date | 32 |
| Eligibility | 31-34 |
| Payment | 32-33 |
| Qualified Domestic Relations Order-REA | 9, 26, 33, 57 |
| Reemployment | (13), 40, 52, 66 |
| Retirement, Early: | |
| Benefit Options | 4 |
| Benefits, Determination of | 6-9 |
| Benefits, Payment of | 50-53 |
| Benefits, Redetermination of | 7 |
| Eligibility | 4 |
| Mutual Retirement Standards | 78-79 |
| Reductions for Age | 7 |
| Retirement, General | (12)-(13) |
| Retirement, Normal: | |
| Benefits, Determination of | 6 |
| Benefits, Payment of | 50-53 |
| Eligibility | 4 |
| Retirement, Total and Permanent Disability: | |
| Benefits, Determination of | 6 |
| Benefits, Payment of | 50-53 |

# INDEX — Cont'd.

|  | Page No. |
|---|---|
| Disability, Determination of | 5 |
| Eligibility | 5, 51, 56 |
| Recovery From | (12)-(13), 5 |
| Seniority (See "Credited Service") | 17, 52 |
| Seniority, Definition of | 66 |
| Seniority, Equal to Credited Service | 39 |
| Social Security Benefits: | |
| Redeterminations for | 46-47 |
| Special Benefit | 18-19 |
| Standards for Application of Provisions for Mutually Satisfactory Retirement | 78-79 |
| Statement of Intent-Representation | 80-85 |
| Supplement, Early Retirement: | |
| Benefits Commencing Prior to October 1, 1990 | 24-25 |
| Benefits, Determination of | 13-14, 16-17 |
| Earnings Limitation | 17 |
| Eligibility | (13), 13-14 |
| Limitation of 70% of Final Pay | 17-18 |
| Payment of | 14, 50-53 |
| Penalty Against | 16-17 |
| Recovery if Overpaid | 17 |
| Redetermination if Commenced Prior to October 1, 1990 | 25 |
| Waiver of Earnings Limitation, Mutual Retirement | 17 |
| Supplement, Interim: | |
| Benefits, Determination of | 14-15 |
| Earnings Limitation | 17 |
| Eligibility | (13), 13-14 |
| Limitation of 70% of Final Pay | 17-18 |
| Payment of | 15, 50-54 |
| Penalty Against | 16-17 |
| Recovery if Overpaid | 17 |

## INDEX — Cont'd.

| | Page No. |
|---|---|
| Supplemental Pension Agreement: | |
| Conflicts With Plan | (1) |
| Date of | (1) |
| Duration of | (14)-(15) |
| Parties to | (16)-(17) |
| Surviving Spouse Benefits: | |
| After Employe's Retirement | 9-13 |
| Before Employe's Retirement | 12-13 |
| Cancellation Because of Death | |
| or Divorce | 9-10, 26 |
| Effective Date | 10-11 |
| Election to Receive Full Amount | |
| of Future Increases | 26-27 |
| Joint and Survivor-ERISA | 28-31 |
| Reduction of Basic Benefit | 11-12 |
| Rejection of Coverage | 10-11, 29 |
| Special Survivor Option | 25-26 |
| Spouse Consent | 10-11, 29 |
| Upon Marriage or Remarriage | |
| After Retirement | 27 |
| Temporary Benefit Applicable to: | |
| Benefits Commencing Prior to | |
| October 1, 1990 | 22-24 |
| Early Retirement | 8-9 |
| Total and Permanent Disability | |
| Retirement | 8 |
| Termination of Plan | |
| (See "Plan, Termination of") | |
| Trust Fund: | |
| Definition of | 66 |
| Establishment of | (3), 48 |
| Irrevocability of | 49 |
| Trustee, Duties of | (3) |
| Trustee or Insurance Company: | |
| Definition of | 65 |
| Designation of | (3) |

## INDEX — Cont'd.

| | Page No. |
|---|---|
| Union Dues, Deduction of | (14) |
| Vesting (See "Deferred Pension") | |
| Wage Inequity Adjustments | 21 |
| Widow's Benefits | |
| (See "Surviving Spouse Benefits") | |
| Workers Compensation: | |
| Deductions for Receipt of | 47-48, 89 |

EXHIBIT A

SUPPLEMENTAL
AGREEMENT
(Pension Plan)

A, Sec. 1

# SUPPLEMENTAL AGREEMENT
## (PENSION PLAN)

On this 17th day of September, 1990, General Motors Corporation, hereinafter referred to as the Corporation, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, hereinafter referred to as the Union, on behalf of the employes covered by the collective bargaining agreement of which this Supplemental Agreement becomes a part, agree as follows:

## Section 1. Establishment of Plan

Subject to the approval of its Board of Directors, the Corporation will establish an amended pension plan, hereinafter referred to as the "Plan", a copy of which is attached hereto as Exhibit A-1 and made a part of this agreement to the extent applicable to the employes represented by the Union and covered by this agreement as if fully set out herein, modified and supplemented, however, by the provisions hereinafter. In the event of any conflict between the provisions of the Plan and the provisions of this agreement, the provisions of this agreement will supersede the provisions of the Plan to the extent necessary to eliminate such conflict.

The Plan, as set forth in Exhibit A-1, and the Plan as it may be modified and supplemented by superseding provisions of this agreement, as above provided, are both contingent upon and subject to obtaining and retaining such approval of the Commissioner of Internal Revenue as the Corporation may find necessary to establish the deductibility under Section 404 of the Internal Revenue Code for income tax purposes of any and all contributions made by the Corporation to both plans and to establish the plans and related trust as being qualified and tax exempt

(1)

A, Sec. 1

under Sections 401 and 501(a) or other applicable provisions of the Internal Revenue Code. Any modification or amendment of either the Plan, or the Plan as modified and supplemented by this agreement, may be made retroactively by the Corporation with the consent of the Union, if necessary or appropriate, to qualify or maintain the Plan as a plan and trust meeting the requirements of Sections 401 and 501(a) of the Internal Revenue Code, as now in effect or hereafter amended, or any other applicable provisions of the federal tax laws, as now in effect or hereafter amended or adopted, and the regulations issued thereunder, provided that pension benefits under the Plan are not diminished.

Until the Plan is approved by the Corporation's Board of Directors and by the Commissioner of Internal Revenue, all as hereinbefore provided, the benefits payable shall be only those determined under the Plan as constituted prior to October 1, 1990; provided, however, that following approval by its Board of Directors and its receipt of the favorable ruling from the Commissioner of Internal Revenue as set forth above, the Corporation or the trustee will pay to retired employes and surviving spouses any excess amounts equal to the difference between the monthly pension calculated in accordance with the terms of the Plan, attached hereto as Exhibit A-1, and the monthly pension paid or payable in accordance with the terms of the Pension Plan which was attached as Exhibit A-1 to the Supplemental Agreement (Pension Plan) between the Parties dated October 8, 1987. Any such excess amounts payable for months prior to the receipt of the aforementioned Board of Directors and the Commissioner of Internal Revenue approvals, shall be payable the first of the month following the date upon which the last of these two approvals is received by the Corporation, and any such amounts payable thereafter shall be paid on the first of the month at the same time as the related pension is paid.

(2)

A, Sec. 1

In the event that the Plan is disapproved by the Board of Directors of the Corporation, the Corporation within thirty days after any such disapproval will give written notice thereof to the Union and this agreement shall thereupon have no force or effect. In that event the matters covered by this agreement shall be the subject of further negotiation between the Corporation and the Union.

Section 2. Financing

(a) A trustee or an insurance company, or both, shall be designated by the Corporation, and a trust agreement or contract, or both, executed between the Corporation and such trustee or insurance company, or both, under the terms of which a pension fund or insured fund, shall be established to receive and hold contributions payable by the Corporation, interest, and other income, and to pay the pensions and supplements provided by the Plan.

(b) The Corporation agrees to pay over irrevocably to the trustee or insurance company during the period of this agreement, contributions or payments for the Plan equal to the sum of (i) and (ii) below as determined and certified as of each anniversary of the effective date of the Plan by one or more actuaries chosen by, but independent of, the Corporation, and qualified through Fellowship in the Society of Actuaries and enrollment with the Joint Board for Enrollment of Actuaries (hereinafter referred to as the actuary). Such contributions or payments for any year may be made not later than the date on which such contributions are required by law to be made for the purpose of crediting such contributions to such year under the minimum funding standards of the Employee Retirement Income Security Act of 1974;

(i) the annual "current service" or "normal cost" contribution attributable to a year's cost accruals

(3)

in respect of assumed continuous service after each such anniversary date, and

(ii) the "prior service contribution" computed as that part of the present value, at each such anniversary date, of the prospective pensions payable under the Plan for employes, pensioners and former employes who are entitled to a deferred pension then covered by the Plan which is in excess of:

(aa) the value of the trust fund, as then comprised of any contracts and total other assets, invested and uninvested, such total assets being valued on a basis at least equal to the total cost thereof, plus

(bb) the then present value of the prospective "current service" or "normal cost" contributions determined by the actuary in accordance with (i) above,

such excess part being amortized according to the following schedule:

(1) in respect of the portion of such excess part attributable to the level of benefits in effect prior to October 1, 1979 — the fifty-ninth anniversary of the Corporation's pension plan (October 1, 2009), and

(2) in respect of the portion of such excess part attributable to the increase in the level of benefits established by amendments to the Corporation's pension plan effective on or after October 1, 1979 — the thirtieth anniversary of the date on which such increase in the level of benefits becomes effective.

(c) The Corporation may contribute or pay additional amounts to the trustee or insurance company, or both, under (b) above in any year without such additional amounts being construed to reduce any thirty-year period for the completion of the "prior service contributions" of subsection (b)(ii) above. If the Corporation has contributed any such additional amounts prior to any anniversary date of the

(4)

Corporation's pension plan or shall contribute any such additional amounts prior to any anniversary date of the Plan falling within the duration of this agreement, the Corporation may as of such anniversary date, the Corporation may as of such anniversary contribute a lesser amount than otherwise determined by (b) above for such anniversary, provided that the value of any contracts and total other assets as valued in accordance with (b)(ii)(aa) above at such anniversary shall not be less than the amount estimated by the actuary to be the value as if contributions and payments up to and including such anniversary date had been made as provided in (b) above and no additional amounts had been contributed or paid prior to such anniversary.

(d) The Corporation by payment of the contributions or amounts as hereinbefore provided in this section and pensions and supplements shall be payable only from the trust fund or the insured fund or both.

Section 3. Administration

(a) Board of Administration

(1) There shall be established a central Board of Administration hereinafter referred to as the Board, composed of six members, three appointed by the Corporation and three by the Union. Each member of the Board shall have an alternate. In the event a member is absent from a meeting of the Board, his alternate may attend and when in attendance shall exercise the duties of the member. Either the Corporation or the Union at any time may remove a member or alternate appointed by it and may appoint a member or alternate to fill any vacancy among members or alternates appointed by it.

No person shall act as a member of the Board of Administration or as an alternate for such member unless notice of his appointment has been given in

(5)

writing by the party making the appointment to the other party.

(2) The Board shall meet at such times and for such periods for the transaction of necessary business as may be mutually agreed upon by its members.

(3) To constitute a quorum for the transaction of business, the presence of four members of the Board shall be required. At all meetings of the Board the member or members present appointed by the Corporation shall have in the aggregate a total of one vote to be cast on behalf of the Corporation, and the member or members present appointed by the Union shall have in the aggregate a total of one vote to be cast on behalf of the Union.

(4) The compensation and expenses of the Corporation members will be paid by the Corporation and the compensation and expenses of the Union members will be paid by the Union and no part of such compensation or expenses will be paid from the trust fund.

(5) The Corporation shall cause to be furnished to the Board of Administration annually:

(i) A statement as of each anniversary date of the Plan showing in summary form the value of the assets which comprise such fund by general categories of investment, such value being determined on a basis at least equal to the total cost thereof for each such category.

(ii) Such information as to age, sex and service of hourly-rate employes of the Corporation as a whole in the United States and as to the number of pensioners and amount of pensions and supplements by age groups, as the Board may reasonably require, but in no event shall the Corporation be required to furnish the Board with any data not furnished by the Corporation to the actuary.

(6)

A. Sect. 3(a)(5)(iii)

(iii) A report, prepared by the actuary, in respect of each year's actuarial valuation of the Plan, setting out the following:

(a) the amount of the normal cost contribution and the amount of the payment toward amortization of the actuarial deficiency required in accordance with Section 2(b) hereof.

(b) a statement of the method and the assumptions, such as the interest rate, mortality rates, withdrawal rates, retirement rates, average benefit unit and assumptions used with respect to the survivor benefit, adopted for the valuation for the purposes of Section 2(b) hereof.

(c) the amount, as of each anniversary date, of the gross actuarial deficiency, determined in accordance with Section 2(b) hereof as the present value of the prospective pensions payable under the Plan less the then present value of the prospective normal cost contributions, if any, for (1) retired employes, (2) employes who have separated with retention of deferred pensions, (3) non-retired and non-separated employes, and (4) total.

(d) the amount of assets used in the actuarial valuation, together with a reconciliation of the amount of such assets with the amount used in the preceding valuation.

(e) the amount of the net (unfunded) actuarial deficiency.

(f) the amount by which the value of the trust fund exceeded the amount then required by Section 2(b) hereof to be in such fund.

(g) the extent to which the trust fund assets as of the valuation date would be sufficient to cover the pension liabilities, as determined in accordance with SFAS 87.

(7)

A, Sec. 3(a)(5)(iv)

(iv) A statement, certified by the actuary, that the amount of the trust fund is or is not less than the amount then required by Section 2(b) hereof to be in such fund.

(v) A statement setting forth:

(aa) The value of the trust fund computed on the basis of market value as of the previous anniversary date of the Plan.

(bb) Additions during Plan year:

(i) payments by General Motors into the fund

(ii) interest and dividends received by the fund

(iii) net investment gains, and

(iv) total additions.

(cc) Pension payments and supplements to retired employes and surviving spouses during Plan year.

(dd) The value of the trust fund computed on the basis of market value as of the anniversary date of the Plan for the year for which the statement is being submitted.

(vii) A schedule setting forth as of March 31 of each year:

(aa) the amount of investment of the pension fund in residential real estate mortgages, by type, in communities with General Motors plants and in other communities,

(bb) the amount invested in such residential real estate mortgages during the preceding year in comparison with total new money investments during that year, and

(8)

A, Sec. 3(a)(5)(vi)(cc)

(cc) a description of such residential mortgages in which funds were invested during the preceding year, by type, separately by plant city areas and in total for other areas.

(vii) A copy of Form 5500 reports and attendant schedules for the Plan will be furnished as soon as practicable after General Motors has filed such report with the Internal Revenue Service.

(6) The Board of Administration shall have no power to add to or subtract from or modify any of the terms of this agreement or the Plan, nor to change or add to any benefit provided by said agreement or Plan, nor to waive or fail to apply any requirement of eligibility for a benefit under said agreement or Plan.

(7) Any case referred to the Board of Administration on which it has no power to rule shall be referred back to the parties without ruling.

(8) No ruling or decision of the Board of Administration in one case shall create a basis for a retroactive adjustment in any other case prior to the date of written filing of each such specific claim.

(9) There shall be no appeal from any ruling by the Board which is within its authority. Each such ruling shall be final and binding on the Union and its members, the employe or employes involved, and on the Corporation.

The Union will discourage any attempt of its members and will not encourage or cooperate with any of its members, in any appeal to any Court or Administrative Board or Agency from a ruling of the Board of Administration.

(b) Impartial Chairman

(1) The Corporation and the Union shall mutually agree upon and select an Impartial

(9)

A. Sect. 3(b)(1)

Chairman, who shall serve until requested in writing to resign by three Board members.

(2) The Impartial Chairman will not be counted for the purpose of a quorum, and will vote only in case of a failure of the Corporation and the Union by vote through their representatives on the Board to agree upon a matter which is properly before the Board and within the Board's authority to determine; provided that the Impartial Chairman may vote only on matters involving the processing of individual cases, not on the development of procedures.

(3) The fees and expenses of the Impartial Chairman will be paid one-half by the Corporation and one-half by the Union.

(c) As soon as possible after the effective date of this agreement, the Union and Corporation members of the Board of Administration shall work out matters such as but not limited to: (1) procedures for establishing Local Pension Committees and the duties of such Local Pension Committees; (2) the authority and procedures for reviewing applications for pensions; (3) the procedures for making appeals to the Board; (4) the handling of complaints regarding the determination of age, service credits, and computation of benefits; (5) procedures for making appeals to the Board; (6) means of verifying service credits to which employes are entitled under the Plan; (7) methods of furnishing information to employes regarding past and future service credits; (8) the amount of time the Union members of the local committees may be permitted to leave their work to attend meetings of the Local Pension Committees; (9) how disputes over total and permanent disability claims will be handled, including disputes, if any, with respect to whether a disabled pensioner engages in gainful employment; (10) the review of pertinent information about the Plan for dissemination to employes; (11) how pension payments will be authorized by the Board. All such

(10)

A. Sect. 3(c)

matters shall be consistent with all other provisions of the Plan and this agreement. The working out of the procedures outlined in this section shall be the responsibility of the Corporation and Union members of the Board, and the Impartial Chairman shall have no power to decide any question with respect thereto.

The provisions of Agreement Implementing Section 3(c) of the Supplemental Agreement, Pension Plan, dated October 14, 1988 which were established by the Board pursuant to the foregoing are incorporated herein by reference and are a part hereof and effective with respect to the administration of the Plan as fully as if set out herein at length.

(d) Except as provided otherwise in this agreement, the general administration of the provisions of the Plan shall be the responsibility of the Corporation.

(e) The Board and any member of the Board, or the Local Pension Committees or any member of the Local Pension Committees, shall be entitled to rely upon the correctness of any information furnished by the Union or the Corporation. Neither the Board nor any of its members, nor the Local Pension Committees nor any of its members, nor the Union nor any officer or other representative of the Union, nor the Corporation nor any officer or other representative of the Corporation shall be liable because of any act, or failure to act, on the part of the Board or any of its members, or the Local Pension Committees or any of its members or any person, except that nothing herein shall be deemed to relieve any such individual from any liability for his own fraud or bad faith.

(f) No matter respecting the Plan as modified and supplemented by this agreement or any difference arising thereunder shall be subject to the grievance procedure established in the collective bargaining agreement between the Corporation and the Union,

(11)

A, Sect. 3(f)

except as expressly provided in Paragraph (46) of such collective bargaining agreement.

(g) Credited service shall be granted an employe who is absent from his work pursuant to Paragraph 24 of the National Agreement, or on a leave of absence under Paragraph 109 of the National Agreement if the leave was granted for the purpose of permitting the employe to engage in the business of or to work for the Local Union, or if the leave was granted under Paragraph 109(a) of the National Agreement for the purpose of permitting the employe to engage in the business of or to work for the International Union while on such leave (an employe on leave under the National Agreement solely to permit the employe to be Manager of the credit union sponsored by the Local Union shall be included hereunder, but only with respect to any period while serving in such capacity while on such leave).

An employe eligible for credited service under this section shall be credited with up to 40 hours for each calendar week since October 1, 1950 while he is on such leave, including compensated hours, provided he meets the requirements of the leave; but in no event shall the employe be credited with more than 1700 hours, including compensated hours, in any calendar year.

Section 4.  Effect of Retirement on Employment Status and Seniority

(a) An employe who retires or is retired under the terms of the Plan shall cease to be an employe and shall have his seniority canceled.

(b) An employe who has been retired on a total and permanent disability pension and who thereby has broken his seniority in accordance with subsection (a) above, but, who recovers and has his pension discontinued, shall have his seniority reinstated as

(12)

A, Sect. 4(b)

though he had been on a sick leave of absence during the period of his disability retirement, provided, however, if the period of his disability retirement was for a period longer than the seniority he had at the date of retirement, he shall, upon the discontinuance of his disability pension, be given seniority equal to the amount of seniority he had at the date of such retirement.

(c) If an employe retired for reasons other than total and permanent disability, who has lost seniority in accordance with subsection (a) above, is retired, such employe will have the status of a new employe.

Section 5.  Supplements

Notwithstanding any other provisions of the Plan, an employe who retires with benefits payable commencing on or after October 1, 1990 while on an approved leave of absence requested by the International Union to permit him to engage in the business of or to work for the International Union shall not be prevented from receiving benefits under Section 6 of Article II of the Plan solely because the last day he worked for the Corporation was not within five years of the date his pension benefits commence.

Section 6.  Deduction of Union Dues

(a) Notwithstanding any other provisions of the Plan, any retired employe entitled to receive a pension or supplement may, pursuant to the retired employe's written authorization and direction acceptable to the Corporation, authorize the deduction of monthly Union dues from any monthly pension or supplement otherwise payable to him and direct that such dues be remitted to the Union.

(b) An authorization to deduct said monthly Union dues shall become effective as of the first of the second month following the month in which the Corporation

(13)

A, Sect. 6(b)

receives such authorization from the Union, and shall remain in full force and effect until revoked by the retired employe's written notice given to the Corporation, except that during any period when there is not in effect a written collective bargaining agreement or supplement thereto between the Corporation and the Union which permits or provides for the deduction of Union dues from monthly pension benefits payable to a retired employe, such assignment, authorization and direction, if otherwise in effect, shall automatically be suspended for the duration of such period only.

(c) The Union shall indemnify and hold harmless the Corporation against any and all liability, including reasonable attorney's fees, that may arise by reason of the Corporation's compliance with this Section 6.

(d) This Section 6 shall be of no force or effect during any month for which less than one thousand such authorizations are in effect.

## Section 7. Foundry Jobs

Any job classification put into effect after September 14, 1973 at a plant identified in Appendix B of the Plan, shall be designated by written agreement between the parties as a foundry job if such classification (a) supersedes or replaces a job classification previously designated as a foundry job for such plant and (b) becomes applicable to employes who perform substantially the same work as had been performed by employes while on a job classification previously designated as a foundry job for such plant.

(14)

A, Sect. 8

## Section 8. Duration of Agreement

This agreement and Plan shall continue in effect until the termination of the collective bargaining agreement of which this is a part.

In witness hereof, the parties hereto have caused this agreement to be executed the day and year first above written.

(15)

| INTERNATIONAL UNION, UAW | GENERAL MOTORS CORPORATION |
|---|---|
| OWEN BIEBER | ROBERT C. STEMPEL |
| STEPHEN P. YOKICH | LLOYD E. REUSS |
| DONALD J. DAVIS | F. ALAN SMITH |
| DARREL NEWBERRY | CHARLES KATKO |
| CALVIN T. RAPSON | ALFRED S. WARREN, JR. |
| TED MILLER | RICHARD F. O'BRIEN |
| TOM FASCO | JOHN D. BUTLER |
| HENDERSON SLAUGHTER | HOWARD C. CARLSON |
| TOM WEEKLEY | DONALD G. GARDNER |
| RICHARD SHOEMAKER | RICHARD K. McMILLAN |
| LEON BLACKWELL | THOMAS J. MORR |
| GEORGE BRODEUR | ROBERT G. WIENCEK, M.D. |
| LESTER BRYAN | RALPH E. HANDLEY |
| L. E. BUNCH | JAMES E. PRYCE |
| MIKE GRACEY | KENNETH J. McCORMICK |
| RICHARD HOALCRAFT | THOMAS E. UTTER |
| JAMES JACKSON | ARTHUR R. SCHWARTZ |
| RICK LYONS | CHARLES E. RYAN |
| DICK MONCZKA | ALAN S. DAWES |
| JUDY MURPHY | ROBERT W. HENDRY |
| PEGGY PERSON | H. EUGENE BROWN |
| GARY WATSON | EDWARD D. DuCHARME |
| RICHARD SWIM | FRED G. HADIGOLD |
| HAROLD SHELTON | RICHARD L. HUBER |
| J. D. DALTON | GERALD A. KNECHTEL |
| VINCE DEMME, JR. | ROBERT D. LEE |
| SAM ISAAC | ANTHONY L. MARCHIO |
| KEN LAUBERT | MICHAEL V. TIERNEY |
| CARL PEDERSEN, JR. | JAMES R. WHEMELS |
| ROGER RATLIFF | BETTY R. ANDERSON |
| TOM ROBINSON | JOHN H. BERRY, III |
| DON SARKESIAN | E. PRESTON BOLDEN |
| LEWIS W. SCHULTZ | RICHARD L. BREWER |
| NORM ACORD | SAMUEL L. COLE, JR. |
| ROGER ANCLAM | WILLIAM L. COWELL |
| BILL APPLE | H. STEPHEN DOYLE |
| JIM BEARDSLEY | JOHN J. FLAHARTY |
| AL BERGMANN | MARK R. FLORA |
| CHARLES BEST | RALPH E. DEEDS, JR. |
| JACK BROWN | JOHN P. FURMAN |
| BENNIE BURGESS | THOMAS A. GAWEL |
| BILL CAPSHAW | STEVEN L. GEBBIA |
| JIM CARSON | BEACH B. HALL |

(16)

| INTERNATIONAL UNION, UAW | GENERAL MOTORS CORPORATION |
|---|---|
| RUFUS COLEMAN | CARLTON V. MATZELLE |
| JERRY COVILLE | TERRY J. McDOUGALL |
| HAROLD COX | MILTON H. OSBORN, JR. |
| DICK DANEN | GARY N. PHELEY |
| BOB FARLEY | BERNARD J. QUICK |
| EARL FARRELL | JAY C. WILBER |
| JERRY FAULKNER | GERALD J. WINTER |
| MARK FIELDER | W. GARY BRYANT |
| RAY GIBSON | CAROLE G. DAVEY |
| ROY GOFORTH | JENNIE F. HART |
| LARRY GONTKO | BETTY SUE JONES |
| MOSES GREEN | JAMES W. LaLONDE |
| CECIL HAMPTON | SANDRA POPE THOMPKINS |
| LINDA HOALCRAFT | BERNARD G. WEBBER |
| JIM HOWE | |
| LARRY JOLLY | |
| DICK JONES | |
| CHRIS MANNING | |
| GEORGE MAPES | |
| BUD MILLER | |
| CLAYTON MOLL | |
| RON MURRAY | |
| WILBERT NEAL | |
| HERSCHEL NIX | |
| BILL RENO | |
| TOM RICHARDSON | |
| JOE SAWYER | |
| ELLA MAE SCHULTZ | |
| JIM SHROAT | |
| DARRELL SMITH | |
| WILLIAM SMITH | |
| JOE SPRING | |
| LARRY STEVENS | |
| CINDY SUBANICK | |
| KARLA SWIFT | |
| KEN TERRY | |
| JIM TITSWORTH | |
| TOM WALSH | |
| DICK WEEDEN | |
| JIM WESTNESS | |
| JIM WHEATLEY | |
| WILLIE WILLIAMS | |
| ED YONAN | |

(17)

A. Sect. 8

EXHIBIT A-1

THE GENERAL MOTORS
HOURLY-RATE EMPLOYES
PENSION PLAN

1

Art. I

# ARTICLE I

## ESTABLISHMENT OF THE PLAN

General Motors Corporation on behalf of itself and its Divisions and as agent for certain of its directly or indirectly wholly-owned and substantially wholly-owned domestic subsidiaries in accordance with I.R.C. Section 414(b), (c), and (m) will establish, subject to the approval of its Board of Directors, a pension fund either by a trust agreement with a trustee or trustees or by contract with an insurance company or insurance companies, or both, and with respect thereto shall make such payments or contributions as will be sufficient to maintain the fund on a sound actuarial basis as well as to pay expenses incident to the operation and management of the Plan.

Except as expressly provided in Sections 6, 7, and 8 of Article II and as provided in Article VII and Article IX, the provisions set forth in this Plan are applicable only to employes with seniority on or after October 1, 1990. Employes retired with benefits commencing prior to such date or separated prior to such date, or eligible surviving spouses of such employes, shall be entitled to the benefits, if any, under the Plan as it existed immediately prior to such date.

Notwithstanding the paragraph immediately above, employes who retired with benefits commencing after September 17, 1990 and prior to October 1, 1990 pursuant to the provisions of Article II of the Plan, shall be considered for purposes of Article II herein as having retired with benefits payable commencing on or after October 1, 1990; the surviving spouse of any employe who died after September 17, 1990 and prior to October 1, 1990, who is otherwise eligible for monthly benefits under the Plan, shall be considered entitled to monthly benefits pursuant to Section 5 of Article II herein; and any such employes

2

3

shall be considered eligible for credited service under Article III herein.

## ARTICLE II
## ELIGIBILITY FOR RETIREMENT AND AMOUNT OF PENSIONS

### Section 1. Normal Retirement

Any employe who shall have attained the age of 65, shall have completed one or more years of credited service as provided in Article III and shall cease active service, shall be entitled to receive a pension.

### Section 2. Early Retirement

(a)(1) An employe who has attained age 60 but not age 65, and who has 10 or more years of credited service, may retire at the option of the employe.

(2) An employe who has attained age 55 but not age 60, and whose combined years of age and years of credited service (to the nearest 1/12 in each case) shall total 85 or more, may retire at the option of the employe.

(3) An employe who has 30 or more years of credited service may retire at the option of the employe.

(b) An employe who has attained age 55 (age 50 for an employe who is laid off on or after October 1, 1994 as a result of a plant closing where no other General Motors plants are in the same geographical area) but not age 65 and who has 10 or more years of credited service may be retired under mutually satisfactory conditions as set forth hereinafter in the Standards applicable to such retirement.

4

### Section 3. Total and Permanent Disability Retirement

(a) An employe who is totally and permanently disabled prior to attaining age 65, and has at least 10 years of credited service, shall be eligible for a disability pension as hereinafter provided.

(b) An employe shall be deemed to be totally and permanently disabled only if he is not engaged in regular employment or occupation for remuneration or profit and on the basis of medical evidence satisfactory to the Corporation the employe is found to be wholly and permanently prevented from engaging in regular employment or occupation with the Corporation at the plant or plants where he has seniority for remuneration or profit as a result of bodily injury or disease, either occupational or nonoccupational in cause, but excluding disabilities resulting from service in the armed forces of any country unless the employe becomes totally and permanently disabled after he has accumulated at least 5 years of seniority following his separation from service in the armed forces.

(c) Any disability pensioner may be required to submit to medical examination at any time during retirement prior to age 65, but not more often than semi-annually, to determine whether the pensioner is eligible for continuance of the disability pension. If on the basis of such examination it is found that the pensioner is no longer disabled or if the pensioner engages in gainful employment, except for purposes of rehabilitation as determined by the Corporation, the pensioner will be deemed recovered and his disability pension will cease. In the event the disability pensioner refuses to submit to medical examination the pension will be discontinued until the pensioner is examined.

5

## Section 4. Amount of Pensions

(a) (1) The monthly pension payable to an employe retired pursuant to the provisions of Sections 1, 2, or 3 of this Article II with benefits payable commencing on or after October 1, 1990 shall be a basic benefit for each year of credited service that the employe had at the date of his retirement, determined by his Benefit Class Code and based on the month for which payment is being made as set forth in the table immediately following:

| Retirement With Benefits Payable Commencing | Benefit Class Code | Basic Benefit Rate Per Year of Credited Service For Months Commencing | | |
|---|---|---|---|---|
| | | 10-1-90 through 9-1-91 | 10-1-91 through 9-1-92 | 10-1-92 and After |
| October 1, 1990 and After | A | $28.35 | $29.50 | $30.70 |
| | B | 28.60 | 29.75 | 30.95 |
| | C | 28.85 | 30.00 | 31.20 |
| | D | 29.10 | 30.25 | 31.45 |

(2) The monthly pension benefit payable to an employe who retires at his option at a date selected by the employe shall be multiplied by a percentage as set forth in the following table:

| Age When Pension Commences | Percentage* |
|---|---|
| 42 | 21.0% |
| 43 | 22.6 |
| 44 | 24.3 |
| 45 | 26.1 |
| 46 | 28.2 |
| 47 | 30.4 |
| 48 | 32.8 |
| 49 | 35.4 |
| 50 | 38.3 |
| 51 | 41.5 |
| 52 | 45.0 |
| 53 | 48.9 |
| 54 | 53.2 |
| 55 | 57.9 |
| 56 | 63.5 |
| 57 | 69.4 |
| 58 | 75.2 |
| 59 | 80.8 |
| 60 | 86.7 |
| 61 | 93.3 |
| 62 or over | 100.0 |

*Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employe is under the age he will attain at his next birthday.

If an employe:

(i) with 30 or more years of credited service retires at his option, or

(ii) whose combined years of age and years of credited service (to the nearest 1/12 in each case) shall total 85 or more retires at his option,

the monthly basic benefits otherwise payable to him after age 62 and one month shall be redetermined without any such reduction.

Art. II, 4(a)(2)

6

7

Art. II, 4(d)

(3) The basic benefit payable in any month will not be reduced below an amount which results in the early retirement supplement paid to a participant in such month, under Article II, Section 6 (a) (1), exceeding the old age insurance benefits, unreduced on account of age, payable under Title II of the Social Security Act, as amended.

(b) A temporary benefit for each year of credited service up to 30 shall be payable in addition to the monthly basic pension payable to an employe retired under mutually satisfactory conditions, or totally and permanently disabled pursuant to Section 2 (b) or Section 3 above, as set forth in the table immediately following:

| Retires With Benefits Payable Commencing | Monthly Temporary Benefit Amount | |
|---|---|---|
| | Per Year of Credited Service $ | Maximum $ |
| October 1, 1990 through September 1, 1991 | 25.00 | 750.00 |
| October 1, 1991 through September 1, 1992 | 27.20 | 816.00 |
| October 1, 1992 and After | 29.30 | 879.00 |

(c) The monthly temporary benefit determined in (b) above shall be payable until age 62 and one month, or until the age at which the employe becomes or could have become eligible for a Federal Social Security benefit for disability or an unreduced Federal Social Security benefit for age. At such age the temporary benefit shall cease to be payable.

8

(d) An employe discharged for cause after such employe is eligible to retire at his option under Section 2 (a) of this Article II shall be entitled to the benefits provided under Section 4 (a) of this Article II as though he had retired at his option.

(e) The amount of any monthly pension benefit otherwise payable to the employe at retirement, or earlier commencement, will be reduced by the value of any past and future benefits paid or payable to any alternate payee(s) under a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p).

The actuarial value will be used to determine any amount to be paid to any such payee(s), if applicable, and the remaining benefit entitlement of the employe.

Section 5. Pension Benefits to Employe's Surviving Spouse

(a) In lieu of the monthly basic benefit otherwise payable, an employe who retires or is retired pursuant to the normal, early or total and permanent disability retirement provisions of this Article II, or who breaks seniority and is eligible for a deferred pension pursuant to the provisions of Section 2 of Article VII hereof, shall be deemed to have elected automatically a reduced amount of monthly basic benefit to provide that, if his designated spouse shall be living at his death after such election shall have become effective, a survivor benefit shall be payable to such spouse during the spouse's further lifetime. In the event such spouse predeceases such employe, or they are divorced by court decree and a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p) does not provide to the contrary, such employe may cancel the survivor benefit election and have his monthly basic pension benefit restored to the amount payable without such election, effective the first day of the third month following the month in

9

Art. II, 5(a)

which the Corporation receives (i) evidence satisfactory to the Corporation of the spouse's death, or (ii) such employe's written revocation of the election because of divorce, on a form approved by the Corporation and accompanied by evidence satisfactory to the Corporation of a final decree of divorce.

The automatic election provided in this subsection (a) shall become effective on the later of (i) the commencement date of the employe's monthly pension benefit, (ii) the first day of the month following the month in which the employe attains age 55 (except that this item (ii) shall not apply to an employe with 30 or more years of credited service or to an employe who retires with benefits payable prior to age 55 pursuant to Section 2 (b) of this Article II), or (iii) the first day of the month following the month in which the employe has been married one year if he is married when the election would otherwise become effective but such marriage has been in effect less than one year at that date.

An employe may prevent the automatic election provided in this subsection (a); (i) at the time of application for retirement benefits, or (ii) if later, during the month prior to that in which he attains age 55 (except that this item (ii) shall not apply to an employe with 30 or more years of credited service or to an employe who retires with benefits payable prior to age 55 pursuant to Section 2 (b) of this Article II) by executing a specific written rejection of such election, which includes the written consent of his spouse witnessed by the plan representative or a notary public, on a form approved by the Corporation and filing it with the Corporation.

Information regarding this coverage is included in the summary plan description, which will be provided to each employe. Within a reasonable period prior to the annuity starting date, each participant shall be

10

Art. II, 5(a)

provided a written explanation of: (i) the terms and conditions of the surviving spouse coverage; (ii) the participant's right to make and the effect of an election to waive the surviving spouse coverage; (iii) the rights of the participant's spouse; and (iv) the right to make and the effect of revocation of a previous selection to waive the surviving spouse coverage.

(b) The beneficiary of a survivor benefit election shall be only the person who is the employe's spouse at such time and who has been his spouse for at least one year immediately prior to the effective date of such election.

(c) A survivor benefit election shall be revoked automatically upon the death of the employe or his designated spouse, or both, prior to the effective date of the election.

(d) A survivor benefit election shall be irrevocable at and after its effective date if the employe and his designated spouse shall be living at such date, except as otherwise provided in Section 5 (a) of this Article II.

(e) For an employe who makes a survivor benefit election or who is deemed to have made such election under this Section 5, the reduced amount of his monthly basic benefit referred to in (a) above shall be equal to an amount determined by multiplying the monthly basic benefit otherwise payable to the employe by 95% if the employe's age and his eligible spouse's age are the same; except that, in the case of an employe whose basic benefits are subject to redetermination at age 62 and one month the amount of reduction in his monthly basic benefit before such age for the survivor benefit election shall be based on the monthly basic benefit payable to such employe after age 62 and one month. Such percentage shall be increased by one-half of one percent (1/2%) (up to a maximum of 100%) for each 12 months in excess of

11

Art. II, 5(e)

five (5) years that the spouse's age exceeds the employe's age and shall be decreased by one-half of one percent (1/2%) for each 12 months in excess of five (5) years that the spouse's age is less than the employe's age.

(f) The survivor benefit payable to the surviving spouse of a retired employe who has completed an election or who is deemed to have made an election under this Section 5, and who dies after such election becomes effective, shall be a monthly benefit for the further lifetime of such surviving spouse equal to 60% of the reduced amount of such employe's monthly basic benefit as determined in (e) above; except that the survivor benefit payable to the surviving spouse of an employe whose basic benefits are subject to redetermination at age 62 and one month pursuant to Section 4 (a) of this Article II, shall be based on the monthly basic benefit payable to such employe after age 62 and one month.

(g) The surviving spouse of an employe

(i) who dies on or after attaining age 65, or on or after attaining age 55 and after the employe is eligible to retire at his option under Section 2 (a) (1) or 2 (a) (2) of this Article II, or at any age with 30 or more years of credited service, but before the first day of the month following the date on which the employe retires or before the commencement date of the employe's monthly pension in the case of an employe who retires at his option and defers the receipt of his monthly pension, and

(ii) who, if he had retired at the date of his death, would have been eligible for the election under subsection (a) of this Section 5,

shall be entitled to a monthly benefit during the spouse's lifetime, terminating with the last monthly payment before the spouse's death. The monthly

12

Art. II, 5(g)(iii)

benefit payable to the surviving spouse shall be the amount such spouse would have been entitled to receive under subsection (f) of this Section 5, if the employe had retired on the date of his death under Sections 1, 2 (a) (1), 2 (a) (2) or 2 (a) (3), whichever is applicable, of this Article II with benefits commencing the first of the following month and had effectively made the election under subsection (a) of this Section 5.

(h) The death of an otherwise eligible employe who has retired under Section 3 of this Article II, occurring on or after his attaining age 55, but before the first day of the month following the date on which he dies, shall not disqualify an otherwise eligible surviving spouse from receiving a benefit hereunder.

Section 6. Supplements

(a) An employe who retires under Section 2 (other than an employe referred to in Section 4 (d) of this Article II, unless the Corporation or an Impartial Umpire under an applicable collective bargaining agreement determines his discharge should not result in his being ineligible for benefits under this Section 6), or 3 of this Article II, and who files his application for a pension within five years of the last day he worked for the Corporation and who agrees to restrict his participation in the work force before age 62 and one month as provided in (e) below will receive, in addition to his pension, certain supplements as set forth below:

(1) If the employe retires under Section 2 or 3 of this Article II with 30 or more years of credited service at the date of his retirement, he shall be entitled to a monthly early retirement supplement until age 62 and one month in an amount which when added to his monthly pension under this Plan will equal the amount of total monthly benefit applicable to him as

13

Art. II, 6(a)(1)

provided in the table set forth below, subject to subsequent provisions of this Section 6:

| | Total Monthly Benefit Rate For Determining Monthly Early Retirement Supplement Prior to Age 62 and One Month For Retirements With 30 or More Years of Credited Service | | |
|---|---|---|---|
| Retirement With Benefits Payable Commencing | 10-1-90 through 9-1-91 | 10-1-91 through 9-1-92 | 10-1-92 and After |
| October 1, 1990 and After | $1,600 | $1,700 | $1,800 |

(2) If the employe retires at his option after attaining age 55 with benefits payable commencing on or after October 1, 1990 with less than 30 years of credited service, he shall be entitled to a monthly interim supplement until he attains age 62 and one month equal to the amount applicable to him as provided immediately below for each year of credited service that he had at the date of his retirement, subject to the provisions of (b), (e) and (g) of this Section 6:

14

Art. II, 6(a)(2)

| | Monthly Amount* and Effective Date of Interim Supplement Payable Prior to Age 62 and One Month for Each Year of Credited Service | | |
|---|---|---|---|
| | Retired With Benefits Payable Commencing on or After October 1, 1990 | | |
| Age at Retirement | 10-1-90 | 10-1-91 | 10-1-92 |
| 55 | $11.00 | $12.00 | $12.90 |
| 56 | 12.95 | 14.10 | 15.20 |
| 57 | 15.70 | 17.05 | 18.40 |
| 58 | 18.40 | 20.00 | 21.55 |
| 59 | 20.55 | 22.40 | 24.10 |
| 60 | 23.75 | 25.85 | 27.85 |
| 61 | 23.75 | 25.85 | 27.85 |

*Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employe is under the age he will attain at his next birthday.

(b) The early retirement supplement under provision (a) (1) of this Section 6 for an employe who retires at his option shall be calculated assuming that his basic pension commences immediately after retirement, and such early retirement supplements and the interim supplement under provision (a) (2) of this Section 6 shall be reduced for any month prior to age 62 and one month, for which he becomes or could have become eligible for a Federal Social Security benefit, by an amount equal to the amount of the temporary benefit to which he would have been entitled if he had retired under Section 2 (b) of this Article II.

15

Art. II, 6(c)

(c) The early retirement supplement under provision (a) (1) of this Section 6 for an employe who retires under Section 2 (b) or Section 3 of this Article II shall be calculated on the assumption that he will receive a temporary benefit until age 62 and one month, even if such temporary benefit is not received by the employe until such age because of his entitlement to Social Security Benefits.

(d) The early retirement supplement under provision (a) (1) of this Section 6 for an employe who does not prevent the automatic election of surviving spouse coverage provided under Section 5 of this Article II shall be calculated on the basis of the monthly pension he would have received if he had prevented such automatic election.

(e) Any of the supplements to which an employe is entitled shall commence on the first day of the month following the date on which the employe retires and shall be payable monthly thereafter until and including the first day of the month in which he dies, or his pension ceases for any other reason, or he is reemployed by the Corporation, or he attains age 62 and one month, whichever occurs first, provided, however, that if an employe entitled to receive a supplement has earnings after retirement in excess of the following annual earnings limitation in any calendar year before he attains age 62 and one month, such earnings being defined for this purpose as the type counted for the earnings test under the Federal Social Security Act or the corresponding type in any future Federal legislation amending, superseding, supplementing or incorporating the Federal Social Security Act, a penalty equal to double the amount by which such earnings exceed the amount permitted shall be charged against each succeeding monthly supplement which he would otherwise be entitled to receive until the full amount of such penalty is

16

Art. II, 6(e)

satisfied, it being understood that penalties and charges herein shall be cumulative if appropriate:

| Calendar Year | Annual Earnings Limitation Amount |
|---|---|
| | $ |
| 1990 | 10,000 |
| 1991 | 10,000 |
| 1992 | 15,000 |
| 1993 | 15,000 |

An employe receiving a monthly early retirement supplement or interim supplement may be required to certify whether his earnings have been in excess of the permitted amount and to furnish verification of the amount of his earnings. Unless repaid by the employe in a lump sum, any overpayments of a supplement made after an employe incurred a penalty because of excess earnings in accordance with the preceding paragraph shall be deducted from future monthly benefits payable to him under this Pension Plan.

(f) If a retired employe has been receiving a pension under Section 3 of this Article II and has been receiving a supplement and on the basis of medical evidence satisfactory to the Corporation it is found that he is no longer totally and permanently disabled and his seniority is restored, or if he is reemployed by the Corporation, he shall not thereby forfeit any right he may thereafter have to receive a supplement if he thereafter retires under this Pension Plan.

(g) If the total of the employe's monthly pension under this Pension Plan and his monthly early

17

Art. II, 6(g)

retirement supplement or interim supplement receivable as computed above would exceed 70% of his final base pay, his monthly supplement (but not his monthly pension) shall be reduced to the extent required so that such monthly pension plus his supplement will equal 70% of his final base pay. For this purpose, an employee's final base pay shall mean 173 1/3 times his Base Hourly Rate as defined in Article X.

## Section 7. Special Benefits

(a) A retired employee, or a surviving spouse, (i) age 65 or older, or (ii) under age 65 and enrolled in the voluntary "Medicare" coverage that is available under the Federal Social Security Act by making contributions (in either case excluding the spouse of a former employee who received a deferred vested pension benefit under Article VII of the Plan) who is receiving a monthly benefit under Article II of the Plan which commenced prior to October 1, 1979, subject to (d) below, shall receive a monthly special benefit equal to:

(i) the lesser of $28.00 or the generally applicable "Medicare" Part B premium for months commencing on or after January 1, 1990,

(ii) the lesser of $31.00 or the generally applicable "Medicare" Part B premium for months commencing on or after January 1, 1991,

(iii) the lesser of $34.00 or the generally applicable "Medicare" Part B premium for months commencing on or after January 1, 1992,

(iv) the lesser of $38.50 or the generally applicable "Medicare" Part B premium for months commencing on or after January 1, 1993.

(b) In no event shall such payment commence prior to the first day of the month following the earlier of (i) the month during which age 65 is attained, or

18

Art. II, 7(b)

(ii) for enrollments effective prior to October 1, 1990 receipt by the Corporation of application on a form provided for this purpose from an otherwise eligible individual under age 65, except that, with respect to an otherwise eligible individual under age 65, payment shall commence with the first month of such enrollment, but in no event prior to October 1, 1979.

(c) Not more than one such payment shall be made to any individual for any one month. No such payment shall be made to any individual under age 65 for any month such individual is not enrolled for such voluntary "Medicare" coverage. No such payment shall be made under this Plan to any individual who retires with benefits payable commencing on or after October 1, 1979.

(d) Effective January 1, 1991, the special benefit payable to an individual who is not enrolled in "Medicare" Part B as of October 1, 1990, but who was receiving a special benefit, will be limited to $28.00 per month. Such an individual will become entitled to the schedule of payments in subsection (a) above, upon proof of enrollment in "Medicare" Part B. Thereafter, continued receipt of a special benefit will be contingent on maintenance of "Medicare" Part B enrollment.

(e) For an individual enrolled in "Medicare" Part B as of October 1, 1990, or who first becomes eligible for "Medicare" Part B on or after October 1, 1990, receipt of a special benefit on and after January 1, 1991 is contingent upon continued enrollment in "Medicare" Part B.

## Section 8. Benefits for Employees Who Retired With Benefits Payable Commencing Prior to October 1, 1990

An employee who retired under Article II of the Plan with benefits payable commencing prior to October 1, 1990, or the eligible surviving spouse of

19

Art. II, 8

such an employe, shall be entitled to the benefits, if any, under the Plan as it existed immediately prior to such date, except that

(a) (1) Benefits payable to such retired employes or surviving spouses shall be increased to the extent necessary to provide monthly benefits equal to the benefits which would have been payable had the basic pension benefits payable to the employe after age 65 been based on the following table:

| Retirement With Benefits Payable Commencing | Benefit Class Code | Basic Benefit Rate Per Year of Credited Service For Months Commencing October 1, 1990 and After $ |
|---|---|---|
| Prior to October 1, 1979 | N/A | 20.00* |
| October 1, 1979 through September 1, 1980 | A<br>B<br>C<br>D | 21.25<br>21.50<br>21.75<br>22.00 |
| October 1, 1980 through September 1, 1981 | A<br>B<br>C<br>D | 21.35<br>21.60<br>21.85<br>22.10 |
| October 1, 1981 through September 1, 1984 | A<br>B<br>C<br>D | 21.45<br>21.70<br>21.95<br>22.20 |
| October 1, 1984 through September 1, 1985 | A<br>B<br>C<br>D | 24.10<br>24.35<br>24.60<br>24.85 |

*Including, if applicable, $1.00 waived for election of a special survivor option.

(Continued On Next Page)

20

Art. II, 8(a)(1)

(Continued From Preceding Page)

| Retirement With Benefits Payable Commencing | Benefit Class Code | Basic Benefit Rate Per Year of Credited Service For Months Commencing October 1, 1990 and After $ |
|---|---|---|
| October 1, 1985 through September 1, 1986 | A<br>B<br>C<br>D | 24.20<br>24.45<br>24.70<br>24.95 |
| October 1, 1986 through September 1, 1987 | A<br>B<br>C<br>D | 24.30<br>24.55<br>24.80<br>25.05 |
| October 1, 1987 through September 1, 1988 | A<br>B<br>C<br>D | 27.30<br>27.55<br>27.80<br>28.05 |
| October 1, 1988 through September 1, 1989 | A<br>B<br>C<br>D | 27.40<br>27.65<br>27.90<br>28.15 |
| October 1, 1989 and prior to October 1, 1990 | A<br>B<br>C<br>D | 27.50<br>27.75<br>28.00<br>28.25 |

(2) Benefits payable to employes retired on and after October 1, 1973, shall be based on the Benefit Class Code applicable to the employe, determined as though the maximum base hourly rate of the employe's job classification had included the amount of any wage inequity adjustment made applicable to such job classification on or after September 14, 1973, and prior to the employe's loss of seniority.

21

Art. II, 8(b)

(3) If an employe whose monthly basic benefit otherwise would have been redetermined at age 62 attains age 62 on or after March 1, 1982, such redetermination shall be effective at age 62 and one month.

(b) Any temporary benefits payable to such retired employes until age 65 if retired with benefits payable commencing before March 1, 1974, or age 62 if retired with benefits payable commencing on or after March 1, 1974 or age 62 and one month for a retired employe who attains age 62 on or after March 1, 1982, or, in any case, if earlier, until the age at which the employe becomes or could have become eligible for a Federal Social Security benefit for disability or an unreduced Federal Social Security benefit for age shall be increased to the extent necessary to provide monthly temporary benefits equal to the temporary benefits which would have been payable had the temporary benefits payable to the employe prior to such age 65 (or age 62 or age 62 and one month) or earlier age been based on the following:

| Retires With Benefits Payable Commencing | Monthly Temporary Benefit Amount* | |
|---|---|---|
| | Per Year of Credited Service $ | Maximum $ |
| Prior to September 1, 1964 | 11.50 | 300.00 |
| September 1, 1964 and prior to October 1, 1967 | 12.00 | 300.00 |
| October 1, 1967 and prior to October 1, 1970 | 12.25 | 306.25 |
| October 1, 1970 and prior to March 1, 1974 | 12.75 | 318.75 |
| March 1, 1974 and prior to October 1, 1976 | 13.75 | 343.75 |
| October 1, 1976 and prior to October 1, 1978 | 14.25 | 356.25 |
| October 1, 1978 and prior to October 1, 1979 | 15.25 | 381.25 |
| October 1, 1979 and prior to October 1, 1980 | 16.25 | 406.25 |
| October 1, 1980 and prior to October 1, 1981 | 17.25 | 431.25 |
| October 1, 1981 and prior to January 1, 1983 | 18.25 | 456.25 |
| January 1, 1983 and prior to October 1, 1985 | 18.25 | 547.50 |

*Benefit payable for months commencing October 1, 1990.

(Continued On Next Page)

22

23

Art. II, 8(b)

(Continued From Preceding Page)

| Retires With Benefits Payable Commencing | Monthly Temporary Benefit Amount* | |
|---|---|---|
| | Per Year of Credited Service $ | Maximum $ |
| October 1, 1985 and prior to October 1, 1986 | 19.25 | 577.50 |
| October 1, 1986 and prior to October 1, 1987 | 20.25 | 607.50 |
| October 1, 1987 and prior to October 1, 1988 | 20.45 | 613.50 |
| October 1, 1988 and prior to October 1, 1989 | 21.55 | 646.50 |
| October 1, 1989 and prior to October 1, 1990 | 22.65 | 679.50 |

*Benefit payable for months commencing October 1, 1990.

(c) (1) An employe who retired under Article II of this Plan with 30 or more years of credited service who is receiving a monthly supplement which commenced prior to October 1, 1990 shall receive an increase to such monthly supplement as follows:

| Effective Date of Increase | Amount of Increase* | |
|---|---|---|
| | Payable to Age 62 and One Month $ | Payable Between Ages 62 and One Month - 64 $ |
| October 1, 1990 | 75.00 | 37.50 |

*This increase will not result in a total monthly benefit of less than $1,100 for months prior to age 62 and one month, or $550 for months between ages 62 and one month and 64.

24

Art. II, 8(c)(1)

The amount of any monthly supplement payable to an employe who retired under Article II of the Plan with benefits commencing prior to October 1, 1990 shall be redetermined to the amount of supplement which would have been payable had the applicable benefit rates set forth in this Section been in effect when such employe's benefits commenced. If such retired employe is entitled as of October 1, 1990 to receive Social Security benefits, and if he became so entitled before October 1, 1990 any increase in the rate of temporary pension provided in provision (b) of this Section 8 shall not be considered in redetermining his supplement until he ceases to be so entitled.

(2) An employe who retired under Article II of this Plan at his option after attaining age 55 with less than 30 years of credited service who is receiving an interim supplement which commenced prior to October 1, 1990 shall receive, for months commencing on and after October 1, 1990, an increase to such interim supplement, as follows:

| Age at Retirement | Monthly Increase Per Year of Credited Service $ |
|---|---|
| 55 | 0.55 |
| 56 | 0.65 |
| 57 | 0.80 |
| 58 | 0.95 |
| 59 | 1.05 |
| 60 | 1.20 |
| 61 | 1.20 |

(d) The survivor benefit payable to the surviving spouse of a retired employe who has completed an election of a special survivor option and who dies after such election becomes effective, shall be a monthly benefit for the further lifetime of such surviving spouse equal to:

25

Art. II, 8(d)(1)

(1) $7.00 for each year of credited service that such retired employe had at the date of his retirement, with respect to benefits payable for any month commencing October 1, 1991,

(2) $8.00 for each year of credited service that such retired employe had at the date of his retirement, with respect to benefits payable for any month commencing October 1, 1990 through September 1, 1991,

(3) $9.00 for each year of credited service that such retired employe had at the date of his retirement, with respect to benefits payable for any month commencing on or after October 1, 1992.

(e) An employe who retired under Article II of the Plan, or who is eligible for a deferred pension pursuant to the provisions of Section 2 of Article VII of the Plan, and who has surviving spouse coverage in effect but whose designated spouse predeceases him, may have his monthly basic pension benefit restored to the amount payable without such coverage, effective the first day of the third month following the month in which the Corporation receives evidence satisfactory to the Corporation of the spouse's death.

(f) In lieu of receiving a reduced amount of any increase in benefits otherwise payable to him under this Section 8 on or after April 1, 1971 in order to provide an increase in the amount of survivor benefit otherwise payable, an employe who retired under Article II of the Plan with benefits payable commencing prior to November 23, 1970, who is divorced by court decree, and for whom the terms of a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p) do not expressly prohibit cancellation of the survivor annuity, from his designated spouse for whom he has a survivor benefit

26

Art. II, 8(f)

coverage in effect, may elect to receive the full amount of such increase. To make such election he must complete a form approved by the Corporation and file it with the Corporation, accompanied by evidence satisfactory to the Corporation of a final decree of divorce, in which case such election shall become effective with respect to benefits falling due for months commencing on the first day of the third month following the month in which the Corporation receives such completed election form and final decree of divorce.

(g) An employe who retired or retires under Article II of the Plan with benefits payable commencing on or after January 1, 1962, who marries, or remarries, subsequent to the earliest date a survivor benefit coverage was in effect, or was not in effect on such date solely because the retired employe was not then married, may elect, or re-elect, a survivor benefit coverage. Any such coverage, and the benefits thereunder, shall be provided under the terms and conditions of the Plan in effect at the time of the employe's retirement. Such coverage shall become effective on the first day of the third month following the month in which the Corporation receives a completed election form, but in no event before the first day of the month following the month in which the retired employe has been married one year.

No election provided hereunder shall become effective under any circumstance for any retired employe whose completed election form is received by the Corporation after the first day of the month in which the retired employe has been married one year.

This subsection (g) also shall be applicable to an employe retired with benefits payable commencing on or after October 1, 1990.

27

Art. II, 8(h)

(h) Monthly benefits payable under this Section 8 on and after October 1, 1990 shall not be limited by the 70% benefit limitation in Section 6(g) of this Article II.

(i) The monthly amount of any lifetime supplement payable to an employe retired with benefits payable commencing on or after March 1, 1974 with 30 or more years of credited service shall be $35.00.

Section 9.  Employes Not Actively at Work

The absence of an employe from active work at the time such employe would be eligible to retire under the Plan shall not preclude the employe's retirement without return to active work.

Section 10.  Joint and Survivor Coverage

(a) In lieu of the monthly basic benefit otherwise payable, an employe who retires pursuant to the provisions of Section 3 of this Article II who is under age 55 and has less than 30 years of credited service shall be deemed to have elected automatically a reduced amount of monthly basic benefit, up to and including the month in which he dies or attains age 55, whichever occurs first, and a monthly survivor's benefit, beginning on the first day of the month after the retired employe would have reached age 55 if he dies before the first day of the month after he would have reached age 55, shall be payable to his designated spouse during the further lifetime of the spouse.

(b) This automatic election shall be deemed to have been made at the time the employe shall apply or shall have applied for a disability pension benefit (with the election being effective the first day of the month for which his first benefit under the Plan is payable).

28

Art. II, 10(c)

(c) The automatic election provided in this Section 10 shall be applicable only with respect to a spouse to whom the employe is married on the date of such election and only if the retired employe and his spouse shall have been married throughout the one-year period ending on the date of the retired employe's death.

(d) An employe may prevent the automatic election provided in this Section 10 at the time such election would otherwise be deemed to have been made, as set forth in subsection (b) of this Section 10, by specific written rejection which includes the written consent of his spouse witnessed by the plan representative or a notary public on a form approved by the Corporation.

(e) In any event, the election shall automatically be canceled:

(i) if the employe's disability retirement status terminates other than by death prior to the first day of the month after the retired employe attains age 55, or

(ii) if the retired employe survives on a disability retirement status until the first day of the month after he attains age 55, at which time the coverage described in Section 5 of this Article II becomes applicable.

(f) The amount of the monthly basic benefit payable to an employe deemed to have made the election provided hereunder shall be determined by reducing actuarially the amount of such benefit for the cost of the survivor benefit payable in the event of the retired employe's death before the first of the month following the attainment of age 55. The actuarial reduction shall be based on the age of the retired employe and his spouse (the age of each being

29

Art. II, 10(f)

determined as the age at his or her birthday nearer the date on which the benefits commence) and shall reflect the higher mortality associated with being disabled. Reduction factors at selected ages for disability survivor coverage before age 55 are set forth in the following table:

|  | Age Difference Between Disabled Employe and Spouse | | | | |
|---|---|---|---|---|---|
| Age of Employe When Benefits Commence | Spouse Is: | | | | |
|  | 10 Years Younger | 5 Years Younger | Same Age | 5 Years Older | 10 Years Older |
|  | % | % | % | % | % |
| 30 | 8.6 | 8.1 | 7.5 | 6.7 | 5.9 |
| 35 | 10.4 | 9.9 | 9.2 | 8.3 | 7.2 |
| 40 | 12.5 | 11.8 | 11.0 | 10.0 | 8.8 |
| 45 | 14.3 | 13.5 | 12.7 | 11.6 | 10.3 |
| 50 | 13.9 | 13.2 | 12.4 | 11.4 | 10.2 |
| 51 | 13.1 | 12.5 | 11.7 | 10.8 | 9.7 |
| 52 | 10.4 | 9.9 | 9.3 | 8.6 | 7.7 |
| 53 | 3.4 | 3.2 | 3.0 | 2.8 | 2.5 |
| 54 | 3.4 | 3.3 | 3.1 | 2.8 | 2.5 |

*NOTE: Actuarial reduction factors for ages not shown will be calculated on the same basis as the factors shown.*

(g) The amount of the monthly benefit payable to the surviving spouse of a retired employe deemed to have made the election specified hereunder shall be 50% of the amount of the monthly basic benefit payable to the retired employe after the reduction provided in subsection (f) of this Section 10.

(h) Anything in the Plan to the contrary notwithstanding, if the designated spouse of a retired employe deemed to have made the election provided

30

Art. II, 10(h)

hereunder shall predecease such retired employe, or they are divorced by court decree and a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p) does not provide to the contrary, such retired employe shall have his monthly basic benefit restored to the amount payable without such election, effective the first day of the third month following the month in which the Corporation receives evidence satisfactory to the Corporation of the spouse's death or divorce.

(i) No benefit shall be payable under this Section 10 for any month for which benefits are payable under Article II, Section 5(f) or Section 11 of this Plan.

(j) Information regarding this coverage is included in the summary plan description, which will be provided to each employe. Within a reasonable period prior to the annuity starting date, each participant shall be provided a written explanation of: (i) the terms and conditions of the surviving spouse coverage; (ii) the participant's right to make and the effect of an election to waive the surviving spouse coverage; (iii) the rights of the participant's spouse; and (iv) the right to make and the effect of a revocation of a previous selection to waive the surviving spouse coverage.

**Section 11.  Pre-Retirement Survivor Coverage to Comply With the Retirement Equity Act of 1984**

(a) An employe who:

(i) has either 5 or more years of credited service, or 5 years of "service" as provided under Article III, Section 6, or

(ii) breaks seniority on or after October 1, 1990 and who is eligible for a deferred pension under Article VII, Section 2,

31

Art. II, 11(a)(ii)

and in either case is not eligible for the survivor benefit coverage provided under Section 5 of this Article II, shall have the pre-retirement survivor coverage described herein.

Such coverage shall remain in full force and effect until the date on which the employe or former employe becomes eligible for the survivor benefit coverage provided under Article II, Section 5, at which time the pre-retirement survivor coverage described herein shall cease to be effective.

In the event the employe or former employe predeceases the designated spouse while the pre-retirement survivor coverage provided hereunder is in effect, the designated spouse shall be eligible, during the further lifetime of such spouse, for a monthly benefit commencing on the first of the month following the month in which the employe or former employe would have become eligible, except for the fact that he died, to retire at the option of the employe.

(b) The survivor coverage provided hereunder for an employe or former employe shall be effective on the date the employe or former employe attains 5 years of credited service or ''service'' as provided under Article III, Section 6.

The amount of any such monthly survivor benefit shall be determined by the basic benefit rate in effect for the employe on the date of death of such employe, or the date seniority broke for a former employe.

(c) The survivor coverage provided hereunder shall be effective with respect to a spouse to whom the employe or former employe is married, but only if the couple shall have been married throughout the one-year period ending on the date of the employe's or former employe's death.

32

Art. II, 11(d)

(d) Subsections (b) and (c) notwithstanding, if an employe or former employe marries or remarries, such coverage shall be in effect in favor of his spouse upon such marriage or remarriage, unless, in the case of remarriage, a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p) requires such coverage to remain in effect for the former spouse. The effective date of any such coverage shall be in accordance with subsection (c) of this Section 11.

(e) In the event of divorce, the employe or former employe can revoke the coverage provided hereunder without spousal consent, unless a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p) provides to the contrary.

(f) The coverage provided hereunder shall be canceled automatically on the date when any employe or former employe becomes eligible for the survivor coverage provided under the provisions of Article II, Section 5 of the Plan.

(g) The monthly benefit amount payable hereunder to any eligible surviving spouse shall be 50% of the monthly amount of the basic benefit as determined in Article VII, Section 2(b) otherwise payable at the (i) date of death to the employe, or (ii) date seniority broke for a former employe, after any reduction provided in Section 2(c) of Article VII.

(h) No benefit shall be payable under this Section 11 for any month for which benefits are payable under Article II, Section 5 or Section 10 of this Plan.

(i) Information regarding the coverage provided hereunder is included in the summary plan description, which will be provided to each employe covered by the Pension Plan, in accordance with The Employee Retirement Income Security Act (ERISA).

33

Art. II, 11(j)

(j) The pre-retirement survivor coverage provided hereunder will apply to eligible employes and former employes separated from service:

(1) whose last day worked for the Corporation was on or after October 1, 1976, and

(2) who have entitlement to but have not commenced receipt of deferred vested benefits, and

(3) who are alive as of August 23, 1984.

## ARTICLE III

## CREDITED SERVICE

**Section 1. Credited Service Subsequent to October 1, 1950**

(a) (1) Credited service shall be computed for each calendar year for each employe on the basis of total hours compensated by any plant or Division of the Corporation during such calendar year while the employe has unbroken seniority. Employment while covered under The GM Special Pension Plan shall not be credited hereunder, except for an employe with seniority on March 1, 1988, who has not received a cash payment representing his accrued benefit under The GM Special Pension Plan. Any calendar year in which the employe has 1700 or more compensated hours shall be counted a full calendar year. Where the employe's total hours compensated during a calendar year are less than 1700 hours, a proportionate credit shall be given to the nearest 1/10 of a year.

(2) For the purpose of computing credited service, hours of pay at premium rate shall be computed as straight time hours.

(b) For the purpose of computing compensated hours under subsection (a) of this Section 1:

34

Art. III, 1(b)(1)

(1) An employe with seniority on or after January 1, 1968 who is absent from work during any calendar year thereafter because of layoff or while on a Corporation approved sick leave, shall be credited with 40 hours for each complete calendar week of such absence during such year in addition to any other hours credited provided that such employe shall have received pay from the Corporation during that year for at least 170 hours, and provided further, that if such absence commences in calendar year 1970, or later, and such layoff or sick leave continues into the following year, he shall be credited with 40 hours for each complete calendar week of absence in the following year, not to exceed 1530 hours of credit for all such absence related to receipt of such pay from the Corporation in the first year.

An employe who is recalled from permanent layoff and returns to work on or after October 1, 1990 shall become eligible for the 1530 hours of credit hereunder, applicable during a sick leave or layoff, on the later of: (1) receipt of pay from the Corporation for at least 170 hours, or (2) the day next following the 12th week of pay from one or more GM plants within a calendar year. If the employe receives pay from the Corporation for 170 or more hours prior to the 12th week in (2) immediately above, the employe shall become eligible for "bank" hours equal to the number of hours worked since recall, plus any "bank" hours to which he was entitled immediately before such return to work, but in no case to exceed 1530 hours.

An employe who returns to work on or after October 1, 1979 and receives pay for a period of less than 170 hours and who thereafter returns to such layoff or sick leave, shall not be disqualified, solely because of the receipt of such pay, from receiving any such credit for which he otherwise would be eligible hereunder. For the purposes of this subsection only, an employe who is laid off subsequent to

35

October 1, 1979 and whose first day of absence due to such layoff is the first regularly scheduled work day in the January next following his last day worked shall be deemed to have been laid off on December 31 of the year in which he last worked. A part-time employe shall be credited for any week of such absence in the same percentage relationship as such employe's regular part-time schedule is to 40 hours.

An employe who (i) is at work on or after October 1, 1990;(ii) has 10 or more years of seniority at time of layoff commencing on or after October 1, 1990; (iii) while on such layoff has received the maximum of 1530 hours of credit for periods of absence due to layoff or Corporation approved sick leave in accordance with the preceding paragraph of this Section 1(b)(1); and (iv) continues thereafter to be absent due to such layoff shall be credited with 40 hours for each complete calendar week of absence due to such layoff up to a maximum of 1700 hours of credit.

(2) An employe who is absent from work because of occupational injury or disease incurred in the course of such employe's employment with the Corporation, and on account of such absence receives Workers' Compensation while on Corporation approved leave of absence shall be credited with 40 hours for each complete calendar week of such absence after September 1, 1961.

(c) Any salaried employe transferred to an hourly-rate job who thereby becomes an employe covered by the Plan shall have credited to the nearest 1/10 of any credited service the employe had as of the date of such transfer under any Corporation retirement plan for salaried employes.

(d) If an employe who retired is retired, such employe may accumulate additional credited service by reason of such reemployment.

36

(e) For the purpose of computing compensated hours under subsection (a) of this Section 1:

(1) An employe who after October 1, 1950 and prior to June 1, 1955 was absent from work because he entered into active service in the armed forces of the United States and who was given a Corporation approved leave of absence for such period shall be credited with the number of hours that the employe would have been scheduled to work during such absence.

(2) An employe, who on or after June 1, 1955 was or is absent from work to enter into (or remain in) active service in the armed forces of the United States and for that reason was or is given a Corporation approved leave of absence, shall be credited with 40 hours for each complete calendar week that he is on such leave; provided, however, that credited service based on such hours shall not exceed four years (including credited service, if any, granted under subsection (e)(1) of this Section 1), or such longer period during which he has reemployment rights pursuant to any Federal law, and provided, further, that the employe is reemployed in accordance with the terms of such leave of absence or, if reemployed by the Corporation at a location other than the location from which the leave was granted, within 90 days from the date of his discharge from the armed forces.

(f) Any employe hired on an hourly-rate job by a plant or Division of the Corporation, who has credited service under any Corporation retirement plan for salaried employes or who has lost credited service under any such plan, shall, upon making proper application, have such service credited to the nearest 1/10 year; provided that the employe acquires or acquired seniority following the loss of such credited service.

37

Art. III, 1(g)

(g) If a former salaried employe who is entitled to a deferred retirement benefit under Part A of the General Motors Retirement Program for Salaried Employes is reemployed by the Corporation and acquires seniority prior to the commencement of such deferred retirement benefit, such employe shall, upon making proper application, have reinstated, in lieu of the deferred retirement benefit, the credited service lost at the time the employe became entitled to such deferred retirement benefit.

(h) An employe with at least five years of seniority:

(1) on January 1, 1968 who was absent from work because of layoff during any calendar year after December 31, 1955 and before January 1, 1963, or

(2) on December 10, 1973 who was absent from work because of layoff during any calendar year after December 31, 1950 and before January 1, 1956, or

(3) on October 1, 1979 who was absent from work because of layoff during any calendar year after December 31, 1962 and before January 1, 1968, or

(4) on October 1, 1984 who was absent from work because of layoff during any calendar year after December 31, 1978 and before January 1, 1984

shall be credited with 40 hours for each complete calendar week of such absence, not previously credited under this Section 1, during which he had seniority multiplied by a percentage as set forth in the following table:

38

Art. III, 1(h)(4)

| Employe's Seniority on January 1, 1968 in the Case of (1) Above or December 10, 1973 in the Case of (2) Above or October 1, 1979 in the Case of (3) Above or October 1, 1984 in the Case of (4) Above | % |
| --- | --- |
| 20 years or more | 100 |
| 15 years but less than 20 years | 75 |
| 10 years but less than 15 years | 50 |
| 5 years but less than 10 years | 25 |

provided that the employe makes proper application.

(i) In no event shall any employe be credited with more than 1700 hours, including compensated hours, in any calendar year. No employe shall be credited with any service after retirement. There shall be no duplication of credited service under the Plan. Not more than one year of credited service shall be credited to any employe in any calendar year, except as otherwise provided in Section 5 of this Article III with respect to foundry service.

(j) Notwithstanding any other Section of this Article III, in the case of an employe who shall retire on or after October 1, 1990, the employe's credited service for the period before January 1, 1966 shall not be less than the employe's seniority as of December 31, 1965 as determined under the Collective Bargaining Agreement.

39

Art. III, 2

## Section 2. Loss of Credited Service

An employe will lose all credited service for purposes of this Plan:

(a) if the employe quits,

(b) if the employe is discharged or released,

(c) if the employe's seniority is broken for any other reason.

## Section 3. Reinstatement of Credited Service

(a) Any employe with seniority on or after October 1, 1990 who breaks seniority and thereby loses or has lost credited service under Section 2 of this Article III and then is or was later reemployed by any plant or Division of the Corporation shall, upon making proper application, have such credited service reinstated provided the employe subsequently acquires or acquired seniority.

(b) Any employe retired under the provisions of this Plan who subsequently has seniority reinstated, will have credited service at the time of retirement reinstated.

## Section 4. Service With a Foreign Subsidiary

An employe with seniority on or after October 1, 1990 whose employment as an hourly or salaried employe with a directly or indirectly wholly-owned or substantially wholly-owned foreign subsidiary of General Motors Corporation has been terminated other than by retirement, shall be granted credited service under this Plan for any periods of active service with such foreign subsidiary or, if greater, the amount of service credited to such employe under any pension or retirement plan of the foreign subsidiary at the time of his termination, provided such service was prior to

40

Art. III, 4

his most recent period of active service credited under this Plan.

Any monthly benefits payable under this Plan to a retired employe who has received credited service under this Section 4 will be reduced by an amount equivalent to the total of any monthly benefits that could be payable to such employe under any retirement plan to which the foreign subsidiary has contributed, excluding, however, any such plan or any portion of any such plan providing retirement benefits purchased solely by voluntary employe contributions. Any survivor's benefits payable under this Plan to a survivor of such an employe shall be subject to similar reduction by monthly survivor's benefits payable under any plan to which the foreign subsidiary has contributed.

## Section 5. Foundry Service

An employe with seniority on or after October 1, 1990 who at retirement has over 10 years of credited service which he accrued while employed on certain foundry job classifications as set forth in Appendix B, shall receive additional credited service related thereto. Total credited service for any such employe who retires with benefits payable commencing on or after October 1, 1975 shall be the sum of (i) credited service otherwise credited to him, and (ii) any such additional credited service which shall be credited to him in accordance with the following table:

| Years of Credited Service Credited on Foundry Jobs | Additional Credited Service |
| --- | --- |
| For years 1 through 10 | 0 |
| For years 10.1 through 25 | 33-1/3% |
| For years over 25 | 20% |

41

Art. III, 5

If any such employe is continuously employed exclusively on such foundry jobs in a calendar year, such additional credited service shall apply to any credited service otherwise credited to him for such year. If any such employe (i) is not continuously employed in a calendar year, or (ii) is employed on other than such foundry jobs in such year, such additional credited service shall apply to any credited service otherwise credited to him for such year in accordance with the following table:

| If Credited Service Otherwise Credited to Employe For Calendar Year is | Additional Credited Service Applies to Such Year Only if Employe Spent Following Minimum Number of Complete Calendar Weeks on Foundry Jobs During Such Year |
| --- | --- |
| 1.0 (year) | 26 |
| .9 | 23 |
| .8 | 21 |
| .7 | 18 |
| .6 | 16 |
| .5 | 13 |
| .4 | 10 |
| .3 | 8 |
| .2 | 5 |
| .1 | 3 |

No additional credited service shall be granted for any calendar year in which any such employe spends less than the minimum required number of complete calendar weeks on such foundry jobs, as indicated above.

If any such employe is on such foundry job at the time he goes on layoff or approved leave of absence, such additional credited service shall apply to any

42

Art. III, 5

credited service otherwise credited to him while on such layoff or approved leave of absence.

**Section 6. Hours, Years and Breaks in Service to Comply With The Employe Retirement Income Security Act of 1974**

(a) An employe who breaks seniority on or after October 1, 1976 who would be eligible for a deferred pension under Article VII, Section 2, except solely for the fact that he does not have at least 5 years of credited service under the foregoing Sections of this Article III, shall be eligible for a deferred pension under the provisions of Article VII, Section 2 if, at the time the employe breaks seniority, he has 5 years of service solely as determined under this Section 6.

(b) The monthly amount of any such deferred pension shall be based solely on the credited service that the employe had under the foregoing Sections of this Article III when he broke seniority.

(c) No employe shall be eligible to be covered under this Section 6 until he (i) attains age 21, or (ii) completes 1 year of service under this Section 6, whichever is later. Retired employes shall participate immediately.

(d) An employe shall complete 1 year of service when he completes 750 hours of service in the 12 consecutive month period beginning with his employment commencement date. If an employe fails to complete 750 hours of service in such period, he shall complete 1 year of service in the first 12 consecutive month period thereafter in which he completes 750 hours of service, measured from each succeeding anniversary of his employment commencement date. Thereafter, an employe shall complete 1 year of service during each 12 consecutive month period in which he completes 750 hours of

43

Art. III, 6(d)

service, measured from the anniversary of his employment commencement date. A year of service under this Section 6 shall include service (i) with affiliated group members accrued subsequent to acquisition, (ii) rendered to the Corporation as a former leased employe (but only upon employe application, supported by substantiation satisfactory to the Corporation of such service), and (iii) rendered to the Corporation as a salaried employe in accordance with I.R.C. Section 414(b), (c), (m), (n), and (o).

(e)  An employe who satisfies the eligibility requirements of this Section 6, and who is otherwise entitled to participate in the Plan, shall commence participation under this Section 6 if he satisfies such requirements (i) between April 1 and September 30, on the first day of the plan year beginning after the date on which such requirements are satisfied, or (ii) between October 1 and March 31, on the first day of the plan year that includes the date such requirements are satisfied, but in no event shall any employe participate hereunder if he breaks seniority prior to such commencement date.

(f)  An employe shall complete an hour of service under this Section 6 for each hour for which he is paid by the Corporation for working or for which he is paid by the Corporation for having been entitled to work. Any hours for which an employe receives pay for having been entitled to work, irrespective of mitigation of damages, shall be credited to the period or periods he was so entitled, rather than to the period in which he receives such pay. There shall be no duplication of any hours of service under this Section 6.

(g)  Solely for purposes of determining years of service for vesting under this Section 6, all of the employe's years of service shall be taken into account except the following: (i) years of service before age 18

44

Art. III, 6(g)

(age 22 prior to October 1, 1985); (ii) years of service before January 1, 1971, unless the employe has at least 3 years of service after December 31, 1970; (iii) years of service prior to any 1-year break in service as defined herein, until the employe completes a year of service after such break; (iv) for non-vested participants under this section, years of service prior to any 1-year break in service if the number of such consecutive breaks equals or exceeds the aggregate number of years of service prior to such break, for a non-vested participant at work on or after October 1, 1985, years of service prior to any 1-year break in service if the number of such consecutive breaks equals or exceeds the greater of 5, or the aggregate number of years of service prior to such break (such aggregate number of years of service before such break shall not include any years of service not required to be taken into account under this Section 6 by reason of any prior break in service); (v) years of service before October 1, 1976, if such service would have been disregarded under rules of the Plan as in effect on October 1, 1976, regarding breaks in service; and (vi) any year in which the employe completes less than 750 hours of service.

(h)  An employe shall incur a 1-year break in service under this Section 6 in any 12 consecutive month period during which he does not complete more than 375 hours of service, measured from the anniversary of his employment commencement date. Solely for purposes of determining whether an employe has incurred such 1-year break in service, in addition to hours worked which are paid by the Corporation, any hours for which an employe does not work but for which he is paid by the Corporation for vacation, sickness or disability, or is entitled to be so paid, directly or indirectly, shall be taken into consideration. For any absence from work commencing on and after October 1, 1985 by reason of pregnancy of the individual, childbirth, placement

45

of a child related to an adoption, or for child care purposes immediately following such birth or placement, the employe shall be credited with the hours of work for which he otherwise would have been scheduled, or, if unable to determine such scheduled hours, 8 hours for each work day of such absence, not to exceed a total of 501 hours for any such absence. Such hours shall be credited in the year in which the absence commences if necessary to prevent incurring a 1-year break in service, otherwise such hours shall be credited in the immediately following year.

## Section 7. Asbestos Service

An employe with seniority on or after October 1, 1990 who at retirement has over 10 years of credited service which was accrued while employed on certain asbestos job classifications as set forth in Appendix C, shall receive additional credited service related thereto in the same manner as set forth in Section 5 of this Article III.

## ARTICLE IV
## REDETERMINATIONS ON ACCOUNT OF SOCIAL LEGISLATION

## Section 1. Redeterminations for Federal Social Security Benefits for Age or Disability

(a) The benefits payable for age or disability under the Federal Social Security Act, as amended, as now in effect, or as hereafter amended, which are referred to in the determination of pensions under Article II shall be included in such determination even though the employe either does not apply for, or loses part or all of such payments through delay in applying for them, by entering into covered employment, or otherwise.

46

Art. IV, (b)

(b) Old age benefit payments or disability benefit payments, other than those payable on a basis of "need" or because of military service, under any future federal legislation, amending, superseding, supplementing, or incorporating the Federal Social Security Act, as amended, or benefits provided therein, shall be considered as benefits for age or disability under the Federal Social Security Act for the purposes of the Plan.

(c) If an employe is eligible for a Federal Social Security benefit for disability or an unreduced Federal Social Security benefit for age at the time of retirement or thereafter, such employe shall provide the Corporation with evidence of the effective date of entitlement to such benefit.

## Section 2. Deductions for Workers Compensation

In determining the monthly benefits payable under this Plan, a deduction shall be made unless prohibited by law, equivalent to all or any part of Workers Compensation (including compromise or redemption settlements) payable to such employe by reason of any law of the United States, or any political subdivision thereof, which has been or shall be enacted, provided that such deductions shall be to the extent that such Workers Compensation has been provided by premiums, taxes or other payments paid by or at the expense of the Corporation, except that no deduction shall be made for the following:

(a) Workers Compensation payments specifically allocated for hospitalization or medical expense, fixed statutory payments for the loss of any bodily member, or 100% loss of use of any bodily member, or payments for loss of industrial vision.

(b) Compromise or redemption settlements payable prior to the date monthly pension benefits first become payable.

47

Art. IV, 2(c)

(c) Workers Compensation payments paid under a claim filed not later than two years after the breaking of seniority.

## ARTICLE V

## FINANCING

### Section 1. Trust Fund

The Corporation shall execute a trust agreement with a trustee or trustees selected by the Corporation to manage and operate the pension fund and to receive, hold and disburse such contributions, interest and other income as may be necessary to pay such of the pensions and supplements or portions thereof under this Plan as are not provided for by an insured fund. The Corporation may establish an insured fund with such insurance company or companies as it may select for the payment of such of the pension and supplements or portions thereof under this Plan as are not provided for in a trusted fund.

The Corporation will determine the form and terms of any such trust agreement which may authorize the inclusion of obligations and stock (common and preferred) of the Corporation and its wholly-owned subsidiaries among the investments of the pension fund provided for by such trust agreement; may utilize any investment manager as defined under the Employee Retirement Income Security Act of 1974 or regulations thereunder; may modify any such trust agreement from time to time to accomplish the purposes of this Plan; may remove any trustee, and select any successor trustee; and select and change insurance companies.

### Section 2. Contributions

(a) The Corporation, subject to Article IX, Section 1, shall make such contributions to the trustee

48

Art. V, 2(a)

or pay such premiums under any insured contract for the purposes of providing pensions and supplements under the Plan as shall be required under accepted actuarial principles and Title I of the Employee Retirement Income Security Act of 1974 to maintain the Plan and pension or insured fund in a sound condition and shall pay for expenses incident to the operation and management of the Plan.

(b) The Corporation may charge to the fund expenses necessary for the proper administration of the Plan and investment of the funds, including the direct cost of benefit administration performed by, or on behalf of, the Corporation for the Plan, and Pension Benefit Guaranty Corporation premiums for participants.

(c) No employe shall be required to make any contributions to the Plan.

### Section 3. Irrevocability

(a) The Corporation shall have no right, title or interest in the contributions made by it to the trustee and no part of the pension or insured fund shall revert to the Corporation, except that after satisfaction of all liabilities of the Plan as set forth in Article IX, such contributions as may have been made by the Corporation as the result of overpayments may revert to the Corporation.

(b) The pension benefits and supplements of the Plan shall be only such as can be provided by the assets of the pension fund or by any insured fund and there shall be no liability or obligation on the part of the Corporation to make any further contributions to the trustee or insurance company in event of termination of the Plan. No liability for the payment of pension benefits or supplements under the Plan shall be imposed upon the Corporation, the Officers, Directors or Stockholders of the Corporation, except as otherwise may be required by the Employee Retirement Income Security Act of 1974.

49

Art. VI

# ARTICLE VI
## ADMINISTRATION

**Section 1.**

The Corporation shall be responsible for the general administration of the Plan and for carrying out the provisions thereof.

**Section 2.**

(a) The Corporation shall have all such powers as may be necessary to carry out the provisions of the Plan except as the powers and duties of the Corporation may be modified by any collective bargaining agreement.

(b) Subject to the limitations of (a) above, the Corporation may from time to time establish rules for the administration of the Plan and the transaction of the Plan's business.

(c) In making any such determination or rule, the Corporation shall pursue uniform policies and shall not discriminate in favor of, or against any employe or group of employes.

# ARTICLE VII
## PENSION BENEFITS AND SUPPLEMENTS

**Section 1. Pension and Supplement Payments**

(a)(1) Pensions and supplements shall be paid monthly.

(2) The first monthly payment of an employe's pension other than for total and permanent disability shall become payable with the employe's consent on

50

Art. VII, 1(a)(2)

the first day of the month following the month in which the employe actually retires, and the pension shall be payable monthly thereafter.

(3) Total and permanent disability pension shall be payable monthly during the continuance of total and permanent disability and while the pensioner otherwise remains eligible for such benefits. Such payments shall begin the later of:

(i) the first day of the month which includes the date the required proof of disability is received by the Corporation, or

(ii) the first day of the month which includes the date the employe has been continuously and totally disabled for a period of 5 months.

Successive periods of absence due to the same disability as that upon which claim for total and permanent disability pension is based and aggregating at least five months will be considered the same as one continuous absence provided that the aggregate will not include any such absence which precedes the last day at work by more than one year, or

(iii) the first day of the third month following the date the required proof of disability is received by the Corporation, or

(iv) the first day of the third month following determination by the impartial clinic that the employe is totally and permanently disabled.

These subsections (iii) and (iv) shall not be applicable (a) if the employe dies prior to such date, or (b) where Extended Disability Benefits are less than the benefits payable under this Plan.

(4) A supplement for an employe shall be payable in the manner provided in Section 6 of Article II.

51

Art. VII, 1(a)(5)

(5) Pension and supplement payments shall not be payable with respect to any period for which weekly sickness and accident benefits are payable to the employe under any plan to which the Corporation has contributed. If such sickness and accident benefits during any month are payable for a period of less than 4-1/3 weeks the sum of the monthly pension benefit (excluding any special benefit) and supplement payable for that month shall be reduced by the percentage which such period of sickness and accident benefits is of 4-1/3 weeks.

(b) A pensioner who is reemployed by the Corporation shall cease to receive, during such reemployment, any monthly pension benefits to which the pensioner might otherwise be entitled. Any such reemployed pensioner will have his credited service at the time of retirement reinstated. A reemployed pensioner shall accrue additional credited service as a result of such employment and the monthly pension benefits of such pensioner shall be adjusted with regard to such employment upon subsequent cessation of service.

(c) In the event that it shall be found that any pensioner or surviving spouse to whom a pension or survivor benefit is payable is unable to care for the affairs of such pensioner or surviving spouse because of illness or accident any monthly pension payment and supplement or survivor benefit due (unless prior claim therefor shall have been made by a duly qualified guardian or other legal representative) may be paid to the spouse, parent, brother, sister or other person or party (including private or public institutions) deemed by the Corporation to have incurred expense for such pensioner otherwise entitled to payment. Any such payment shall be a payment for the account of the pensioner and shall be a complete discharge of any liability of the Plan therefor.

52

Art. VII, 1(d)

(d) In order to retire under the Plan, an employe must have unbroken seniority at the time of retirement except that a person who is eligible for benefits under the Guaranteed Income Stream Benefit Program and is not receiving deferred pension benefits under this Plan shall not be precluded from retiring without return to employment even though he shall have incurred a break in seniority while on continuous layoff from the Corporation.

(e) Notwithstanding any other provision of this Section 1, an employe attaining age 70-1/2 on and after January 1, 1988, will commence monthly receipt of his accrued benefits under this Plan, beginning April 1 of the calendar year immediately following the year the employe attains or attained age 70-1/2. No employe shall be eligible to receive any such payment for any month prior to April, 1990, however, and the first such monthly payment shall be April 1, 1990. Only those employes who attained age 70-1/2 during 1988 and 1989 are eligible for any payment under this provision. No employe attaining age 70-1/2 prior to January 1, 1988, shall be eligible hereunder. An employe attaining age 70-1/2 after December 31, 1989, shall have his monthly payment based on his pension benefit accrual as of December 31 of the year in which he attains age 70-1/2. The actual value of the sum of all cash distributions received by any otherwise eligible employe prior to his actual retirement under this Plan will be used as an offset from any additional benefit accrual that might otherwise have been payable to such employe as a result of his working for the Corporation.

Section 2. Retention of Deferred Pension if Separated

(a) Any employe who loses accumulated credited service under the provisions of Article III, Section 2 shall be eligible for a deferred pension if such employe

53

Art. VII, 2(a)

is not retired and eligible for pension benefits pursuant to Article II, and provided the credited service of such employe at separation is at least 5 years, or such employe satisfies the "service" requirements of Article III, Section 6.

(b) The monthly amount of such deferred pension for an employe breaking seniority on or after October 1, 1990 shall be a basic benefit for each year of credited service that he had when he broke seniority, determined by his Benefit Class Code when he broke seniority as set forth in the table immediately following:

| Date Seniority Broke | Benefit Class Code | Basic Benefit Rate |
|---|---|---|
| | | $ |
| October 1, 1990 through September 30, 1991 | A | 28.35 |
| | B | 28.60 |
| | C | 28.85 |
| | D | 29.10 |
| October 1, 1991 through September 30, 1992 | A | 29.50 |
| | B | 29.75 |
| | C | 30.00 |
| | D | 30.25 |
| October 1, 1992 and After | A | 30.70 |
| | B | 30.95 |
| | C | 31.20 |
| | D | 31.45 |

(c) A former employe who is eligible for a deferred pension may at the election of such former employe receive

(1) a monthly pension commencing at or after age 65 determined in accordance with subsection (b) of this Section 2, or

54

Art. VII, 2(c)(2)

(2) a monthly pension commencing after age 60 and prior to age 65 determined in accordance with subsection (b) of this Section 2, such pension being reduced by 6/10 of 1 percent for each complete calendar month by which such former employe is under the age of 65 at the date the deferred pension commences, or

(3) a monthly pension commencing after age 55 and prior to age 60 for a former employe who breaks seniority on or after October 1, 1976, determined in accordance with subsection (b) of this Section 2. Such pension shall be multiplied by a percentage as set forth in the following table:

| Age When Pension Commences | Percentage* |
|---|---|
| | % |
| 55 | 42.8 |
| 56 | 46.8 |
| 57 | 51.2 |
| 58 | 55.5 |
| 59 | 59.6 |
| 60 | 64.0 |

*Prorated for intermediate ages computed on the basis of the number of complete calendar months by which the employe is under the age he will attain at his next birthday.

(d) The deferred pension shall be payable commencing the later of the first day of the month following the month (i) in which such employe attains the applicable age set forth in Section 2(c) of this Article VII, or (ii) during which the Corporation receives a written request from such former employe, provided that such written request shall be valid and effective only if it is filed with the Corporation not

55

Art. VII, 2(d)

earlier than 60 days prior to the date such former employe first becomes eligible for such benefit, and, for such employe who broke seniority prior to October 1, 1976, not later than his 70th birthday, otherwise no deferred vested pension benefit shall be payable at any time.

(e) If, prior to the commencement of deferred pension benefits, an employe is reemployed by the Corporation and: (1) acquires seniority, or (2) is reemployed by, and works for, the Corporation at the plant where he worked immediately prior to the loss of his credited service, or (3) dies after having qualified for a deferred pension in accordance with this Section 2, such employe shall, in lieu thereof, have reinstated the credited service in effect when such deferred pension was granted; provided that if an employe with 10 or more years of credited service

(1) is reemployed by, and works for, the Corporation within 36 months of the date he lost credited service under Article III, Section 2, and

(2) becomes disabled while employed by the Corporation prior to acquiring 5 months of seniority, and such disability is continuous for a period of 5 months during which he makes proper application and submits medical evidence satisfactory to the Corporation that he is totally and permanently disabled as set forth in Section 3 of Article II,

he will be deemed eligible for a disability pension under Section 3 of Article II, and such pension will be payable pursuant to Section 1 of Article VII, as though he had been an employe with seniority throughout such disability period.

(f) The amount of any monthly pension benefit otherwise payable to a former employe eligible for a deferred pension will be reduced by the value of any past and future benefits paid or payable to any

56

Art. VII, 2(f)

alternate payee(s) under a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p).

The actuarial value will be used to determine any amount to be paid to any such payee(s), if applicable, and the remaining benefit entitlement of the employe.

Section 3. Non-Alienation of Benefits

The pension fund shall not in any manner be liable for or subject to the debts or liability of any employe, separated employe, retired employe, pensioner or surviving spouse. No right, benefit, pension or supplement at any time under the Plan shall be subject in any manner to alienation, sale, transfer, assignment, pledge or encumbrances of any kind except in accord with provisions of a Qualified Domestic Relations Order within the meaning of I.R.C. Section 414(p). If any person shall attempt to, or shall, alienate, sell, transfer, assign, pledge or otherwise encumber accrued rights, benefits, pensions or supplements under the Plan or any part thereof, or if by reason of bankruptcy or other event happening at any time such benefits would otherwise be received or enjoyed by anyone else, the Corporation in its discretion may terminate the interest of such employe, pensioner or surviving spouse in any such benefit and instruct the trustee to hold or apply it to or for the benefit of such employe, pensioner or surviving spouse, his or her spouse, children or other dependents, or any of them as the Corporation may instruct; provided, however, that any pensioner, or surviving spouse, entitled to a monthly benefit under the Plan:

(a) who elects Blue Cross, Blue Shield, or equivalent coverage, made available under the General Motors Health Care Program for Hourly

57

Art. VII, 3(a)

Employes may, insofar as it is consistent with the regulations governing the plans providing such coverage, participate in such coverage and have deducted from the monthly pension and any supplement, if the monthly pension shall be insufficient, pursuant to written authorization and direction acceptable to the Corporation, the required contribution for such coverage.

(b) will have Federal and state income tax withheld pursuant to Federal and state statutes or regulations unless, only with respect to Federal income tax, elected otherwise by submitting to the Corporation written authorization and direction acceptable to the Corporation.

(c) who elects optional or dependent life insurance coverage(s) made available under the General Motors Life and Disability Benefits Program for Hourly Employes may have deducted from the monthly pension, pursuant to written authorization and direction, acceptable to the Corporation, the required contribution(s) for such coverage(s).

(d) may have amounts of not less than $40.00, but in no event more than 10% of the retired employe's monthly benefit, withheld to repay any outstanding overpayment owing to any benefit plan of the Corporation, pursuant to written authorization and direction acceptable to the Corporation.

58

Art. VIII

# ARTICLE VIII
# MISCELLANEOUS PROVISIONS

## Section 1. No Enlargement of Employment Rights

The Corporation's rights to discipline or discharge employes shall not be affected by reason of any of the provisions of the Plan.

## Section 2. Internal Revenue Service Approval

This Plan as amended is contingent upon and subject to obtaining and retaining such approval of the Commissioner of Internal Revenue as may be necessary to establish the deductibility under Section 404 of the Internal Revenue Code for income tax purposes of any and all contributions made by the Corporation to this Plan and to establish this Plan and related trust as being qualified and tax exempt under Sections 401 and 501(a) or other applicable provisions of the Internal Revenue Code. Any modification or amendment of the Plan may be made retroactively, if necessary or appropriate, to qualify or maintain the Plan as a plan and trust meeting the requirements of Sections 401 and 501(a) of the Internal Revenue Code, as now in effect or hereafter amended, or any other applicable provisions of the federal tax laws, as now in effect or hereafter amended or adopted, and the regulations issued thereunder.

## Section 3. Corporation Board of Directors Approval

Continuation of the Plan as amended in 1990 is contingent upon obtaining the approval of the Corporation's Board of Directors not later than June 1, 1991.

59

Art. VIII, 4

### Section 4. Named Fiduciary

The Finance Committee of the Corporation's Board of Directors shall be the named fiduciary with respect to the Plan. The Finance Committee may delegate to various officers, employes and committees of the Corporation authority to carry out such of its responsibilities as it deems proper to the extent permitted by the Employee Retirement Income Security Act of 1974.

### Section 5. Limitation of Benefits

No benefits paid from this Plan will exceed the limits of Section 415 of the Internal Revenue Code.

## ARTICLE IX
## AMENDMENT AND TERMINATION

### Section 1. Amendment

The Corporation reserves the right to amend, modify, suspend or terminate the Plan by action of its Board of Directors, provided, however, that no such action shall alter the Plan or its operation, except as may be required by the Internal Revenue Service for the purpose of meeting the conditions for qualification of the Internal Revenue Code under Sections 401, 404, and 501(a) and tax deduction under Sections 401, 404, and 501(a) of the Internal Revenue Code, in respect of employes who are represented under a collective bargaining agreement in contravention of the provisions of any such agreement pertaining to pension benefits and supplements as long as any such agreement is in effect. Except as provided in Article V, Section 3, no such action shall operate to recapture for the Corporation any contributions previously made to the

60

Art. IX, 1

trustee or insurance company under the Plan, nor, except to the extent necessary to meet the requirements of the Internal Revenue Service or any other governmental authority, to affect adversely the pensions or supplements of employes already retired or the trust fund or insured fund then securing such pensions and supplements.

### Section 2. Termination of Plan

(a) If the Corporation, in accordance with Section 1 of this Article IX, or the Pension Benefit Guaranty Corporation terminates the Plan, the amount of the assets, which are available to provide benefits, and which are held by the trustee as of the termination date, shall be allocated, after deducting expenses for administration or liquidation, in the following manner and order to the extent of the sufficiency of such assets:

(1) First, in the case of benefits payable as an annuity:

(i) In the case of the benefit of a participant or beneficiary which was in pay status as of the beginning of the 3-year period ending on the termination date of the Plan, to each such benefit, based on the provisions of the Plan (as in effect during the 3-year period ending on such date) under which such benefit would be the least;

(ii) In the case of a participant's or beneficiary's benefit (other than a benefit described in subsection (a)(1)(i)) which would have been in pay status as of the beginning of such 3-year period if the participant had retired prior to the beginning of the 3-year period and if his benefits had commenced (in the normal form of annuity under the Plan) as of the

61

Art. IX, 2(a)(1)(ii)

beginning of such period, to each such benefit based on the provisions of the Plan (as in effect during the 5-year period ending on such date) under which such benefit would be the least.

For purposes of subsection (a)(1)(i), the lowest benefit in pay status during a 3-year period shall be considered the benefit in pay status for such period.

(2) Second, to all other benefits (if any) of individuals under the Plan which are guaranteed under the plan termination insurance provisions of the Employee Retirement Income Security Act of 1974 determined without regard to Section 4022B(a) of said Act.

(3) Third, to all other nonforfeitable benefits under the Plan.

(4) Fourth, to all other benefits under the Plan.

(b)(1) The amount allocated under any of the preceding subsections of this Section 2 with respect to any benefit shall be properly adjusted for any allocation of assets with respect to that benefit under a prior subsection of this Section 2.

(2) If the assets available for allocation under subsections (a)(1) and (a)(2) are insufficient to satisfy in full the benefits of all individuals which are described in such subsections, the assets shall be allocated pro rata among such individuals on the basis of the present value (as of the termination date) of their respective benefits described in such subsections.

(3) If the assets available for allocation under subsection (a)(3) are not sufficient to satisfy in full the benefits of individuals described therein:

62

Art. IX, 2(b)(3)(i)

(i) Except as provided in subsection (b)(3)(ii), the assets shall be allocated to the benefits of individuals described in subsection (a)(3) on the basis of the benefits of individuals which would have been described in subsection (a)(3) under the Plan as in effect at the beginning of the 5-year period ending on the date of the Plan's termination.

(ii) If the assets available for allocation under subsection (b)(3)(i) are sufficient to satisfy in full the benefits described therein (without regard to this subsection (b)(3)(ii)), then for purposes of subsection (b)(3)(i), benefits of individuals described therein shall be determined on the basis of the Plan as amended by the most recent Plan amendment effective during such 5-year period under which the assets available for allocation are sufficient to satisfy in full the benefits of individuals described in subsection (b)(3)(i) and any assets remaining to be allocated under such subsection shall be allocated under subsection (b)(3)(i) on the basis of the Plan as amended by the next succeeding Plan amendment effective during such period.

(c) If the Secretary of the Treasury determines that the allocation made pursuant to this Section 2 results in discrimination prohibited by Section 401(a)(4) of the Internal Revenue Code of 1986, or as may be subsequently amended, then, if required to prevent the disqualification of the plan (or any trust under the plan) under Section 401(a) or 403(a) of such Code the assets allocated shall be reallocated to the extent necessary to avoid such discrimination.

(d) In the event of termination or partial termination of the Plan, the right of all affected employes to benefits accrued to the date of such termination, partial termination or discontinuance, to the extent funded as of such date, are nonforfeitable.

63

Art. IX, 2(e)

(e) Anything in the Plan to the contrary notwithstanding it shall not be possible at any time prior to the satisfaction of all liabilities with respect to employes under the plan for any part of the corpus or income of the Pension Fund to be used for, or diverted to purposes other than the exclusive benefit of employes. After satisfaction of all liabilities to participants and beneficiaries under the Plan, any residual assets of the Pension Fund will be distributed to the Corporation if the distribution does not contravene any applicable provision of law.

## Section 3. Merger or Consolidation

In the case of any merger or consolidation with, or transfer of assets or liabilities to, any other plan after September 2, 1974, each participant in the Plan would, if the Plan then terminated, receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer, if the Plan had then terminated.

## ARTICLE X

## DEFINITIONS

### 1. Employe

(a) Any person regularly employed in the United States by the Corporation or by a wholly-owned or substantially wholly-owned domestic subsidiary in accordance with I.R.C. Section 414(b), (c), and (m) thereof, including:

(1) hourly-rate persons employed on a full time basis;

(2) hourly-rate persons on incentive pay plans;

(3) students from educational institutions who are enrolled in cooperative training courses on hourly rate;

64

Art. X, 1(a)(4)

(4) part-time hourly-rate employes who, on a regular and continuing basis, perform jobs having definitely established working hours, but the complete performance of which requires fewer hours of work than the regular work week, provided such employes work one-half or more of the employing unit's regular work week;

(5) hourly-rate employes of Delco Electronics Corporation (DEC).

(b) The term "employe" shall not include:

(1) temporary employes;

(2) part-time employes, who work less than one-half of the employing unit's work week;

(3) employes represented by a labor organization which has not signed an agreement making this Plan applicable to such employes;

(4) employes of any directly or indirectly wholly-owned or substantially wholly-owned subsidiary of the Corporation acquired or formed by the Corporation on or after January 1, 1984;

(5) leased employes as defined under Section 414(n) of the Internal Revenue Code;

(6) employes of Saturn Corporation.

### 2. Trustee or Insurance Company

The bank or banks, trust or insurance company or companies or any combination thereof designated by a trust agreement or contract as the medium for financing the Plan.

65

Art. X, 3

## 3. Seniority

Seniority means the period following the most recent date of hire by the Corporation and subsequent to which there has been no loss of credited service (as loss of credited service is defined in the Plan), or if the employe is represented under a collective bargaining agreement seniority will be as defined in such agreement. An employe who is retired on or after October 1, 1984, and thereby has his pension discontinued, but does not have his seniority reinstated, shall be deemed, solely to satisfy purposes of The General Motors Hourly-Rate Employes Pension Plan, to have seniority while so employed.

## 4. Federal Social Security Benefit

A Federal Social Security benefit for disability or an unreduced Federal Social Security benefit for age means a benefit determined and payable under Title II of the Federal Social Security Act, as now in effect or as hereafter amended, without any reduction being made therefrom based on the age of the recipient.

## 5. Trust Fund; Pension Fund; Insured Fund

The General Motors Hourly-Rate Employes Pension Plan fund established by payments made by the Corporation in accordance with Article V herein. Such fund therein called the trust fund shall be comprised of either a pension fund or insured fund, or a combination thereof.

## 6. Base Hourly Rate

For the purpose referred to in Section 6(g) of Article II of this Plan only, Base Hourly Rate shall be the higher of:

(a) the employe's highest straight-time hourly rate,
or

66

Art. X, 6(b)

(b) for an employe who worked on incentive or piece work in at least 4 pay periods, the employe's average earned straight-time hourly rate for the first 4 pay periods (or, if higher, for the last 4 pay periods) for which he had any incentive earnings (provided, however, that if he worked in less than 4 pay periods but during each such pay period worked he worked on incentive or piece work, his average earned straight-time hourly rate for such pay periods worked shall be used)

during the last 13 consecutive pay periods ending with the pay period which includes his last day worked, plus any cost-of-living allowance in effect with respect to the employe's last day worked for the Corporation.

## 7. Basic Benefit

The monthly benefit payable under the Plan for the lifetime of a retired or separated employe, including a benefit reduced by a percentage because of early retirement. The term ''basic benefit'' shall not include any temporary benefit, special benefit, or supplement payable under the Plan.

## 8. Age 62 and One Month

''Age 62 and one month'' means age 62 and one month except that for purposes of determining the month for which the temporary benefit provided in Article II, Section 4 and the early retirement and interim supplements provided in Article II, Section 6 shall cease and the month for which the basic benefit is redetermined in accordance with Article II, Section 4, it shall mean age 62 if both a temporary benefit, early retirement supplement, or interim supplement under the Plan and a benefit under the Federal Social Security Act could otherwise be payable.

67

Art. X, 9

## 9. Actuarial Value

The actuarial value as of any determination date shall be calculated on the basis of the UP-84 mortality table and the applicable interest rate used by the Pension Benefit Guaranty Corporation (PBGC) as of the first day of the plan year preceding the determination date.

68

APPENDIX A

Appendix A

## (HOURLY-RATE EMPLOYES PENSION PLAN)

A Benefit Class Code for the sole purpose of this Plan is hereby established for each job classification in effect on September 17, 1990 on the basis of the maximum base hourly rate (which term as used herein shall include incentive earnings unless otherwise noted) applicable to the job classification on that date, as follows:

| | For Job Classifications Having a Maximum Base Hourly Rate of | Benefit Class Code |
|---|---|---|
| On or after September 17, 1990 but prior to October 1, 1990 | Less than $14.48 | A |
| | $14.48 but less than $14.70 | A |
| | $14.70 but less than $15.63 | B |
| | $15.63 and over | C |
| On or after October 1, 1990 | Less than $16.16 | D |
| | $16.16 but less than $16.38 | A |
| | $16.38 but less than $17.31 | B |
| | $17.31 and over | C |
| | | D |

(1) The Benefit Class Code applicable to an employe is the Benefit Class Code for the job classification held by the employe for the greatest number of calendar days during the 24 consecutive months immediately preceding his last day worked.

(2) The Benefit Class Code to be established for any new job classification put into effect after September 17, 1990 shall be whichever Benefit Class Code is applicable to other job classifications having the same maximum base hourly rate on the date that such new job classification is put into effect. With respect to a job classification that was obsolete as of September 17, 1990 a hypothetical maximum base hourly rate applicable thereto shall be determined by increasing the maximum base hourly rate for that job

69

Appendix A(2)

classification at the time of its discontinuance to the extent necessary so as to give effect to general wage increases (including cost-of-living allowance transfers) that have occurred since such discontinuance, and the Benefit Class Code for such classification so derived shall be whichever Benefit Class Code herein is applicable to other job classifications having the same maximum base hourly rate on that date.

(3) For purposes hereof, the maximum base hourly rate of a job classification, paid on a day-work basis at any plant or facility shall be the maximum straight-time hourly rate for that job classification at such plant or facility (excluding any cost-of-living allowance and premiums).

(4) The maximum base hourly rate of a job classification in effect on September 6, 1967 and paid under an incentive method of pay at any plant or facility shall be the average straight-time hourly earned rate (including incentive earnings and any wage increases and cost-of-living allowance transfers which, as of September 6, 1967, were not factored in the base rate of the job classification but excluding any cost-of-living allowance and premiums) for all hours worked by all employes in that job classification at such plant or facility for the period beginning September 5, 1966, and ending September 3, 1967, plus any wage increases and cost-of-living allowance transfers effective for that job classification subsequent to September 6, 1967.

In the event an employe is transferred to a job which results in a lower basic benefit rate, such employe's vested pension benefit, if any, shall not be less than the amount of his accrued pension benefit on the date of such transfer to such job.

70

Appendix B

APPENDIX B

For the sole purpose of Article III, Section 5 of the Plan, all approved job classifications set forth in the Local Wage Agreements as of September 14, 1973 of the Central Foundry Plant, Danville, Illinois, the Central Foundry Plant, Defiance, Ohio, the Central Foundry Malleable Iron Plant, Saginaw, Michigan, and the Central Foundry Grey Iron Plant, Saginaw, Michigan, are designated foundry jobs at the respective plant locations except for those job classifications listed herein for each such respective plant location. No other job classifications shall be designated foundry jobs.

Central Foundry Plant, Danville, Illinois

Bulldozer, Operator
Bus Boy
Cashier
Cook
Crane Operator, Locomotive
Crane Operator - Yard & Bridge
Driver - Licensed Trucks - Tractor
   & Trailer
End Loader Operator
Kardex Clerk
Kitchen Help
Pattern & Maintenance Clerk
Pattern Storage and Transport
Salvage Reclaimer
Scrap Cutter - Torch
Shipping Clerk
Spue Crane Hook Up
Stock Room Clerk
Stock Room and Receiving
Warehouse Attendant
Window Washer
Yard Labor
Yard Switchman

71

Appendix B

**Central Foundry Plant,
Danville, Illinois (Con't'd.)**

Garage Mechanic
Machinist
Pattern Maker, Wood & Metal
Power House Operator

**Central Foundry Plant, Defiance, Ohio**

Bus Boy
Cashier
Clerk - Pattern and/or Maintenance
Cook
Crane Operator - Locomotive
Dispatcher - Materials
Driver - Licensed Trucks - Tractor
   and Trailer - Semi
Heavy Equipment Operator
Inspection Department - Inspection
   (Special Assignment)
Kitchen Help
Locomotive Operator
Safety Equipment Repair
Salvage Reclaimer
(2)Shipping Clerk
Yard Labor

Blacksmith
Casting Layout
(3)Garage Mechanic
(1)Machinist
Pattern Maker - Leader
Pattern Maker - Wood & Metal
Shift Operating Engineer
Tool Grinder

(1)Designated as a foundry job only for those
employes so classified who work in Plant 2,
816 Department.

72

Appendix B

**Central Foundry Plant,
Defiance, Ohio (Con't'd.)**

(2)Designated as a foundry job only for those
employes so classified who work in
Plant #1, 539 Department.

(3)Designated as a foundry job only for those
employes so classified who work in Plant #2,
816 Department, Battery Charge Area.

**Central Foundry Malleable Iron Plant,
Saginaw, Michigan**

Bull Dozer Operator
Bus Boy
Cashier
Clerk - Pattern and Maintenance
Cook
Crane Operators - Locomotive
Driver-Licensed Trucks, Tractor,
   and Trailer
Kitchen Help
Salvage Reclaimer
Stock Room and Receiving
Yard Labor

Blacksmith
Core and/or Mold Maker - Experimental -
   Bench & Floor
Garage Mechanic
Inspector - Layout
Machinist - Maintenance
Machinist - Miscellaneous
(1)Machinist - Pattern
Pattern Maker - Leader
Pattern Maker - Wood and Metal
Power House Operator

(1)Designated as a foundry job only for those
employes so classified who work in
Department 16.

73

**Central Foundry Grey Iron Plant, Saginaw, Michigan**

(1)Attendant - Pattern Storage
Attendant - Pattern Storage - Leader
Clerks - Receiving - (Includes Inspectors)
Crane Hooker or Signal Man
Crane Operator - Locomotive
Crib Attendant - Maintenance
Crib Attendant - Pattern Shop
Drill Press Operator
Driver - Licensed Passenger Cars
Drivers - Licensed Trucks - Receiving & Yard
(1)Equipment Operator - Special (Including Bay City Shovel, Bull Dozer, Pay Loader Shovel Operator)
Field Sand Gasoline Locomotive Operator
Flask Repair - Metal Flask
Flask Repair - Metal Flask - Leader
Gardener
Laborer - Yard - Maintenance - Leader
Labor - Yard - Maintenance - Leader
Railroad Track Repair
Locker Room Attendant
(2)Oiler - Machinery, Equipment and Motors
Power House Attendant
Receiving Department - Leader
Salvage - Flash Cutter
Crane Repairman - (Also Operates Crane)
Crane Repairman - Leader
Die Repair
Flask Welder

74

**Central Foundry Grey Iron Plant, Saginaw, Michigan (Cont'd.)**

Grinder - Cutter
Grinder Operator - Blanchard
Inspector - Layout
Machine Repair - Machinist - Maintenance - Leader
Machine Repair - Machinist - Maintenance
Machine Repair - Machinist - Pattern Shop
Power House - Engineer - Class "B"
Power House - Fireman
Power House - Repairman
Power House - Repairman - Leader
Truck Repair - Gas
Truck Repair - Gas - Leader
Truck Repairman - Gas and Electric
(3)Welder - Maintenance - Gas & Arc
Welder - Tool and Die

(1)Designated a foundry job only for credited service accrued on and after July 27, 1987.

(2)Not designated as a foundry job for those employees so classified who work in Department 32.

(3)Not designated as a foundry job for those employees so classified who work in Department 30.

75

Appendix B

## Appendix B

Any job classification in effect at a plant specified in Appendix B that was discontinued at such plant prior to September 14, 1973 shall be designated a foundry job if the work that was performed by employes on such discontinued job classification shall conform substantially to work performed at the same plant by employes on a job classification designated as a foundry job for such plant.

76

Appendix C

## APPENDIX C

For the sole purpose of Article III, Section 7 of the Plan, only those job classifications specifically listed herein, which are set forth in the Local Wage Agreement in effect as of October 1, 1979 at Delco Moraine Division, Dayton, Ohio, may be designated asbestos jobs. Such designation as an asbestos job will apply only to these classifications at the above-specified plant location under the conditions specifically set forth herein. No other job classifications shall be designated asbestos jobs.

### Delco Moraine Division, Dayton, Ohio

The following job classifications involved in the blending and processing of raw asbestos are designated asbestos jobs for employes so classified who are assigned to Departments 73M, 515, 523, and 530.

Experimental Lining
Extruding Machine Operator
Janitors
Job Setter
Lining-Grinder
Machine Cleaners
Preform of Disc Brake Linings
Production Heat Treat Linings
Protective Coating Operator
Sensor Riveters
Stock Handler
Weigh and Mix Materials

77

Standards

## STANDARDS FOR APPLICATION OF PROVISIONS REGARDING RETIREMENT UNDER MUTUALLY SATISFACTORY CONDITIONS

## GENERAL MOTORS HOURLY-RATE EMPLOYES PENSION PLAN

Article II, Section 2(b) and (c) of the General Motors Hourly-Rate Employes Pension Plan provides that an employe may be retired early under mutually satisfactory conditions providing he is otherwise eligible. The following standards have been adopted by the Corporation as a guide in the application of this provision.

### Standards

A. An employe who is unable to work efficiently by reason of permanent disability:

The retirement must be in the best interest of the Corporation. It is also intended to benefit employes who are unable to work efficiently by reason of permanent disability. It contemplates that the efficiency of operation will be improved by reason of the retirement which may be the case in any of the following situations:

(1) The employe is no longer physically or mentally capable of performing his work in an efficient and satisfactory manner.

(2) The employe, though still capable of performing his work satisfactorily, is prevented by chronic physical illness or physical disability (less than total) from working regularly to the extent that efficiency of operation is interfered with.

(3) The employe's condition, based on medical evidence satisfactory to the Corporation, is such that,

78

although able to perform the duties of his job efficiently and satisfactorily, he would thereby be jeopardizing his health or that of fellow employes.

(4) The employe is on disability leave or is laid off because he is unable to do the work offered by the Corporation efficiently and satisfactorily although able to perform efficiently and satisfactorily other work in the plant to which he would have been entitled if he had had sufficient seniority, and his condition, based on medical evidence satisfactory to the Corporation, is expected to be continuous until his normal retirement age.

B. An employe who is laid off:

Retirement under mutually satisfactory conditions will be available to an employe who is laid off

(i) as a result of a plant closing or discontinuance of operations, or

(ii) whose layoff appears to be permanent, and in either case has not been offered suitable work by the Corporation in the same labor market area.

79

Misc. (Benefit Plan Provisions)

## STATEMENT OF INTENT

Notwithstanding the provisions of Exhibit A, Section 3(c) of The General Motors Hourly-Rate Employes Pension Plan; Exhibit B, Items Agreed To of the General Motors Life and Disability Benefits Program For Hourly Employes; Exhibit C, Items Agreed To of the General Motors Health Care Program For Hourly Employes; Exhibit D, Articles V and VI of the Supplemental Unemployment Benefit Plan, and the Items Agreed to by GM-UAW SUB Board of Administration; and Exhibit E, Section 6(a) of the Guaranteed Income Stream Benefit Program, which deal with local union representatives for each of these benefit plan areas, the Corporation and the Union agree as follows:

1. **Appointment of Local Union Benefit Representatives**

(a) Local union benefit representative(s) and alternate(s) shall be appointed or removed by the GM Department of the International Union.

(b) Temporary replacement appointments may be made by the local union President for a minimum of one week and a maximum of four weeks. Replacement appointments for any absence in excess of four weeks also shall be made by the GM Department of the International Union. Replacement appointments in situations when the benefit representative(s) and alternate(s) are both absent but for less than one week and are on a leave of absence pursuant to the provisions of Paragraph 109 of the GM-UAW National Agreement may be made by the local union President. Any problems that may arise under this procedure may be discussed by the Corporation with the GM Department of the International Union.

80

Misc. (Benefit Plan Provisions)

(c) A local union benefit representative shall be an employe of the Corporation having at least one year of seniority, and working at the plant where, and at the time when, he/she is to serve as such representative or alternate. No such representative or alternate shall function until written notice has been given. In the case of temporary appointments, the notice should be given to local Management with additional copies forwarded to the GM Department of the International Union and the Corporation.

2. **Number of Local Union Benefit Representatives**

(a) In plants having a total of less than 600 employes, there may be one local union benefit representative and one alternate.

(b) In plants having a total of 600 but less than 1,200 employes, there may be two local union benefit representatives and two alternates.

(c) In plants having a total of 1,200 but less than 2,000 employes, there may be three local union benefit representatives and three alternates.

(d) In plants having a total of 2,000 but less than 5,000 employes, there may be four local union benefit representatives and three alternates. If such plants have a total of 1,400 or more employes on the second and third shifts combined, there may be five local union benefit representatives and two alternates.

(e) In plants having a total of 5,000 but less than 8,000 employes, there may be five local union benefit representatives and two alternates.

(f) In plants having a total of 8,000 but less than 10,000 employes, there may be six local union benefit representatives and two alternates.

(g) In plants having a total of 10,000 or more employes, there may be seven local union benefit representatives and two alternates.

81

The number of employes as used herein shall include active employes, employes on sick leave of absence, and employes on temporary layoff.

3. Of the total number of local union benefit representatives and alternates otherwise available, one or more representatives and alternates may be assigned to the second shift or third shift so long as the total number of representatives and alternates set forth in Paragraph 2. above is not exceeded.

4. When plant population changes occur which would increase or decrease the number of local benefit plan representatives, such population changes must be in effect for a period of six consecutive months before such adjustment is made in the number of representatives, unless such population change results from the discontinuance or addition of a shift or the opening or closing of a plant. In the event of a cessation of operations, the Corporation, at the request of the UAW General Motors Department of the International Union, will provide for the continuance of Benefit Representation. Other situations involving a sudden significant change in the number of employes at a location may be discussed by the Corporation and the GM Department of the International Union.

5. Benefit Plan districts will be established by local mutual agreement. Only one local union benefit representative will function in a benefit district and will handle specified benefit plan problems raised by employes within that district pertaining to the Pension Plan, Life and Disability Benefits Program, Health Care Program, Supplemental Unemployment Benefit Plan, and Guaranteed Income Stream Benefit Program agreements. An alternate will be permitted to function in the absence of a local benefit plan representative on his/her shift.

82

Misc. (Benefit Plan Provisions)

6. Any local union benefit representative may function as the member of the local Pension Committee, as the member of the local Supplemental Unemployment Benefit Committee, as a member of the Guaranteed Income Stream Benefit Committee or handle benefit problems under the Life and Disability Benefits Program and the Health Care Program with respect to employes in his/her Benefit Plan district. An alternate may function in the absence of a local union benefit representative.

7. The time available to a local union benefit representative and alternate with respect to a Benefit Plan district may not exceed eight (8) regular working hours of available time in a day.

(a) On his/her regular shift and without loss of pay, a local union benefit representative(s) may accompany the management benefit representative for a mutually agreeable joint off-site visit to a local hospital, an impartial medical opinion clinic or a health maintenance organization, or other similar type joint ventures, with respect to benefit plan matters.

(b) A local union benefit representative attending a scheduled Management-Union Benefit Plan meeting on a shift other than his/her regular shift will be paid for time spent in such meeting.

(c) One local union benefit representative attending the local union retiree chapter meeting will be paid for time spent in such meeting.

(d) The time spent in such local union retiree chapter meetings, off-site visits or Management-Union Benefit Plan meetings will not result in additional hours which exceed regularly scheduled shift hours, overtime premiums or an increase in representation time being furnished as a result of the representative(s) not working a full shift on his/her regular shift.

83

Misc. (Benefit Plan Provisions)

8. The local union benefit representative shall be retained on the shift to which he/she was assigned when appointed as such representative regardless of seniority, provided there is a job that is operating on his/her assigned shift which he/she is able to perform.

9. The Benefit Plans — Health and Safety office may be used by local union benefit representatives during their regular working hours:

(a) To confer with retirees, beneficiaries, and surviving spouses who ask to see a local union benefit representative with respect to legitimate benefit problems under the Pension, Life and Disability Benefits Program and Health Care Program Agreements.

(b) If the matter cannot be handled appropriately in or near the employe's work area, to confer with employes who, during their regular working hours, ask to see a local union benefit representative with respect to legitimate benefit problems under the Pension, Life and Disability Benefits, Health Care, SUB, and GIS Agreements.

(c) To confer with employes who are absent from, or not at work on, their regular shift and who ask to see a local union benefit representative with respect to legitimate benefit problems under the Pension, Life and Disability Benefits, Health Care, SUB, and GIS Agreements.

(d) To write position statements and to complete necessary forms with respect to a case being appealed to the Pension, SUB, or GIS Boards by an employe in his/her Benefit Plan district, and to write appeals with respect to denied life, health care, and disability claims involving employes within his/her Benefit Plan district.

(e) To file material with respect to the Pension, Life and Disability Benefits, Health Care, SUB and GIS Agreements.

84

Misc. (Benefit Plan Provisions)

(f) To make telephone calls with respect to legitimate benefit problems raised by employes under the Pension, Life and Disability Benefits, Health Care, SUB, and GIS Agreements.

85

86

87

LETTER
AGREEMENTS

Workers Compensation

# GENERAL MOTORS CORPORATION

September 17, 1990

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

Attention: Mr. Stephen P. Yokich
Vice President and Director
General Motors Department

Gentlemen:

This letter of agreement constitutes an amendment to
the 1990 GM-UAW Pension Plan and shall be construed
and applied as if it were therein incorporated.

Pursuant to Subsection 354(14) of the Michigan Workers
Compensation Act, as amended, until termination or
earlier amendment of the 1990 Collective Bargaining
Agreement, workers compensation for employes shall
not be reduced by disability retirement benefits
payable under the Hourly-Rate Employes Pension Plan.

Very truly yours,

GENERAL MOTORS CORPORATION

Alfred S. Warren, Jr.
Vice President

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By: Stephen P. Yokich

88

89

Lump-Sum Payment

# GENERAL MOTORS CORPORATION

September 17, 1990

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

Attention: Mr. Stephen P. Yokich
Vice President and Director
General Motors Department

Gentlemen:

During these negotiations the parties agreed upon certain lump-sum payments to be made to eligible retirees and surviving spouses.

Lump-sum payments would be made, on the basis described below, by Corporation check or draft paid directly to retired employes and surviving spouses.

1. The following persons will be eligible for lump-sum payments:

(a) employes who retired prior to October 1, 1990 under the terms of Article II, Sections 1, 2 or 3 of the Plan and who are receiving benefits from the Plan as of the first of the month for which a lump-sum payment would be made.

(b) eligible surviving spouses of employes who retired under the terms of Article II, Sections 1, 2 or 3 of the Plan prior to October 1, 1990, or surviving spouses eligible for a benefit prior to September 17, 1990 pursuant to Article II, Section 5(g) of the Plan (excluding surviving spouses of former employes who broke seniority and who are eligible for a deferred pension), or surviving spouses eligible for a benefit under Article II, Section 8(d) and who are eligible for a pension benefit from the Plan as of the first of the month for which a lump-sum payment would be made.

90

Lump-Sum Payment

2. Amount of Benefit:

(a) a maximum payment of $630 will be made to retired employes with thirty or more years of credited service. The payment to pensioners with less than thirty years of credited service will be $21 per year of credited service (with a proportional amount for fractional years); or a minimum payment of $210.

(b) eligible surviving spouses will receive 60% of the amount that would have been payable to the retired employe under (a) above.

3. Dates of Payment: December 1991 and December 1992.

Please indicate your concurrence in the proposed lump-sum payments arrangement and other provisions of this letter.

Very truly yours,

GENERAL MOTORS CORPORATION

Alfred S. Warren, Jr.
Vice President

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By: Stephen P. Yokich

91

Mutually Satisfactory Retirement

# GENERAL MOTORS CORPORATION

September 17, 1990

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

Attention: Mr. Stephen P. Yokich
Vice President and Director
General Motors Department

Gentlemen:

During these negotiations the parties agreed to provide mutually satisfactory retirements, commencing as early as age 50, and solely during the period November 1, 1990, through May 1, 1991, inclusive, to up to 5,213 hourly employes, in selected GM locations, who had attained age 50 with 10 or more years of credited service as of October 1, 1990, all as set forth in detail in Document 9 attached to the 1990 GM-UAW Collective Bargaining Agreement.

Solely to implement the agreement described immediately above, this letter of agreement constitutes an amendment to the 1990 GM-UAW Pension Plan and shall be construed and applied as if it were therein incorporated.

In that regard, Article II, Section 2(b) of the GM-UAW Pension Plan, and the "Standards" attached to such Plan, shall be deemed to provide eligibility for mutually satisfactory retirement as early as age 50, solely for the otherwise eligible employe set forth in such Document 9, only during the period described therein, and only under the specific circumstances described therein.

92

Mutually Satisfactory Retirement

In conjunction therewith, the attached guidelines are applicable, and must be satisfied with respect to certain such employes retired under Attachment B of the GM-UAW Collective Bargaining Agreement.

Very truly yours,

GENERAL MOTORS CORPORATION

Alfred S. Warren, Jr.
Vice President

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By: Stephen P. Yokich

Attach.

## ATTACHMENT

An employe with seniority:

Retirement under mutually satisfactory conditions will be available to an employe who on or after October 1, 1990

(i)  is in a JOBS Bank, or

(ii) will be replaced by

    (aa) an employe in a JOBS Bank, or

    (bb) a laid off GIS eligible employe with seniority whose layoff appears to be permanent,

and in any such case, only to any such employe who at the date of his retirement satisfies the conditions for such retirement as stipulated under Attachment B of the JOBS Program.

93

GENERAL MOTORS CORPORATION

September 17, 1990

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214

Attention: Mr. Stephen P. Yokich
Vice President and Director
General Motors Department

Gentlemen:

During these negotiations the parties agreed to provide mutually satisfactory retirements, commencing as early as age 50, and solely during the period November 1, 1990, through May 1, 1991, inclusive, to (1) active employes, (2) laid off seniority employes, and (3) laid off employes with 64(e) retire rights, only at BOC - Leeds, CPC - Fiero, CPC - Framingham, and CPC - Lockwood, who have attained age 50 with 10 or more years of credited service as of October 1, 1990, all as set forth in detail in the new "Special Benefit and Placement Plan Document", which is attached to the 1990 GM-UAW Collective Bargaining Agreement.

Solely to implement the agreement described immediately above, this letter of agreement constitutes an amendment to the 1990 GM-UAW Pension Plan and shall be construed and applied as if it were therein incorporated.

In that regard, Article II, Section 2(b) of the GM-UAW Pension Plan, and the "Standards" attached to such Plan, shall be deemed to provide eligibility for mutually satisfactory retirement as early as age 50, solely for the otherwise eligible employes set forth in the above described Document, only during the period described therein, and only under the specific circumstances described therein.

94

---

Notwithstanding the preceding, the parties further agreed to provide mutually satisfactory retirement eligibility, only to certain employes at the four locations listed earlier herein, each of whom has (a) attained age 48, but not age 50, and (b) 10 or more years of credited service, as of October 1, 1990. Each such retirement granted hereunder will become effective on the first day of the month immediately following each such eligible employe's attainment of age 50.

Very truly yours,

GENERAL MOTORS CORPORATION

Alfred S. Warren, Jr.
Vice President

Accepted and Approved:

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW

By: Stephen P. Yokich

95

NOTES

NOTES



As set forth in supplemental agreements
between General Motors Corporation and
the UAW dated September 17, 1990.

Dear U.S. Hourly Employe:

"What You Should Know About Your Benefits" has been revised for hourly employes. This booklet summarizes all of the outstanding benefit plans covering you and your family. Changes resulting from the GM-UAW negotiations are included in the benefit program descriptions contained in this booklet.

UAW-GM employes continue to enjoy one of the best benefit packages available in American industry. We hope you will carefully study this booklet in conjunction with your Personal Benefit Summary Statement. The Personal Benefit Summary Statement also provides you with important information about the current and future value of your GM benefits and investments.

If you should have any questions regarding the material covered in this booklet, contact the office which administers your benefits or your local union benefit representative.

Sincerely,

Richard F. O'Brien
Vice President
General Motors Corporation

Stephen P. Yokich
Vice President
UAW International Union





**As a GM Employe** --you have one of the finest, most comprehensive employe benefit programs in industry. This booklet is not a contract, however, it summarizes the ways your GM benefit plans can help you and members of your family. The information in this booklet is based upon the benefit plan provisions in effect in January 1991 through termination of the 1990 GM-UAW Agreement. It will help you understand the benefits and protection available to you so that you may have the opportunity to do a better job of providing security for yourself and your family.

*Each of the benefit plans has its own terms and conditions which in all respects control the benefits mentioned. Such terms and conditions are subject to modifications as a result of changes in collective bargaining agreements, Corporation policy and applicable laws. The payment of benefits is conditioned, of course, upon your eligibility to receive them. General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet. No oral or written statements can change the terms of a benefit Plan or Program. The Plans and Programs only can be amended by an appropriate committee as designated by the Board of Directors (subject to the agreement of the UAW).*

The information in this booklet with respect to the Pension Plan applies to employes with seniority on or after October 1, 1990, employes retired with benefits payable commencing after September 17, 1990 and eligible surviving spouses of active employes who died after September 17, 1990. The Life and Disability Benefits Program changes generally are applicable to employes at work on or after October 1, 1990. The effective dates for the Health Care Program are described in the Health Care section of this booklet.

The GM-UAW Pension Board of Administration and the GM-UAW SUB and GIS Boards of Administration have reviewed and approved the explanatory material related to pensions, supplemental unemployment benefits and guaranteed income stream benefits, respectively. The International Union, UAW, has reviewed and approved the material related to life and disability and health care coverages, the Profit Sharing Plan and the Personal Savings Plan.

# How To Find The Information You Want

Investment Opportunities

Personal Savings Plan ......................................... 5

Profit Sharing Plan ............................................. 9

GMAC Demand Note Program .......................... 11

If You Have Health Care Expenses ....................... 12

While You Are Disabled ...................................... 24

If You Are Laid Off
    SUB ............................................................ 30
    GIS ............................................................ 37

When You Retire ................................................ 41

In The Event of Death ......................................... 50

General Information About Your Benefits .......... 58

Procedures For Handling Questions Or
    Disputes About Your Benefits ......................... 62

Information Related To The Employee
    Retirement Income Security Act of 1974
    (ERISA) ..................................................... 64

Consolidated Omnibus Budget Reconciliation
    Act (COBRA) Continuation .............................. 68

When You or an Immediate Family Member
    Purchase a New GM Vehicle ........................... 70

2

# Your General Motors Benefit Programs are designed to work together to help you meet many personal and financial needs now and in the future.

| THESE PLANS CAN HELP YOU THROUGH VARIOUS EVENTS IN YOUR LIFE. PAGE NUMBERS ARE REFERENCED FOR YOUR CONVENIENCE. | When You Save | When There Are Health Care Expenses | If You Become Disabled | In Case of Layoff or Plant Closing | When You Retire | Social Security Information | In The Event of Death | Surviving Spouse Benefits |
|---|---|---|---|---|---|---|---|---|
| Personal Savings Plan | 5 | 6 | 28 | | 7 | 5 | 7 | 7 |
| Profit Sharing Plan | 9 | | | 9 | 9 | 10 | 9 | |
| GMAC Demand Note Program | 11 | | | | | | | |
| Health Care Program | | 12 | 28 | 36 | 49 | 19 | | 55 |
| Disability Benefits | | | 24 | 35 | | 29 | | |
| Supplemental Unemployment Benefits | | | 33 | 30 | | | | |
| Guaranteed Income Stream Benefits | | 39 | 38 | 37 | 39 | 38 | 39 | |
| Pension Plan | | 49 | 46 | 46 | 41 | 48 | 49 | 53 |
| Life Insurance Coverages | | | 27 | 35 | 49 | | 50 | 52 |

A check list of important items to remember is on page 72.

3

4

# Investment Opportunities

This Section is designed to help you better understand the capital accumulation plans available to you as a GM hourly employe. The Personal Savings Plan is aimed to help you accumulate savings for your future financial security. The Profit Sharing Plan enables you to share in the profits of GM's U.S. operations.

You will want to read these summaries carefully so you will be better prepared to make decisions appropriate to your personal financial needs and goals.



# Personal Savings Plan

The purpose of the Personal Savings Plan (PSP) is to allow you to save part of your earnings by investing through convenient and tax-effective payroll deductions. The Plan also provides a tax-effective way for you to invest your Profit Sharing payments.

## Eligibility

You are eligible to participate in the Plan after attaining seniority. Participation in the Plan is voluntary. Therefore, to begin participation, you are required to enroll in the Plan. You may discontinue participation in the Plan at any time.

## How the Plan Works

The Plan allows you to invest up to 15% of your weekly straight-time pay, up to a maximum of 40 hours. You can invest in four investment options. Any Profit Sharing payment also may be invested in PSP.

Under existing tax laws, any amount you may elect to invest in the Plan is not subject to federal income tax withholding. In most cases, the amount you invest is not subject to state and local income tax withholding. Your savings under this Plan are subject to Social Security tax. Therefore, your future Social Security benefits will not be affected adversely by participating in PSP.

All assets in your account are vested to you immediately. These assets cannot be forfeited for any reason. All your assets in the Plan are held by a Trustee. Dividends, and other earnings on amounts invested, are reinvested in your Plan account. Once each month, you can change investment options. In addition, once each month, you may transfer certain assets between investment options.

## Investment Options

The rate of return you earn on your assets will vary over time. The rate depends on the specific returns of the investment option(s) you select. All of your savings may be invested, in 25% increments, in the Plan's four options, as you direct the Trustee. A description of each investment option is shown below. You will want to read the Plan Language, Prospectus, and any Supplements to the Prospectus for more complete details.

1. GM Common Stock ($1-2/3 Par Value)

   The stock value is based on dividend yield and market performance.

2. Income Fund

   This is a fund consisting of investment contracts issued by insurance companies and/or banks. The company or bank selected each year has agreed to pay a specified annual interest rate over a specified period of time. As such, GM does not guarantee either (1) the assets invested in the Income Fund, or (2) the specified interest rate.

3. U. S. Government Savings Bonds

   These bonds have specified redemption values and are backed by the resources of the Federal Government.

4. Equity Index Fund

   This is a portfolio of common stocks which is managed by an investment company. The objective is to match the overall performance of the "Standard and Poor's 500 Index".

5

You can direct your payroll deductions into one investment option. Or, if you wish, you may elect, in 25% increments, how your savings will be allocated to any of the four options.

The first time you enroll, your investment choice will remain in effect until you change it. You may change your investment directions once a month.

In addition, once a month, you may transfer part, or all, of your existing account balances between investment options. The amount transferred must be at least $500 or, if less, all the assets in the investment option. Your assets in the Savings Bond Option cannot be transferred.

## Valuation of Your Account

The funds are "valued" semi-monthly by the Plan's Trustee. This is done to determine the current market value of your investments. All dividends and interest are reinvested in the funds.

## Semi-Annual Statement and Tax Information

Your annual (1) Personal Benefit Summary, or (2) Statement of Account, will show the year-end value of your PSP account. A second account statement will be provided to you each year. This statement will show your account value as of June 30.

Tax information will be furnished to you from time to time during your participation in the Plan.

## Loans

Once each calendar year, you may borrow from your assets in the Plan. The loan may be for any reason. No credit statement is required. Your assets in the Savings Bond Option cannot be borrowed.

The minimum amount that may be borrowed is $1,000. The maximum loan, when added to the outstanding balance of other Plan loans, will be the lesser of:

(1) $50,000, less the highest outstanding loan balance in the preceding 12 months; or

(2) one-half of the current market value of assets in your account.

The interest rate payable on a loan is the prime interest rate of the majority of 12 of the largest U.S. banks. The prime rate is the rate charged to a bank's best customers.

Cash for a loan is obtained by selling assets in your account. There is no appreciation on outstanding loan amounts.

Repayment of a loan is made by payroll deduction of at least $10 per pay period. The loan duration may be from 12 months to 5 years, as you elect. The duration may be up to 10 years, if the loan is to purchase, or build, a principal residence for you. There are no prepayment penalties if you decide to repay the loan earlier than scheduled. Amounts repaid are allocated to your Plan account in the same investment option(s) you elect for your payroll deduction savings.

## Withdrawals

In accordance with provisions of the Internal Revenue Code, you may make a withdrawal from your account, for any reason, after age 59-1/2. Prior to age 59-1/2, withdrawals may be made only in the event of "hardship" when other financial resources are not available to you. The Plan defines a hardship as:

(1) purchase, or construction, of your principal residence;

(2) payment of expenses to prevent foreclosure on, or eviction from, your principal residence;

(3) payment of tuition for post-secondary education for you or your dependents; or

(4) liability for medical expenses not payable by existing coverages.

Any withdrawal from the Plan for hardship will be limited to the amount of your savings. In addition, before you may withdraw assets for a hardship, you must take all available asset distributions, withdrawals, and loans under all applicable plans maintained by the Corporation. If you withdraw assets because of a hardship, you will be suspended from (1) accumulating further savings under this Plan and (2) certain other GM benefit and compensation plans for a period of 12 months following the withdrawal.

6

## Distribution of Your Account

In the event of your death prior to retirement, any assets in your account will be delivered to your designated beneficiary. If you are married, this beneficiary must be your spouse, unless your spouse has agreed earlier, in writing, to the designation of someone else as beneficiary. If you are not married, and no beneficiary has been named, all the assets in your account will be distributed to the beneficiary designated to receive the proceeds of your basic life insurance under the General Motors Life and Disability Benefits Program.

If you terminate employment and (1) the value of your account assets is not greater than $3,500, or (2) you are age 65, or older, you will receive a distribution of your assets as soon as practicable.

If you are under age 65 and you have assets valued in excess of $3,500 at termination of employment, you must consent to receive a distribution. Your assets will remain in the Plan until you (1) consent to the distribution, or (2) attain age 65, whichever comes first. During the time your assets remain in the Plan after termination of employment, you may make asset transfers. You may not make either a loan or a partial withdrawal.

If you are actively employed by GM and you attain age 70-1/2, minimum annual distributions from your account will be required.

## Voting Rights

You will be extended the right to vote all shares of GM common stock through the Trustee at each annual meeting of stockholders. Each year, you will receive a proxy card. You may sign and return the card to instruct the Trustee how to vote all the shares in your account.

## Tax Considerations

GM is required by federal law to limit your deferred savings contributions. For 1991, the limit is $8,475. Other limits on the amount of your contributions may be required to comply with federal tax regulations. You will be notified if any such limits are required.

GM may not give tax advice to employes and recommends that each employe seek the advise of a personal tax advisor. However, under federal tax laws, income taxes on deferred savings and earnings are delayed until withdrawal or distribution.

A 10% additional tax will be imposed on any Plan withdrawal or distribution made when you are under age 59-1/2. The additional tax does not apply to monies you rollover to an Individual Retirement Account (IRA). Moreover, the 10% tax does not apply if you (1) separate from service by retirement during or after the calendar year in which you attain age 55, (2) use the money for tax-deductible medical expenses, (3) use the money to satisfy a Qualified Domestic Relations Order, (4) die, or (5) become disabled.

Upon distribution of your entire account within one taxable year after you attain age 59-1/2, you may be eligible to use special "5-year income averaging" to calculate the amount of tax on your distribution. This treatment may reduce substantially the amount of your tax liability. Special income averaging rules apply if you were age 50, or older, on January 1, 1986. The special rules permit you to make a one time election to use capital gains treatment and/or (1) 10-year income averaging under 1986 tax rates, or (2) 5-year income averaging under tax rates in effect in the year of the distribution.

As an alternative, following termination of employment, you can "rollover" all, or a portion, of your Plan assets to an IRA. If you do this, you would pay no tax at the time of distribution on the amount rolled over. In the event of rollover, however, any amounts withdrawn from the IRA at a later date would be subject to tax at ordinary income tax rates. Moreover, 5-year income averaging would not be available.

You may wish to consult a tax advisor for advice concerning the best approach for you.

7

## How Your Money Can Grow

This chart shows how your PSP savings can grow over a period of years at various assumed growth rates. It assumes that you save $1,000 a year (regardless of increases in pay) and that you make no withdrawals.

| Assumed Growth Rate % | Amount Saved | | | | | |
|---|---|---|---|---|---|---|
| | $5,000 | $10,000 | $15,000 | $20,000 | $25,000 | $30,000 |
| 6 | $5,800 | $13,500 | $23,900 | $37,800 | $ 56,400 | $ 81,200 |
| 8 | $6,100 | $15,000 | $28,100 | $47,400 | $ 75,800 | $117,400 |
| 10 | $6,400 | $16,700 | $33,200 | $59,900 | $102,800 | $171,900 |
| 12 | $6,700 | $18,500 | $39,300 | $75,900 | $140,500 | $254,300 |
| Years | 5 | 10 | 15 | 20 | 25 | 30 |

For example, assuming a 10% growth rate, after 20 years, your $20,000 ($1,000 × 20) savings would be worth $59,900. This is an increase of $39,900. The total is almost 3 times your actual savings!

8



# Profit Sharing Plan

The purpose of the Profit Sharing Plan is to provide you with a share in General Motors U.S. profits from GM's U.S. operations, commencing with the first dollar of U.S. profits.

## Eligibility

You are automatically enrolled in the Plan the month after you attain one year of seniority. In addition to active employes, employes who worked for GM during the year but retired, died, or were placed on layoff or leave of absence before the end of the year may receive a share of the Corporation's Profit Sharing distribution.

## How the Plan Works

The formula for the Plan provides that a distribution of the "total profit share" is made to you for any year in which profits (before-tax) from GM's operations in the United States exceed zero.

The amount of the "total profit share" distributed among all eligible employes is the sum of:

(a) 6% of profits between 0% and 1.8% of sales and revenues; plus

(b) 8% of profits between 1.8% and 2.3% of sales and revenues; plus

(c) 10% of profits between 2.3% and 4.6% of sales and revenues; plus

(d) 14% of profits between 4.6% and 6.9% of sales and revenues; plus

(e) 17% of profits which exceed 6.9% of sales and revenues.

Your share of any Profit Sharing distribution is based on your eligible compensated hours, up to a maximum of 1,850 hours per year. Those hours generally include any time for which you receive pay after you are enrolled for Profit Sharing, including your straight-time hours, for such things as:

- Bereavement Pay;
- Call-in Pay;
- Holiday Pay;
- Jury Duty;
- Overtime;
- Paid Absence Allowance;
- Short-term Military Duty; and
- Vacation Pay.

## The Amount of Your Share

The amount of your share is determined by a simple two-part formula, as follows:

1. First, the Profit Sharing rate is determined.

| The Total Profit Sharing Amount for U.S. Hourly Employes | ÷ | The Total Eligible Compensated Hours for U.S. Hourly Employes | = | The Profit Sharing Rate ($ per hour) |
|---|---|---|---|---|

2. Next, your share is calculated.

| The Profit Sharing Rate | × | Your Eligible Compensated Hours | = | Your Share |
|---|---|---|---|---|

9

## Profit Sharing Choices

You may choose to take your profit share as a cash payment. If you elect cash, you will receive a check by March 15 of the year after the year in which a total profit share is generated.

As an alternative, you may choose to delay paying federal income taxes on your Profit Sharing distribution. You can do that by directing the Corporation to place 100% of your share, when it is above the minimum payment amount, into the Personal Savings Plan. If you do, your money is invested in up to four investment options, as you direct. You should refer to the first section of this booklet for information on your Personal Savings Plan investment options and distribution procedures.

If you elect to place your Profit Sharing amount in the Personal Savings Plan, it will be subject to Social Security taxes. But federal income taxes — and in most cases, state and local income taxes — will be delayed until you withdraw your money at a later date.

If you choose to save your Profit Sharing amount in the Personal Savings Plan, any necessary taxes will be withheld from your next regular paycheck — not from your Profit Sharing amount.

Whatever your Profit Sharing choice, remember that your next election will remain continuously in effect, until you change it.

10



# GMAC Demand Note Program

The GMAC Demand Note Program, offered exclusively to you as a member of the GM Family, is an excellent alternative to money market funds and bank savings accounts. With Demand Notes you will enjoy the benefits of a higher yield than most comparable investments, as well as easy access to your funds, without making a large initial deposit. Since 1985, Demand Notes have been able to help thousands of GM employes save for a variety of goals, including their children's education, dream homes, vacations, and retirement. Whatever your investment needs, Demand Notes may be for you.

## Eligibility

You are eligible to participate in the Demand Note Program the day you begin your employment with General Motors. Your immediate family members, defined as spouse, parents, and children, also are eligible to participate in the Demand Note Program. Participation in the Program is voluntary.

## Benefits of Demand Notes

Here are some of the benefits you will receive with Demand Notes:

### Low Initial Investment

You may begin a GMAC Demand Note with as little as $250. Additional investments of $50 or more may be made at any time.

### Payroll Deduction

As a GM employe you are eligible to invest in Demand Notes through payroll deduction. There is no initial investment required if you choose to begin investing in Demand Notes using this method. The minimum deduction is $11.50 per week.

### Easy, Convenient Access to Your Money

You will have easy, convenient access to your money. Your Demand Note may be redeemed at any time by phone or mail. Free check-writing privileges, subject to a $250 minimum dollar restriction on each check, also are available.

### Interest Compounded Daily

The interest you earn on your Demand Note is compounded daily and reinvested automatically in your account at the end of the month. The Demand Note rate is reviewed on a weekly basis. For current rate information call 1-800-426-8323.

## No Administrative Fees

There are no hidden charges that reduce your yield; GMAC absorbs all Program costs. You can withdraw all or part of your investment at any time without paying service fees or penalties.

## Convenient Records

You will receive confirmation of each investment from The Northern Trust Company, the processing bank for the Program. You also will receive a monthly summary of your investments and redemptions, so you will have available an accurate and up-to-date record of all your transactions.

## A Highly Rated Investment

Demand Notes are highly rated by three of the nation's leading credit rating agencies: Standard & Poor's Corporation, Moody's Investors Service, and Fitch Investors Service, Inc.

## Additional Information

The money you invest in Demand Notes is put to work by GMAC in its financial services business. Demand Note investments help GMAC provide financing for retail and lease customers, as well as for vehicles kept in GM dealer inventories.

## Enrollment Information

GMAC Demand Notes are offered by Prospectus only. You can obtain a Prospectus by calling 1-800-255-4622 or writing GMAC Demand Notes at: P.O. Box 33129, Detroit, MI 48232-5129.

11



# If You Have Health Care Expenses

The General Motors Health Care Program provides protection for you and your eligible dependents against a wide range of health care expenses. **The specific provisions of the Program, the range of covered services, eligibility rules and so forth may change from time to time through the years. Additionally, while coverages provided under the Program are very broad and comprehensive, the Program does not cover all health care services and expenses under all circumstances. Therefore, you should seek guidance from your health care carrier if you have questions as to whether or not a particular health care service or expense is covered under the Program.**

All coverages will become effective on the first day of the month following the month in which you are actively at work, after acquiring seven months of seniority. If you are not in active service on the date your health care coverages otherwise would start, your coverages will become effective upon your return to work.

Basic hospital, surgical, medical, prescription drug, hearing aid, mental health and substance abuse coverages are known as "core coverages." These coverages are provided through the "Informed Choice Plan" (ICP). Dental and vision coverages also are provided and are known as "non-core coverages." Once you are eligible for the Informed Choice Plan, you will be offered a choice, among three health care options, to the extent they are in effect and available in your area, as follows:

- the Traditional option;
- the Preferred Provider Organization (PPO) option; or
- the Health Maintenance Organization (HMO) option.

These options are designed to provide quality care on a cost-effective basis. Descriptive materials concerning benefits provided under each option are available at the office that administers your health care benefits. Although coverages may differ slightly under the various options, in general, covered expenses include items detailed below. **This is a general description only and the provisions of the Program control your eligibility for coverage and specific benefits.** A glossary of terms is provided at the end of the health care section.

## THE TRADITIONAL OPTION

The Traditional option has prior authorization (predetermination) and review procedures to help you and your covered family members avoid unnecessary surgery and services, or unnecessary or prolonged hospitalization. Specifically, the appropriateness of the setting is reviewed as well as the proposed length of stay. If your hospital or physician fails to follow the predetermination process, the reimbursement may be reduced. You will not be responsible for the amount of the reduction, **unless you have agreed to accept responsibility. However, if you are denied prior authorization, and elect to have the services performed, you will be required to pay (1) the first $100 of hospital expenses, plus (2) the first $100 of medical and** surgical expenses. **In addition, you will be required to pay 20% of the balance, subject to an annual maximum of $750 per person, or $1,500 per family.**

**You should inform your physician or hospital that predetermination can be obtained by calling the toll-free telephone number printed on your health care identification card.**

Predetermination is not required in cases of emergency or maternity hospital admissions. **However, emergency hospital admissions must be reported by your physician or hospital within 24 hours after the admission.** This can be done by calling the toll-free telephone number printed on your health care identification card.

12

## Hospital Coverage Provides . . .

payment of charges for:

- up to 365 days of needed care in a semiprivate room in a **participating** hospital for general conditions, including maternity care;

- up to $180 per day for room, board, and all covered services in a **non-participating** non-psychiatric hospital, and full coverage for the first five days of emergency admissions;

- up to 730 days of medically necessary care **(other than custodial care)** in an **approved** skilled nursing facility for general conditions;

- **most medical needs in a hospital or approved facility,** such as supplies, drugs, dressings, anesthesia, x-rays, laboratory tests, intensive care, and routine nursery care;

- **most services in the outpatient department of a hospital,** such as treatment of accidental injuries and certain medical emergencies, surgery, physical therapy (up to 60 treatments per condition per year, which also may be performed in an **approved facility** other than a hospital), and use of an artificial kidney machine, iron lung or similar equipment;

- **medically necessary transfers by ground ambulance between hospitals,** and for transfers from hospitals to facilities with approved CAT scan equipment **(air and/or boat ambulance transportation is excluded);**

- services provided by **approved** home health care programs, including payment for necessary skilled nursing and home health care aides;

- hospice services for terminally ill enrollees when provided through an **approved** hospice program;

- a case management system to identify — and help avoid — unnecessary or prolonged hospital stays. This system will aid those with catastrophic or severe chronic medical conditions and is available on a voluntary basis.

## Medical and Surgical Coverage Provides . . .

payment of reasonable and customary charges for medically necessary:

- surgery and anesthesia, including pre- and post-operative care;

- obstetrical delivery, including pre- and post-natal care;

- in-hospital consultation;

- in-hospital medical care by the doctor in charge of the case;

- doctor's medical visits, at the rate of two per week, for up to 730 days in an approved skilled nursing facility for general conditions;

- radiation therapy and chemotherapy of certain types for malignant conditions;

- organ transplants for certain organs, up to $25,000;

- laser surgery which replaces a cutting procedure;

- necessary and appropriate diagnostic x-ray, laboratory and pathology services;

- laboratory testing for one routine PAP smear per calendar year;

- outpatient treatment of accidental injuries and certain medical emergencies;

- voluntary sterilization; and

- speech therapy for children under six with certain congenital and severe developmental speech disorders.

## Prosthetic and Orthotic Appliances and Durable Medical Equipment Coverage Provides . . .

payment of approved providers' reasonable and customary charges for:

- the purchase, fitting and repair of certain external prosthetic or orthotic appliances which replace a body part or the functions of a permanently malfunctioning body part (these appliances must be prescribed by a licensed physician and furnished and billed by a hospital or provider/supplier approved by the carrier); and

- the rental or purchase of certain durable medical equipment (such as hospital beds, crutches, wheelchairs, portable insulin pumps, home glucose monitors or bone growth

13

stimulators) in appropriate cases and when prescribed by a licensed physician. This equipment must be required for the treatment of a medical condition and be provided and billed by a hospital, skilled nursing facility or professional provider, such as a pharmacy or medical supply house.

## Prescription Drug Coverage Provides . . .

payment of the prescription charge, less a copayment of $5, for each prescription order or refill for:

- the purchase of drugs which require prescription by a licensed physician under federal law; and/or

- injectable insulin and disposable syringes and needles when prescribed to inject the insulin.

Drug quantities are limited to a maximum of a 34-day supply per prescription, except for certain maintenance drugs, which may be dispensed in 100 or 200 unit doses. Disposable syringes and needles are limited to a 1-month supply, when prescribed with a 1-month supply of insulin or, if greater, 100 syringes and needles, when prescribed with a 3-month supply of insulin.

Charges for prescription drugs purchased from a participating pharmacy are billed directly to the carrier.

If prescription drugs are purchased from a non-participating pharmacy, you will be required to pay the full charge. You then should file a claim with your carrier. You will be reimbursed 75% of the reasonable and customary charge, less the $5 copayment, for each prescription filled by a non-participating pharmacy within the geographic area in which your carrier administers coverage. Prescriptions filled by a non-participating pharmacy out-of-area will be reimbursed at 100%, less the $5 copayment.

### Mail Order Prescription Drugs

**If you are enrolled in the Traditional or PPO option,** the mail order prescription drug program is an option available to you any time you have a prescription to be filled. This program can be particularly helpful and cost-effective when you require maintenance drugs over an extended period of time, or when you do not need to have a prescription filled immediately. Under the mail order program, you can expect to receive your filled prescription in about 2 weeks from the time you mail your prescription. You can obtain up to a 90-day supply per prescription. The copayment is $2 per prescription.

You may request order envelopes by writing to:

Metropolitan Life
MediMET Prescription Drugs
P. O. Box 3018
Utica, NY 13504

Please make sure you include your Social Security number when you write to Metropolitan. You also can request order envelopes by calling National Rx Services at 1-800-282-2881.

## Mental Health and Substance Abuse Treatment Coverages . . .

**for Traditional and PPO option enrollees** have been combined into a single, managed care program called CareLine which: (1) has a network of panel providers, (2) promotes the delivery of care in appropriate settings, and (3) has an improved level of coverage.

CareLine has a toll free telephone number which is available 24 hours a day. If you have questions regarding your mental health/substance abuse coverages or need services, call CareLine at 1-800-235-2302. **Remember, you must use panel providers to receive full benefits.**

Changes to substance abuse coverage became effective on January 1, 1991 and the provisions relating to mental health on July 1, 1991. The combined mental health/substance abuse coverage provides for:

- A national central review organization (CRO) which is designated to: (1) confirm the eligibility of the patient for coverage under the Program; (2) authorize and approve all inpatient and outpatient mental health treatment, certain courses of outpatient substance abuse treatment and outpatient psychological testing; and (3) evaluate panel providers and give feedback to the carrier;

- A network of central diagnostic and referral agencies (CDRs) located in most communities, responsible for making all the face-to-face assessments required under the Program for the development of substance abuse continuing care treatment plans. In addition,

14

they make determinations regarding whether the patient's condition requires mental health and/or substance abuse treatment. The CDRs also make referrals to panel providers and perform aftercare planning and follow-up. In addition, CDRs may provide short-term adjustment counseling (up to three visits) to employes needing assistance for personal problems. The CDR may communicate with Employe Assistance Program representatives about assessment and referral activities relating to an employe, where appropriate, and when authorized by the employe;

- A limited nationwide network of inpatient and outpatient mental health and substance abuse professionals, including psychiatrists, Ph.D. psychologists, masters degreed and licensed psychiatric social workers, hospitals, day/night programs, halfway houses, and detoxification facilities;

- Up to a maximum of 45 days mental health and/or substance abuse inpatient care, (these days, including detoxification, are renewable after 60 consecutive days of being "out of care") and up to 35 visits per calendar year for outpatient substance abuse treatment. Outpatient mental health coverage provides up to 35 visits per calendar year, with visits 1-20 paid in full and visits 21-35 paid at 75% of the panel reimbursement level;

- Up to 90 day/night visits per calendar year for mental health and/or substance abuse treatment. Each day or night of care reduces the number of remaining inpatient days by 1/2 day. Each day of inpatient care reduces the number of day or night care by two. These days are renewable after 60 consecutive days of being "out of care";

- Up to 90 days in a skilled nursing facility for mental health care. Each day of inpatient care for mental health treatment within the benefit period reduces by two the number of available days for skilled nursing facility care. Each two days of medical care for the treatment of mental disorders in a skilled nursing facility reduces by one the number of days of inpatient medical care available for the treatment of mental health related disorders in a hospital;

- Up to a lifetime maximum of 90 days of care in a substance abuse halfway house treatment program; and

- Psychological testing, when authorized by the CRO.

If mental health services are rendered due to an emergency, then the provider must contact the CRO to receive authorization within 24 hours. If outpatient mental health services are rendered by a non-panel physician, then the first visit will be covered. Any additional visits must be authorized by the CRO. Unauthorized visits will be paid at 50% of the amount which would have been paid to a panel provider. These payments will be made to the enrollee, not the provider. The enrollee is responsible for paying the provider. Mental health services rendered by non-panel, non-physician providers, (psychologists, social workers, etc.) are not covered under the Program.

Coverage is not available for treatment of mental disorders which are not amenable to improvement except that coverage is available to determine that the disorder is not amenable to favorable modification, or for the evaluation and diagnosis of mental deficiency or retardation.

The coverage is structured in such a way that every enrollee will have easy access to the panel of providers. Therefore, if substance abuse services are rendered by a non-panel provider, the off-panel substance abuse services are not covered.

The focus of the substance abuse treatment coverage is to assist employes (and their dependents) in recovering. Toward this end, if an employe discontinues his/her treatment plan, there will be a warning issued for the first occurrence. For the second occurrence, up to $500 will be recovered from the employe as an overpayment. For a third occurrence, up to $750 will be recovered, and for a fourth or subsequent occurrence, up to $1000 will be recovered. Such overpayments will be recovered from the employe through cash payments or deductions from wages. The GM Medical Director may waive the overpayment if the employe establishes, to the satisfaction of the Medical Director, that the plan was discontinued for a satisfactory reason.

## Hearing Aid Coverage Provides . . .

benefits for you if you are enrolled in the Traditional or PPO option and you have been examined by an ear specialist (otologist or otolaryngologist). This examination is to determine if your hearing problem is caused by a condition which may be corrected by use of a hearing aid. This examination is not a covered service.

15

If it is determined that your hearing problem may be corrected by use of a hearing aid, benefits can be provided. Payment will be made for the reasonable and customary charges for the following services, **when obtained from a participating provider**, once during any period of 36 consecutive months:

◎ audiometric examination;

◎ hearing aid evaluation test (up to $86, subject to change each October); and

◎ one hearing aid (acquisition cost and dispensing fee). However, only the particular hearing aid prescribed as a result of the hearing aid evaluation test will be covered.

Covered services also include an ear mold, necessary fitting and adjustment of the hearing aid, and a follow-up examination to determine the effectiveness of the hearing aid.

Binaural (one aid for each ear) hearing aids may be covered **for children under age 19**. There must be a hearing loss in both ears, and the examination by the ear specialist also must reveal that such an aid will correct, or prevent, speech impairment.

## THE PREFERRED PROVIDER ORGANIZATION (PPO) OPTION

Under this health care arrangement, selected doctors, hospitals and other health care providers in a geographic area are pooled together to provide services to you and your family. Because they have agreed to participate under this arrangement, they can offer quality care on a cost-effective basis.

When PPO providers are used, the PPO option covers all services included under the Traditional option. The PPO option also offers some **additional** benefits, when services are provided by PPO providers. These services include:

◎ 70% payment for a home or office visit by, or on referral from, a PPO physician;

◎ a maximum of $100 of a PPO physician's fees for well baby care for children under the age of one;

◎ limited immunizations, by a PPO provider, of children six years of age or younger, against diphtheria, tetanus, pertussis, polio, measles, mumps and rubella; and

◎ a prescription drug copayment of $3 per prescription. Use of the mail order prescription drug program, with a $2 copayment per prescription, also is available to PPO enrollees (see page 14).

If you are enrolled in a PPO and you incur charges for covered services because you choose to go to a non-PPO provider, without referral by a PPO provider, you will be responsible for 20% of the lesser of (1) the reasonable and customary charges, or (2) the actual charges incurred. Your payments will continue until your out-of-pocket expenses for such payments reach an annual maximum of $500 per person, or $1,000 per family. The 20% payment will not apply in cases of emergency when you are (1) outside of the geographic area of your PPO, or (2) in-area but services are not available from a PPO provider.

## THE HEALTH MAINTENANCE ORGANIZATION (HMO) OPTION

Health Maintenance Organizations (HMOs) are health care delivery systems or organizations which emphasize preventive health care and early treatment, as well as provide medically necessary care for illness and injury. HMO coverage differs from the Traditional option in that you must receive services from HMO providers for the services to be covered. Unlike the PPO option, non-emergency services obtained from providers outside of the HMO panel are NOT covered at all unless the primary care physician makes the referral or the HMO authorizes treatment.

HMOs have monitoring systems to assess quality of care, necessity of treatment, and appropriateness of inpatient hospital stays. The coverage varies among individual HMOs, but all HMOs include certain preventive and routine care services such as physical exams, office visits and immunizations. Generally, such care is provided at lower or no cost to you.

HMOs also provide for prescription drugs, mental health, substance abuse and other coverages. A few HMOs also provide vision coverage which replaces the Traditional vision coverage. **Coverage for services may vary from that provided under the Traditional option**. Therefore, it is important to review the HMO materials carefully to become familiar with the

16

scope and level of benefits that are available through a particular HMO.

HMOs are offered based on your address of record. To obtain information regarding the HMOs available to you, please contact the office that administers your health care benefits. Additional literature can be obtained by contacting an HMO and requesting the membership handbook that describes its benefits and the provider directory which lists the doctors, hospitals, laboratories and pharmacies that participate in that HMO.

## Dental Coverage Provides . . .

benefits up to an annual maximum of $1,200 per person, for other than orthodontics (teeth straightening) during any calendar year, January 1 through December 31.

The lifetime maximum is $1,300 per person for orthodontics, for any individual whose course of treatment begins before age 19. Benefits are not available for treatment begun after attainment of age 19.

For coverage provided through the "Delta Dental" organizations of Michigan, Missouri, California, and Oklahoma, benefits are based on the reasonable and customary charges of participating dentists. Benefits for services performed by a non-participating dentist are based on an established fee for services performed. These fees may be lower than the fees payable to participating dentists.

For coverage provided through Connecticut General Life Insurance Company and Community Mutual Insurance Company, benefits are based on reasonable and customary charges of all dentists, as determined by the carrier.

Alternative dental plans are available in some areas. The benefits provided by such plans may be different than the benefits provided under the traditional dental coverage. **When enrolled in alternative dental plans, benefits may be reduced when services are obtained from non-participating dentists.**

**Benefits are payable at 100% of the reasonable and customary charge for:**

- oral examinations and prophylaxis (cleaning of teeth), but not more than twice in a calendar year (three cleanings per calendar year if you have a documented history of periodontal disease);

- topical application of fluoride for persons under age 20;

- space maintainers that replace prematurely lost teeth for persons under age 19; and

- emergency treatment for temporary relief of pain.

**Benefits are payable at 90% of the reasonable and customary charge for:**

- dental x-rays, including full mouth x-rays (but not more than once in any period of 5 consecutive calendar years), and bitewing x-rays (but not more than once in a calendar year);

- extractions and oral surgery;

- amalgam, silicate, acrylic, synthetic porcelain and composite fillings;

- general anesthetics and intravenous sedation when medically necessary and administered in connection with oral or dental surgery;

- endodontic (nerve and pulp) and periodontal (gum) treatment;

- injection of antibiotic drugs by the attending dentist;

- repair of crowns, bridgework or dentures; and relining or rebasing of dentures more than six months after installation, but not more than one relining or rebasing in any period of 3 consecutive calendar years;

- inlays, onlays, gold fillings or crowns, but only when the tooth cannot be restored with an amalgam or other filling; and

- cosmetic bonding of 8 front teeth when certain conditions exist for children 8-19 years of age, but not more than once in any period of 3 consecutive calendar years.

The remaining 10% of the reasonable and customary charge is a copayment payable by you.

**Benefits are payable at 50% of the reasonable and customary charge for:**

- initial installation of fixed bridgework;

- initial installation of removable dentures, including any adjustments during the six-month period following installation;

- replacement of an existing denture or fixed bridgework, but only when:

17

(a) the replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed; or,

(b) the existing denture or bridgework cannot be made serviceable and, if it was installed under this coverage, at least five years have elapsed prior to the replacement; or,

(c) the existing denture is an immediate temporary denture which cannot be made permanent, and replacement by a permanent denture takes place within 12 months from the date of initial installation of the immediate temporary denture; and

⊚ orthodontic (teeth straightening) procedures and treatment (including related oral examinations) for any person whose course of treatment begins before age 19 (subject to a maximum lifetime payment of $1,300). Benefits are not available for treatment begun after attainment of age 19.

The remaining 50% of the reasonable and customary charge is a copayment payable by you.

## Vision Coverage . . .

is provided through Metropolitan Life Insurance Company, except for certain HMOs. Benefits will be provided for the reasonable and customary charges (less copayment) for the following covered services:

⊚ vision examination by an ophthalmologist or optometrist, once during a calendar year ($7 copayment);

⊚ lenses, once during a calendar year ($10 copayment);

⊚ frames, once during 2 consecutive calendar years ($10 copayment unless frames are supplied with new lenses, in which case one $10 copayment applies to both lenses and frames);

⊚ contact lenses in lieu of regular lenses, when vision cannot be corrected to 20/70 in the better eye except by their use, or when certain irregularities in the shape of the eye require their use ($10 copayment). When contact lenses are prescribed for any other reason, the maximum benefit will be $55, less the $10 copayment. Benefits will be provided for the reasonable and customary charge (less copayment) for contact lenses following cataract surgery, unless otherwise provided under the medical and surgical coverage.

Under certain conditions a benefit may be payable for a second examination within 60 days of the first examination.

If you obtain your frames from a participating provider and you select frames from a display the provider will show you, there will be no expense to you, other than the copayment. However, if you select frames not included in the display, or obtain your frames from a non-participating provider, the maximum benefit will be $15, less the $10 copayment.

The total copayment for each covered individual during a calendar year will not exceed $17 ($7 for a vision examination and $10 for lenses and frames combined).

### Preferred Vision Provider Program

The Preferred Vision Provider (PVP) Program also is provided through Metropolitan Life Insurance Company. When you go to a PVP, your copayment will be $4 for a vision examination and $5 for lenses and frames. You also will be able to receive additional services, and a second pair of glasses, at a reduced cost to you.

18

# GENERAL INFORMATION ABOUT YOUR HEALTH CARE COVERAGES

## Effect of Medicare

You become eligible for Medicare at age 65, whether or not you choose to continue working. However, if you continue to work after age 65, Social Security will not notify you of your eligibility to enroll for Medicare. **It is your responsibility to contact the local Social Security Administration office to apply for Medicare,** whether or not you are working when you attain age 65. It is suggested this contact be made three months prior to attaining age 65. This will allow sufficient time to process your application so you will not miss your initial opportunity for enrollment.

If you or one of your dependents have a severe long-term disability, end-stage renal disease, or undergo a kidney transplant, you may be eligible for Medicare coverage prior to age 65. If you or one of your dependents fit one of these categories, you should contact your nearest Social Security Administration office to have your case evaluated.

**Generally, you or your dependents will want to enroll for Medicare when you first are eligible to do so.** This is true not only because of penalties which may be incurred in Medicare premiums, but also because Medicare may cover services not covered by the GM Health Care Program. **Moreover, eligibility for Corporation-paid coverage may depend on Medicare enrollment.** For example, in the event of your death, your surviving spouse will not be eligible for Corporation contributions for any GM health care coverages if your spouse is eligible, but is not enrolled, for Medicare Part B at or after age 65.

**If you are working,** and you (1) are over age 65, or (2) have a dependent who is eligible for Medicare, you may elect to have coverage under both the GM Program and Medicare. If you do so, the GM Program will be the primary source of benefits (the first to pay for any covered services). Generally, it is in your interest to apply for Medicare hospital insurance (Part A). There is no premium if you have enough work credits under Social Security, and Part A can supplement the GM Program. Enrollment in Medicare medical insurance (Part B) is required for your age 65 or older surviving spouse to receive Corporation-paid coverage in the event of your death **(see preceding paragraph)**, and may provide secondary benefits. For example,

Medicare Part B may cover physician office visits, which generally are not covered under the GM Program.

**If you retire** and are enrolled in Medicare, Medicare will be the primary source of benefits for you and your dependents who also are enrolled for Medicare. Benefits otherwise payable under the GM Program will be adjusted to reflect the amount of benefits payable by Medicare for the same covered services. The GM Program will supplement Medicare, to the extent the GM Program covers services Medicare does not cover. **Your health care claim first must be filed with Medicare.** After Medicare pays its portion, the claim should be sent to the appropriate GM carrier. If you are enrolled in an HMO, you must follow the guidelines of the HMO regarding Medicare claims processing.

## Special Benefit

**If you are enrolled in Medicare Part B on and after January 1, 1991,** and are a (1) retiree, (2) surviving spouse receiving a pension benefit, or (3) disabled employe eligible to receive Extended Disability Benefits, you may be eligible to receive a full monthly Special Benefit for each month you maintain Medicare Part B enrollment. The amount is equal to the lesser of the Medicare Part B premium or:

| 1-1-91 through 12-1-91 | 1-1-92 through 12-1-92 | 1-1-93 and After |
|---|---|---|
| $29.90 | $31.80 | $38.50 |

The Special Benefit paid monthly is included in your pension or Extended Disability Benefit payment. Also under current federal income tax law, if your Medicare Part B enrollment is verified by GM, the Special Benefit will be non-taxable to you.

On and after January 1, 1991, disabled employes, retirees and surviving spouses who were enrolled in Medicare Part B coverage as of October 1, 1990, or who first become eligible for Medicare Part B coverage on or after that date, must be enrolled in Medicare Part B as a condition for

receipt of the Special Benefit. Any recipient who is enrolled in Medicare Part B coverage on or after January 1, 1991, will have the Special Benefit discontinued for periods during which Medicare Part B enrollment is not maintained.

## Coordination of Benefits

A coordination of benefits (COB) provision is included in all coverages under the GM Health Care Program. The purpose of this provision is to avoid duplicate payment of benefits in the event an individual is covered by more than one employe's health care plan. For example, if expenses are incurred by your spouse who is covered by another plan, the other plan may have the primary responsibility of payment. If so, your overall coverages may be enhanced and the cost to the GM Program will be reduced.

Under COB, the idea is to maximize the combined value of multiple plans. If done properly, you and your dependents will receive no fewer benefits than you would have received under the GM Program alone and you may receive more or enhanced benefits.

**When the GM Program is secondary, the following provisions apply:**

(1) Certain requirements under the GM Program, such as predetermination of hospital admissions, are waived. However, if you are enrolled in an ICP HMO option, you still may be required to obtain services from the HMO panel of providers, or obtain a referral from the HMO in advance for services to be covered;

(2) The GM Program will **not** pay expenses which the primary plan does not pay because of failure to follow the rules of the primary plan; and

(3) Only those services covered under the GM Program will be considered for additional benefit payment. For example, if the primary plan covers office visits, no additional payment will be considered for a Traditional enrollee, because office visits are not covered under the GM Program.

The GM carrier should be notified of other plans or programs which may cover you or your dependents. No notice is required for insurance policies issued in your name, or a dependent's name, for which you pay more than 1/2 the cost.

In some cases, you may be required to provide the carriers with the additional information.

Once you have identified whether other coverage is involved, you should determine which plan is primary for the individual having a claim. If another plan or program is primary, the claim should be filed first with the primary plan or carrier. If the primary plan does not cover the health care expenses in full, the unpaid balance can be considered under the GM Program. You should provide your GM carrier with information on the payments made by the other plan or authorize the other carrier to do so. From that point, COB is handled between the carriers. If the remaining balance is for services covered under the GM Program, it will pay the balance, up to the maximum permitted under the GM Program.

### Reimbursement of the GM Program for Third Party Liability (Subrogation)

If benefits are paid under the GM Program, and later it is determined that another party should have been responsible for the expenses, the GM Program is entitled to be reimbursed. In that way, financial liability remains where it belongs, with the party responsible for incurring the expenses, and the GM Program costs are reduced.

If you, or one of your covered dependents, is involved in such a situation, you are required to provide the GM carrier with whatever assistance is necessary to recover payments made on behalf of the GM Program. If you, or your dependent, receive payment for medical expenses, you will be required to reimburse the GM Program.

## Sponsored Dependents

Certain individuals may be eligible for sponsored dependent coverage. Generally, a sponsored dependent must be related to you. With the exception of a child who is a foreign national and whom you are adopting, sponsored dependents who are not citizens of the United States must, in order to establish eligibility, (1) reside in the United States for one full year, and (2) be legally entitled to remain in this country indefinitely. You also must be able to claim an exemption for each such sponsored dependent on your federal income tax return. You pay the full cost for sponsored dependent coverages. Your sponsored dependents have their health care coverages under the Informed Choice Plan option you elect. **Dental and vision coverages are not available to sponsored dependents.**

20

If coverages for a sponsored dependent are discontinued voluntarily, because of failure to (1) make a required payment, or (2) continue to meet all the eligibility requirements, there will be a six-month waiting period prior to reinstatement of coverages. Such waiting period will begin upon receipt by the office that administers your health care benefits of an application for reinstatement of an otherwise eligible individual.

## The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)

COBRA is a federal law which provides certain employes and dependents the opportunity to continue GM group health care coverages, **on a self-paid basis**, when eligibility otherwise would end under the GM Program. Pages 68 and 69 provide additional information.

In some cases, an employe whose eligibility for coverage as an active employe ceases may be eligible for limited continuation under the GM Program provisions. In such a case, you, and your eligible dependents, will have a choice between (1) GM Program continuation and (2) COBRA continuation. If you are involved in such a situation, you will be advised of both options (GM Program and COBRA) at that time.

When health care continuation is discussed in the remaining sections of this booklet, the reference will be to GM Program continuation.

## Exclusions and Limitations

Certain health care services and charges are excluded or limited. A description of general exclusions, and limitations applicable to each benefit provided under the GM Health Care Program, may be found in the appropriate program language, or similar documents provided by the Corporation or the carriers.

In general, programs and/or surgical procedures that are considered experimental by the carrier are not covered services.

The following are **examples** of additional excluded services:

- hospital charges — related to domiciliary, custodial, convalescent, nursing home or rest care;

- certain skilled nursing facility charges;

- blood — coverage is not provided for whole blood or packed red blood cells;

- private duty nursing — nursing care which is privately contracted by, or on behalf of, an enrollee with a nurse, or agency, independent of the Program;

- personal convenience items; and

- services provided by family members.

## Cessation of Coverages

Health care coverages cease at the end of the month in which you are last in active service.

Conversion privileges are set forth on page 61.

## HOW TO FILE A CLAIM

Your Social Security number always is needed when you communicate with any of the carriers. If you are a dependent, the Social Security number of the employe, retiree, or surviving spouse through whom you have coverage is needed.

## Basic Hospital, Medical, Surgical, and Prescription Drug Claims

If your carrier is a Blue Cross or Blue Shield plan, show your health care identification card when you go to the hospital, residential or outpatient treatment facility, physician, or other provider of covered services anywhere in the country. Usually, the hospital or other facility is paid directly by Blue Cross for covered services. Blue Shield generally pays physicians directly for covered services. In any situation where a provider of a service is not paid directly by Blue Cross-Blue Shield, you should submit the charges to your local Blue Cross-Blue Shield plan office.

If your carrier is Metropolitan Life Insurance Company, obtain a claim form from the office that administers your health care benefits, or from Metropolitan. Complete the upper portion of the form and have the hospital, residential or outpatient treatment facility, physician or other provider of covered services complete the lower portion. Either you, or the provider, can submit the completed form to Metropolitan. Payment will be made directly to the provider, unless you have paid all, or part, of the charges for covered services. In that case, Metropolitan will pay you the appropriate amount. In the case of hospital coverage provided by Metropolitan, payment will be made directly to the facility.

21

## Mental Health and Substance Abuse Claims

Because the mental health and substance abuse coverages utilize a closed panel of approved providers only, the facility, or other provider, generally will have a supply of claim forms.

Claim forms also may be obtained from (1) the office that administers your health care benefits, or (2) an authorized Central Diagnostic and Referral agency (CDR). If it becomes necessary for you, instead of the facility or provider, to submit a claim form to Connecticut General Life Insurance Company (CG) (e.g., you receive outpatient mental health treatment from a non-panel physician provider to whom you must make payment before you may seek 50% reimbursement for yourself from CG), you are required to send the originals of either (1) itemized bills, (2) statements, or (3) receipts for each of the medical expenses for which you are claiming payment.

The substance abuse assessment section of the claim form must be completed by the assessment coordinator from the CDR agency. Otherwise, benefits for that treatment will not be payable.

To be considered, a claim MUST be submitted before the end of the calendar year following the calendar year in which expenses related to the claim were incurred.

## Hearing Aid Claims

Because only approved or participating providers are eligible for reimbursement, such providers generally will have the necessary hearing aid claim forms. Benefits will be paid directly to the provider by the carrier. **Benefits are payable only if you obtain hearing aid services from a participating provider, and only if they are obtained in the appropriate sequence** . Ask the provider if he or she is participating, **before** you receive services. If you need the name of a participating provider, inquire at the office that administers your health care benefits, the Blue Cross-Blue Shield Plan in which you are enrolled, or Metropolitan, as may be applicable.

## Dental Claims

Dental claim forms and instructions generally are available from dentists in areas where there are GM employes and retirees. In addition, claim forms also are available at the office that administers your health care benefits, and from the carrier for your area.

If a course of treatment is expected to involve dental expenses amounting to $200 or more, **prior** to the commencement of treatment, your dentist should file with the carrier a description of the procedures to be performed and an estimate of the charges. The carrier will notify the dentist of estimated benefits payable, with consideration given to alternate procedures that may be performed to accomplish the desired results.

**Before treatment begins**, you should discuss with your dentist the treatment plan, the fee, and the estimated dollar amount of benefits.

## Vision Claims

Except for certain HMOs, Metropolitan Life Insurance Company is the vision coverage carrier for all employes and retirees. A claim form may be obtained from the office that administers your health care benefits, or from a participating provider. Complete your portion of the form and have the remaining portion completed by the provider. The completed form should be sent to Metropolitan. Payment will be made directly to the provider, unless you have paid all, or part, of the charges for covered services. In that case, Metropolitan will pay you the appropriate amount.

## EXPLANATION OF CERTAIN TERMS APPLICABLE TO HEALTH CARE COVERAGES

### Carrier . . .

any entity through which GM Health Care Program coverages are administered or benefits are paid, including, but not limited to, General Motors, a Blue Cross or Blue Shield plan, a commercial insurance company, a health maintenance organization or a preferred provider organization.

### Approved Facility or Treatment Program . . .

a facility or a treatment program that has met criteria established by the carrier to provide certain services covered by the GM Health Care Program. **The following are examples of facilities and treatment programs which must be approved by the applicable carrier for full benefits to be paid.**

22

- hospitals

- skilled nursing facilities

- outpatient mental health facilities

- substance abuse treatment facilities

- outlets for prosthetic or orthotic appliances

- free standing physical therapy facilities

- home health care programs

- hospice programs

- free standing ambulatory surgical centers (FASCs)

- hemodialysis programs

In addition, certain services are not payable under the GM Health Care Program unless rendered by approved facilities or on approved equipment. Some services also must meet certain medical criteria. The following are examples of services which must be pre-authorized and rendered by approved providers:

- magnetic resonance imaging (MRI)

- extracorporeal shock wave lithotripsy (ESWL)

In addition, Computerized Axial Tomography (CAT) scan services must be rendered on approved equipment.

If you have any doubts about the approved status of a facility or treatment program, you should contact the appropriate health care carrier.

## Copayment . . .

a part of the charge for services which you must pay. Most health care expenses are paid in full by the appropriate carrier. However, you must pay part of the charge, or a "copayment", for certain services, such as outpatient mental health care, prescription drugs, dental care, and vision care.

## Provider . . .

a person (such as a doctor) or a facility (such as a hospital) that provides health care services. Providers are considered to be "participating" when they have signed an agreement with the carrier to accept as "payment in full" the amount which the carrier determines to be an appropriate charge for services rendered. **You should use**

**participating providers, whenever possible, to limit the likelihood of personal liability for charges in excess of the carrier's payment.**

You may be uncertain about the participating status, or whether there is any need for participation, by any health care provider in your area. If in doubt, contact the appropriate carrier or the office that administers your health care benefits.

## Reasonable and Customary Charge . . .

an amount determined by the carrier, according to certain standards and considerations. **The carrier's determination is conclusive. The carrier will support your refusal to pay more, unless you have paid, or have agreed to pay, an amount in excess of the reasonable and customary charge.**

## Predetermination . . .

a system which applies to Traditional option enrollees and requires doctors and/or hospitals to obtain prior approval of all non-emergency, non-maternity hospitalizations and certain other services. Enrollees also may request predetermination. Predetermination of hospital admissions does not apply to Medicare-enrolled individuals where Medicare is primary.

## Dependents . . .

certain individuals may be eligible for coverage as a "dependent" of an employe, retiree, or surviving spouse. In some cases, a dependent may be eligible for Corporation-paid coverage; in some cases, a dependent will be eligible only for coverage paid for entirely by you. With the exception of a spouse, you generally must be able to claim an exemption for the dependent on your federal income tax return (in accordance with Section 151 of the Internal Revenue Code). To be eligible for GM-paid coverages, an otherwise eligible child of a divorced employe or retiree is eligible for coverage if the divorce decree, or order of the court of proper jurisdiction, stipulates that the employe or retiree is legally responsible for providing health care coverage for the child, and if the child meets all other eligibility criteria. **The Corporation's determination of eligibility, in accordance with GM Program provisions, is conclusive. You must provide the Social Security number of all dependents for whom you are required to provide a Social Security number when claiming an exemption on your federal income tax return.**

23



# While You Are Disabled

## WHILE YOU ARE UNABLE TO WORK . . .

because of sickness or injury and you are under the care of a doctor, weekly sickness and accident benefits can provide you with income for as long as 52 weeks.

Sickness and accident benefits also may be payable if you are (1) disabled from surgery for sterilization, or (2) hospitalized for testing to determine your suitability to be a donor for an organ or tissue transplant.

If you continue to be disabled after the period for which you are entitled to receive sickness and accident benefits, you may be eligible for monthly extended disability benefits.

Sickness and accident and extended disability benefit coverages begin the first day of the sixth month following the month in which your employment commences. If you are not at work on the day your sickness and accident and extended disability benefit coverages otherwise would begin, these coverages begin the day you return to work.

The amounts of your sickness and accident and extended disability benefits are shown on page 26.

## SICKNESS AND ACCIDENT BENEFITS ARE PAYABLE . . .

for up to 52 weeks. If you have less than 52 weeks of employment, benefits are payable on a time-for-time basis which commences on your date of hire. This means benefits will be payable for a period equal to your length of employment (or your years of participation under the Life and Disability Benefits Program, if longer) at the time you become disabled. If you have less than 52 weeks of employment when you become disabled, benefits may continue beyond the time-for-time period (but not beyond 52 weeks) while you are hospitalized, or while you are receiving workers compensation payments from GM.

### To Receive Sickness and Accident Benefits . . .

you must give written notice of any sickness or injury within 20 days after (1) the onset of the sickness, or (2) the accident causing your injury.

### Sickness and Accident Benefits May Begin . . .

immediately in case of an accident if you are (1) hospitalized, or (2) treated by a doctor or the plant medical department, during the first seven days of disability. In case of sickness, benefits begin (1) after a waiting period of seven days, (2) when hospitalized, or (3) when confined in an approved substance abuse facility.

Benefits can begin the day after surgery, in case of outpatient surgery where a surgical benefit of $25, or more, is payable under the hospital,

surgical and medical coverages of the GM Health Care Program.

If you return to work before the end of the maximum period for which you are eligible to receive sickness and accident benefits, and are absent again within three months because of the same, or a related disability, benefits resume where they left off. For example, if you were disabled and received sickness and accident benefits for 20 weeks, returned to work and then became disabled again 8 weeks later from the same condition, you would be eligible for 32 additional weeks of benefits, without a new waiting period. If your second absence results from a different cause, the first absence does not affect the benefits or waiting period, if any, for the second absence.

24

## Sickness and Accident Benefits Are Reduced By . . .

(1) primary Social Security Disability Insurance Benefits (SSDIB) or unreduced Social Security old age insurance (including retroactive amounts paid for the same period of disability), (2) certain workers compensation payments, and (3) any unemployment compensation payments to which you are entitled for the same period you receive sickness and accident benefits. You may be required to apply for SSDIB if your disability is expected to continue for 52 weeks, or longer.

## To Apply for Sickness and Accident Benefits . . .

complete a claim form provided by GM for that purpose, and return it to the office which administers your disability benefits.

(If you are an employe working in California, New Jersey or New York, your benefits are explained in a special insert.)

| SCHEDULE OF DISABILITY BENEFITS<br>FOR EMPLOYES AT WORK ON OR AFTER OCTOBER 1, 1990 | | | |
|---|---|---|---|
| Your Base<br>Hourly Rate<br>(1) | Weekly Sickness<br>and Accident<br>Benefit (2) | Monthly Extended<br>Disability Benefit (3) | |
| | | Schedule I | Schedule II |
| Under $ 6.59 | $155 | $ 555 | $ 610 |
| 6.60 — 6.94 | 165 | 585 | 645 |
| 6.95 — 7.29 | 170 | 615 | 680 |
| 7.30 — 7.64 | 180 | 650 | 710 |
| 7.65 — 7.99 | 190 | 680 | 745 |
| 8.00 — 8.34 | 195 | 710 | 780 |
| 8.35 — 8.69 | 205 | 740 | 815 |
| 8.70 — 9.04 | 215 | 770 | 845 |
| 9.05 — 9.39 | 220 | 800 | 880 |
| 9.40 — 9.74 | 230 | 830 | 915 |
| 9.75 — 10.09 | 240 | 860 | 945 |
| 10.10 — 10.44 | 245 | 895 | 980 |
| 10.45 — 10.79 | 255 | 925 | 1,015 |
| 10.80 — 11.14 | 265 | 955 | 1,045 |
| 11.15 — 11.49 | 270 | 985 | 1,080 |
| 11.50 — 11.84 | 280 | 1,015 | 1,115 |
| 11.85 — 12.19 | 290 | 1,040 | 1,145 |
| 12.20 — 12.54 | 295 | 1,070 | 1,180 |
| 12.55 — 12.89 | 305 | 1,100 | 1,215 |
| 12.90 — 13.24 | 315 | 1,135 | 1,245 |
| 13.25 — 13.59 | 320 | 1,165 | 1,280 |
| 13.60 — 13.94 | 330 | 1,195 | 1,315 |
| 13.95 — 14.29 | 340 | 1,225 | 1,345 |
| 14.30 — 14.64 | 345 | 1,255 | 1,380 |
| 14.65 — 14.99 | 355 | 1,285 | 1,415 |
| 15.00 — 15.34 | 365 | 1,315 | 1,445 |
| 15.35 — 15.69 | 375 | 1,345 | 1,480 |
| 15.70 — 16.04 | 380 | 1,375 | 1,515 |
| 16.05 — 16.39 | 390 | 1,405 | 1,545 |
| 16.40 — 16.74 | 400 | 1,435 | 1,580 |
| 16.75 — 17.09 | 405 | 1,465 | 1,615 |
| 17.10 — 17.44 | 415 | 1,500 | 1,645 |
| 17.45 — 17.79 | 425 | 1,525 | 1,680 |
| 17.80 — 18.14 | 430 | 1,560 | 1,715 |
| 18.15 — 18.49 | 440 | 1,590 | 1,745 |
| 18.50 — 18.84 | 450 | 1,620 | 1,780 |
| 18.85 — 19.19 | 455 | 1,650 | 1,815 |
| 19.20 — 19.54 | 465 | 1,680 | 1,845 |
| 19.55 — 19.89 | 475 | 1,710 | 1,880 |
| 19.90 — 20.24 | 480 | 1,740 | 1,915 |
| 20.25 & Over | 490 | 1,770 | 1,945 |

(1) For this purpose, Base Hourly Rate includes premium for necessary continuous 7-day operations, but does not include overtime, night shift premium, or any cost-of-living allowance.

(2) If you become disabled prior to the day you attain one year of seniority, your weekly benefit amount will be 75% of the scheduled amount.

(3) Schedule II applies to eligible employes who, on their last day worked preceding a continuous period of disability, have 10 or more years of participation under the Program. Schedule I applies to all other employes eligible for extended disability benefits.

# EXTENDED DISABILITY BENEFITS ARE PAYABLE...

for a period based on your years of participation under the Life and Disability Benefits Program (see page 60).

- **If you have 10 or more years of participation when you become disabled...**

  benefits are payable until recovery, but not beyond age 65.

- **If you have less than 10 years of participation when you become disabled...**

  benefits are payable until recovery, or, if less, for a period equal to your years of participation at the commencement of disability (less the period during which sickness and accident benefits are received), but not beyond age 65.

  If you become disabled after age 63, you may receive extended disability benefits for a period of time beyond age 65.

## To Receive Extended Disability Benefits...

you must (1) not be regularly employed, and (2) be totally disabled so as to be unable to perform any job at the plant where you have seniority.

## Extended Disability Benefits Are Reduced By...

any benefit for which you are eligible under the GM Pension Plan or Retirement Program. In addition, governmental benefits such as workers compensation, certain Social Security benefits, or any federal or state lost-time benefits, are deductible. Increases in any of these benefits payable after extended disability benefits commence will not be deducted, unless the increase represents an adjustment in the original determination of the amount of such benefit. **A retroactive award of such benefits creates an overpayment of extended disability benefits which were paid for the same period of disability.** You will be required to apply for Social Security Disability Insurance Benefits (SSDIB), under a special procedure designed to handle the offset of SSDIB against extended disability benefits. You also will be required to repay any overpayment incurred due to receipt of an SSDIB award.

## To Apply for Extended Disability Benefits...

complete a claim form provided by GM for that purpose and return it to the office that administers your disability benefits.

## You May Be Asked To Be Examined By...

an impartial doctor, clinic, or other medical authority for the purpose of verifying disability, at any time you may be eligible to receive sickness and accident or extended disability benefits. Generally, if you are found able to work, your benefits will be discontinued. Failure to report for the examination may affect any eligibility you may have for benefits. You will be reimbursed, upon request, at 23¢ per mile for travel to and from the examination, if your residence is more than 40 miles (one-way) from the examiner's office.

## Life and Disability Coverages While You Are Disabled

Your basic life, extra accident, and survivor income benefit insurance, as well as sickness and accident and extended disability benefit coverages, will be continued at no cost to you for any period during which you are:

(1) entitled to receive sickness and accident benefits while totally disabled, or

(2) totally and continuously disabled and remain on an approved disability leave of absence, but not to exceed the period equal to your years of participation under the Life and Disability Benefits Program (see page 60) as of the first day of disability.

Also, such coverages may be continued while you are entitled to receive monthly extended disability benefits, after cancellation of your disability leave because the period of the leave equaled your seniority. GM will pay the full cost of your coverages during these periods.

27

If your disability leave is canceled because you recovered, and you again become totally disabled so as to be unable to work, within three working days of the date your leave was canceled, all coverages to which you were entitled will be continued at no cost to you while you remain totally disabled. However, coverage cannot continue beyond the period equal to your years of participation as of your first day of disability.

You will need to pay the required monthly contributions to continue optional and dependent life insurance while your basic life insurance remains in force.

## Health Care Coverage While You Are Disabled

In most cases, health care coverages will be continued on a Corporation-paid basis for the duration of an approved disability leave of absence. If your disability leave is canceled because the period of the leave equals your seniority prior to the leave, the coverages may be continued while you remain entitled to receive sickness and accident or extended disability benefits. Exceptions to the above include, but are not necessarily limited to, the following cases:

(1) If you are off work because of layoff, or personal leave of absence, and your coverages have been discontinued while you are off, and if upon reporting for work you are found disabled and are placed on disability leave of absence without returning to work, you will not be eligible for reinstatement of coverages and continuation while on disability leave; and

(2) If you are recalled from permanent layoff, return to work, and become disabled prior to working 12 pay periods during the calendar year, Corporation-paid continuation while on disability leave of absence will be limited to the number of months of such continuation you were entitled to as of the end of the month prior to your return to work, plus 2 months.

If you become "totally and permanently disabled" and retire under the provisions of the Pension Plan, health care coverages will be reinstated, if necessary, and continued in retirement. If you are unable to retire because you have insufficient credited service, and if you elect to take a SUB separation payment (thereby breaking seniority with the Corporation), you will be permitted to continue coverages on a self-paid basis. You can continue for the period of time you could have had coverages continued had you not taken the separation payment.

## IN CASE YOU BECOME TOTALLY AND PERMANENTLY DISABLED

### Pension Benefits . . .

may be payable, upon application, after five months of continuous disability, if you have at least 10 years of credited service and become totally and permanently disabled before age 65 (see page 46).

### Survivor Benefits . . .

may be provided for your spouse under the (1) Life and Disability Benefits Program, and/or (2) Pension Plan, if you die while you are totally disabled. (See pages 52-57 for an explanation of survivor benefits.)

### A Separation Payment May Be Provided Under the SUB Plan . . .

if you have one or more years of seniority and are totally and permanently disabled but do not have the years of credited service required for a disability pension. A SUB separation payment would be in addition to any extended disability benefits you may be eligible to receive under the Life and Disability Benefits Program. (See page 35 for the schedule of SUB separation payments.)

### Personal Savings Plan Account May be Distributed . . .

regardless of your age or seniority, if you are participating in this plan. All assets in your account may be distributed in a lump sum.

28

## SOCIAL SECURITY DISABILITY INSURANCE BENEFITS

If you become disabled before age 65, you may be eligible for disability insurance benefits from Social Security. Your nearest Social Security office can tell you if you qualify. Benefits may be payable after you have been disabled for five full calendar months.

The amount of Social Security benefits payable because of disability generally is in accord with the schedule set forth on page 49 for benefits payable at age 65.

It is important for you to apply for Social Security Disability Insurance Benefits for these reasons:

- Failure to claim a Social Security disability award may result in a lesser Social Security old age benefit.

- Your dependents also may qualify for Social Security benefits.

- Your Social Security benefits may be increased annually to reflect cost-of-living increases.

- You become eligible for Medicare Part B after 24 months of Social Security Disability Insurance Benefits. If you become enrolled in Medicare Part B, you may become eligible for payment of a monthly GM Special Benefit under the GM Health Care Program (see page 19).

- If you are receiving Social Security Disability Insurance Benefits and return to work, you may be eligible to continue these benefits, in addition to your wages, up to 12 months. You should contact your nearest Social Security office for additional information.

- Social Security disability awards are given favorable federal tax treatment.

If you are receiving sickness and accident or extended disability benefits, you may be required to complete an authorization form which allows the Social Security Administration to inform GM of the status of your claim for Social Security Disability Insurance Benefits. If you fail to complete this authorization, your sickness and accident or extended disability benefits will be suspended until the authorization is received.



# If You Are Laid Off

# SUPPLEMENTAL UNEMPLOYMENT BENEFIT (SUB) PLAN

The SUB Plan generally provides three kinds of benefits:

- **REGULAR SUBENEFITS** for full weeks of layoff from GM.

- **SHORT WEEK BENEFITS** when you are laid off from GM for part of a week.

- **SEPARATION PAYMENTS** upon termination of employment because of layoff or total and permanent disability.

## REGULAR SUBENEFITS — for a full week of layoff from GM

### Eligibility

You may be eligible for a regular SUBenefit for a full week of layoff if you are laid off due to:

- reduction in force;

- discontinuance of a plant or operation;

- temporary layoff; or

- being unable to do work offered by the plant but able to do other available work in the plant if you had more seniority.

If you refuse a JOBS Bank assignment while you are a (1) regular active employe, (2) Bank employe, or (3) laid off employe, you will not be on a qualifying layoff, and will not be eligible for SUBenefits.

If you are laid off from Plant A, accept a job at Plant B and subsequently quit Plant B, for any reason other than to accept recall to Plant A, you will be ineligible for SUBenefits for the duration of your continuous layoff from GM.

You will not be eligible for a regular SUBenefit if your layoff was for disciplinary reasons or was a consequence of:

- any strike, slowdown, work stoppage, picketing or concerted action, at a Company plant or plants, or any dispute of any kind involving, generally, employes covered by this Plan;

- any fault attributable to you, the employe;

- any war, or hostile act of a foreign power;

- sabotage (including arson) or insurrection; or

- any act of God, after the first two consecutive full weeks of layoff resulting from such cause for which regular SUBenefits are payable.

Generally, if you refuse a GM employment interview or job offer within your Appendix A-Area Hire area after your 4th full week of layoff, SUBenefit eligibility will be terminated for the duration of your continuous layoff from GM. Refusal of such a job offer during the first 4 full weeks of layoff generally will disqualify you for SUB for one week. However, if such refusal results in denial of state unemployment compensation (UC) benefits for one or more weeks of layoff thereafter, you will either (1) be denied SUB for such weeks, or (2) have your payment limited to the maximum amount of $150 per week.

### Duration of Benefits

Subject to the Combined JOBS/SUB Maximum Financial Liability Cap (CAP), if you were at work on or after October 8, 1990, are subsequently laid off with at least one Year of Seniority as of your last day worked prior to the qualifying layoff, and are otherwise eligible:

- You will be paid Regular SUBenefits.

30

● You may be laid off for a cumulative maximum of 36 weeks due to volume related declines (including individual days of layoff) during the term of the 1990 Agreement. At that time you will be returned to the regular active employment roll or to a JOBS Bank.

● You may be laid off in excess of 36 weeks due to non-volume related reasons, and will be paid SUBenefits for the full duration of any such layoff.

## CONTINUING SUBENEFITS (C-SUB)

"C-SUB" is a Regular SUBenefit payable in certain layoff situations, subject to the CAP.

### Eligibility

You may be eligible for C-SUB for a full week of layoff:

● If you were on indefinite layoff on October 1, 1990 and remain on continuous layoff from GM thereafter, you may be eligible for C-SUB upon exhaustion of any remaining SUB entitlement you may have under the 1987 SUB Plan.

● If you are on a temporary volume related layoff as of October 1, 1990, C-SUB will be payable for weeks of layoff beginning October 1, 1990 and for the duration of such layoff. Any of your 1987 SUB Plan Credit Units remaining as of October 1, 1990 will be suspended for potential future usage under the provisions of the 1987 SUB Plan, if such 1987 SUB Plan provisions are reinstated.

### Duration

The maximum duration for C-SUB will be determined from the following table:

| SUB PLAN Years of Seniority On Last Day Worked | Maximum Weeks of C-SUB If Laid Off From: | |
|---|---|---|
| | BOC-Leeds CPC-Fiero CPC-Framingham CPC-Lakewood | All Other Plants |
| 1 - 9 | 38 | 26 |
| 10 or more | 64 | 52 |

### Application Requirements

You must file an application covering each week of layoff within 60 days after the end of the week, or within 60 days of a state UC redetermination or adjustment which provides a basis for eligibility for a SUBenefit. SUB (including C-SUB) application forms are available at your home plant, caretaker unit or Regional Personnel Center, where applicable. You may also request forms by mail from the

> National Layoff Benefit Center
> GM Regional Personnel Center — Flint
> 4300 S. Saginaw Street
> P. O. Box 1967
> Flint, Michigan 48501-1967

You may call the National Layoff Benefit Center, toll free, at 1-800-852-6000.

For each week of layoff for which you apply, you must:

● be on a qualified layoff;

● generally have at least one year of seniority; and

● have reported to the state employment office (as required by the state) and provided the plant with satisfactory evidence that you have received a state UC benefit, or are ineligible for a state UC benefit only for an acceptable reason under the SUB Plan.

31

## Amount of Regular SUBenefit

For full weeks of layoff, your regular SUBenefit is calculated on the basis of your weekly after-tax, or "take-home" pay, from GM when working full time. Your highest base hourly rate in the 13 weeks prior to layoff (52 weeks in a defined "plant closing" situation) will be used in this calculation. This "take-home" pay would be 40 hours' gross pay, less all federal, state, and local taxes and contributions required to be withheld, as of your last week worked. If your marital status or dependent income tax withholding exemptions change during a period of layoff, promptly report this fact to the National Layoff Benefit Center. Adjustments will be made in your future regular SUBenefit payment amounts.

The amount of your regular SUBenefit is an amount which, when added to the following, will equal 95% of your weekly after-tax pay, minus $17.50 for work-related expenses not incurred:

- ◉ the amount of your state UC benefit received, plus
- ◉ any GM pay (excluding call-in pay), plus
- ◉ any earnings from another employer, or from the military, in excess of the greater of $10 or 20% of such earnings.

A maximum regular SUBenefit of $150 will apply to any week for which you refused available GM work and for which you either (1) had exhausted your state UC benefits, or (2) were denied UC because of such refusal, provided that you refused a job offer you had an option to refuse under your local seniority agreement.

- ◉ If you receive state UC benefits for one or more weeks of layoff during a state UC benefit year, and you do not claim or receive a regular SUBenefit for such week(s), the applicable amount of each such state UC benefit will be included in the regular SUBenefit calculation for future weeks of layoff after UC exhaustion. The state UC benefit amount will be included in your regular SUBenefit calculation for the same number of weeks for which such state UC benefit was received without SUB. For example, if you drew 26 weeks of UC and then began to apply for Regular SUBenefits, the applicable amount of UC would be deducted from the first 26 SUBenefits payable to you after exhaustion of UC.

This provision applies only to weeks of layoff beginning on and after October 8, 1990 for which you receive a state UC benefit and for such week do NOT apply for and receive a SUBenefit. Any UC paid for weeks prior to the week beginning October 8, 1990 shall NOT be cause for deducting an estimated state UC benefit amount with respect to weeks of layoff beginning on and after October 8, 1990.

- ◉ If you are serving a state UC "waiting week" while on a volume related layoff which occurs on or after October 1, 1990, if otherwise eligible, you will be paid a Regular SUBenefit for such "waiting week". The SUBenefit will be unreduced for any estimated state UC benefit amount.

---

**EXAMPLE:**

An assembler with a spouse and two children, living and working in Detroit, Michigan, last works in December 1990. He is laid off commencing in January 1991, with an hourly rate of $16.34 (including cost-of-living allowance).

| | |
|---|---|
| 40 hours' gross pay ............ | $653.60 |
| Less: federal, state and local taxes and FICA ........ | -155.50* |
| Weekly after-tax pay ........... | $498.10 |
| 95% of after-tax pay............ | $473.20 |
| Less: Work-related expenses not incurred...... | - 17. 50 |
| Total income level for week ... | $455.70 |

*Based on the provisions of tax laws as of January 1991. Taxes in this example consist of federal and Michigan taxes, including City of Detroit resident income tax.

The total income level for the week, of $455.70, consists of a $276.00 state UC benefit and a $179.70 SUBenefit. The SUBenefit amount is subject to federal income tax withholding and, in certain areas, state and local withholding taxes. The SUBenefit amount also is subject to reduction by the amount of any outstanding debts owed to GM or the Trustee of any GM benefit plan or program.

---

32

## Disability Benefits
## While Laid Off

If you become disabled while on a layoff, and your sickness and accident benefit coverage no longer is in force, your sickness and accident benefit coverage may be reinstated.

To qualify for reinstated sickness and accident benefits while on layoff, you must:

- submit satisfactory evidence on a claim form provided by GM for that purpose, certifying that you are disabled;

- be insured for basic life insurance;

- be on a qualifying layoff; and

- be eligible for either a regular SUBenefit, or a Trade Readjustment Allowance benefit, or be employed by another employer immediately prior to becoming disabled.

If you remain disabled after the combined JOBS/SUB Maximum Financial Liability cap (with respect to the 1990 SUB Plan) becomes exhausted you must have at least one credit unit for each week for which sickness and accident benefits are claimed.

You may receive up to 52 weeks of reinstated sickness and accident benefits. If you still are disabled after the period for which you are entitled to receive reinstated sickness and accident benefits, you may be eligible for monthly extended disability benefits, as described on page 27.

However, if you become wholly and continuously disabled while receiving Continuing SUBenefits and you are otherwise eligible for reinstatement of sickness and accident benefit coverage as described above you shall be eligible for sickness and accident benefits while so disabled for a period not to exceed the lesser of 52 weeks or the remaining number of weeks for which you otherwise would be eligible to receive Continuing SUBenefits. Extended disability benefits are not payable following the maximum period for which sickness and accident benefits are payable.

## SHORT WEEK BENEFITS — when laid off from GM for part of a week
## Eligibility

You may be eligible for an automatic short week benefit for a week if:

- you had less than 40 hours of work or pay made available to you by GM;

- you were laid off at any time during the week for a qualifying reason, as shown under regular SUBenefits on page 30 (including any short work week caused by any act of God), or you were ineligible for GM pay for (1) jury duty, (2) bereavement, or (3) short term National Guard duty, because you would have been on a qualifying layoff;

- you have one or more years of seniority as of the last day of the week (or have broken your seniority during the week only by reason of death or retirement under the GM Pension Plan); and

- you worked for GM during the week, or received from GM bereavement, jury duty, military or (under certain circumstances) holiday pay, for part of the week.

Overtime hours worked, or made available, during the week in excess of two hours will be excluded in the short week benefit calculation for such week, unless (1) such overtime was worked prior to layoff, or (2) notice of intent to work such overtime had been given prior to the layoff. Also excluded from a short week benefit calculation will be any overtime hours available to certain employes medically restricted as to the number of weekly and daily working hours.

## Application Requirements

Automatic short week benefits will be paid to you, without application, in your regular paycheck for the week, or shortly thereafter.

If you do not receive an automatic short week benefit to which you believe you are entitled, you must file an application within 60 days after the date you normally would have received the benefit payment. SUB application forms are available at your home plant or Regional Personnel Center, where applicable.

## Amount of Short Week Benefits

Automatic short week benefits are payable at 80% of your straight-time pay (including cost-of-living allowance) for each hour less than 40 for which you (1) were not offered work, or (2) did not receive pay.

---

**EXAMPLE:**

An assembler earning **$16.34** per hour (including cost-of-living allowance) worked 23 hours and received holiday pay for 8 additional hours (which were not worked) for a total of 31 hours. The employe is 9 hours short of 40 and was on a qualifying layoff during the week, as shown below:

| | |
|---|---|
| Monday .......... | 8 hours worked |
| Tuesday.......... | 6 hours worked (laid off for 2 hours, machine breakdown) |
| Wednesday ...... | 9 hours worked (1 hour overtime) |
| Thursday ........ | 0 hours worked (laid off because of parts shortage) |
| Friday ............ | 0 hours worked (holiday - no work but received 8 hours' holiday pay) |
| TOTAL | 31 |

Therefore, he is entitled to an automatic short week benefit of 80% of 9 hours' pay, or $117.65 ($16.34 an hour x 9 hours x 80%).

---

# SEPARATION PAYMENTS — upon termination of employment due to layoff or total and permanent disability

## Eligibility

You may be eligible for a separation payment if you have one or more years of seniority on the last day you are on the active employment roll, and:

● are laid off from GM for 12 or more continuous months, provided you have not refused a GM offer of work or broken your seniority within the first 12 months of layoff, or

● become totally and permanently disabled but are not eligible for a disability pension solely because you do not have sufficient years of credited service.

You must not have broken seniority as of the earliest date you may be eligible to apply for a separation payment.

## Application Requirements

To be eligible, you must apply between 12 and 24 months (36 months for 10 or more years of seniority) after the first day of layoff, or at any time up to 24 months (36 months, if applicable) after the date you are determined by GM to be totally and permanently disabled (or, if you then are receiving extended disability benefits under the Life and Disability Benefits Program, within 30 days after the last month for which you are eligible for such benefit).

## Cancellation of Seniority

After you accept a separation payment, (1) you no longer are a GM employe, and (2) your seniority is canceled at all GM plants. However, your seniority may be reinstated if you return the amount of your separation payment to the plant within 30 days from the date of the separation payment check.

## Amount of Separation Payment

The amount of your separation payment is determined by multiplying your base hourly rate (including cost-of-living allowance) by the number of hours of pay, according to your years of seniority, as shown in the table on the next page, less any SUBenefits paid to you for weeks following your last day worked.

The amount of your separation payment may be offset by such things as, but not limited to, the amount of any payment received, or receivable, under any other GM "SUB" plan, or under any GM plan or program to which GM has contributed, for layoff or separation from GM subsequent to the last day you worked for GM.

34

| SEPARATION PAYMENT TABLE | | | |
|---|---|---|---|
| Years of Seniority On Last Day On The Active Employment Roll | Number of Hours of Pay | Years of Seniority On Last Day On The Active Employment Roll | Number of Hours of Pay |
| 1 but less than  2 | 50 | 16 but less than 17 | 770 |
| 2 but less than  3 | 70 | 17 but less than 18 | 840 |
| 3 but less than  4 | 100 | 18 but less than 19 | 920 |
| 4 but less than  5 | 135 | 19 but less than 20 | 1000 |
| 5 but less than  6 | 170 | 20 but less than 21 | 1085 |
| 6 but less than  7 | 210 | 21 but less than 22 | 1170 |
| 7 but less than  8 | 255 | 22 but less than 23 | 1260 |
| 8 but less than  9 | 300 | 23 but less than 24 | 1355 |
| 9 but less than 10 | 350 | 24 but less than 25 | 1455 |
| 10 but less than 11 | 400 | 25 but less than 26 | 1560 |
| 11 but less than 12 | 455 | 26 but less than 27 | 1665 |
| 12 but less than 13 | 510 | 27 but less than 28 | 1770 |
| 13 but less than 14 | 570 | 28 but less than 29 | 1875 |
| 14 but less than 15 | 630 | 29 but less than 30 | 1980 |
| 15 but less than 16 | 700 | 30 and over | 2080 |

## SUB PLAN OVERPAYMENTS

Any SUB Plan overpayment must be repaid unless (1) the cumulative overpayment is $3 or less, or (2) notice of the overpayment was not given to you within 60 days from the date the overpayment was established or created. Notification of overpayment time limits does not apply in any case of fraud or willful misrepresentation of a material fact in applying for benefits under the Plan.

If you fail to promptly return the amount of the overpayment, a maximum of $20 (or $100, but not more than 1/2 of your benefit, if the overpayment resulted from TRA benefits) will be deducted from any future SUBenefits. Not more than $50 will be deducted from any one paycheck. No overpayment recovery limits apply in cases of fraud or willful misrepresentation.

## Life and Disability Coverages for Employes on Layoff

Coverages may be continued for the following periods, after the month in which you last worked prior to layoff:

● For the first month, all basic life, extra accident and survivor income benefit insurance, as well as sickness and accident and extended disability benefit coverages in force, are continued with GM paying the full cost.

● After the first month, basic life, extra accident and survivor income benefit insurance coverages are continued at no cost to you, if you are on a qualified layoff, for up to 12 months (24 months, if you have 10 or more years of seniority). The period these coverages will be continued without cost to you is based on your years of seniority, as shown in the chart on page 36.

● After the period of Corporation-paid continuation described above, you may continue basic life, extra accident and survivor income benefit insurance coverages up to an additional 12 months of layoff, while your seniority remains unbroken, by making the required monthly contribution.

| Years of Seniority As of Last Day Worked Prior to Layoff | Maximum Number of Months of Corporation-Paid Continuation |
|---|---|
| Less than 1 | 0 |
| 1 but less than 2 | 4 |
| 2 but less than 3 | 6 |
| 3 but less than 4 | 8 |
| 4 but less than 5 | 10 |
| 5 but less than 10 | 12 |
| 10 and over | 24 |

If you are placed on layoff immediately upon your return to work from a disability leave of absence, the day you return from such leave will be deemed to be the day you last worked prior to layoff. However, only those life and disability coverages in force on your last day at work prior to your disability leave can be continued.

If you are recalled from permanent layoff, and are again laid off prior to becoming eligible for sickness and accident and extended disability benefit coverages, these coverages may not be continued, as described above. In such case, the number of months basic life, extra accident, and survivor income benefit insurance coverages are continued following layoff, will be equal to the number of months remaining to you as of the last day of the month immediately preceding the date you returned to work. Two additional months, for which GM pays the full cost, are added. You will need to pay the required monthly contributions to continue any optional and dependent life insurance while your basic life insurance remains in force during layoff.

## Health Care Continuation for Laid Off Employes

If you are laid off, your coverage as an active employe ceases at the end of the month in which you last are in active service, as defined under the Health Care Program.

Thereafter, generally you are entitled to a number of months of Corporation-paid continuation of all health care coverages, except dental, based upon your seniority at the time of layoff, as shown in the chart below.

After the period of Corporation-paid continuation described above, you may continue all health care coverages, except dental, on a self-paid basis, up to 12 additional months while your seniority remains unbroken.

The information above does not apply if you return to work from permanent layoff and are laid off again before receiving earnings for 12 pay periods during a calendar year. In such a case, you will be entitled to whatever continuation months you had remaining as of the end of the month prior to your return to work, plus 2 additional months of Corporation-paid coverage.

| Years of Seniority As of Last Day Worked Prior to Layoff | Maximum Number of Months of Corporation-Paid Continuation |
|---|---|
| Less than 1 | 0 |
| 1 but less than 2 | 4 |
| 2 but less than 3 | 6 |
| 3 but less than 4 | 8 |
| 4 but less than 5 | 10 |
| 5 but less than 10 | 13 |
| 10 and over | 25 |

36

If you are **placed on layoff from disability leave of absence or military leave of absence**, the date you report for return from such leave and are placed on layoff will be deemed to be the last day worked prior to layoff, for the purposes of determining continuation. However, only those health care coverages in force as of your actual last day worked can be continued.

At the time of layoff you will be given a notice explaining your health care continuation rights under (1) the Program and (2) COBRA.

# GUARANTEED INCOME STREAM (GIS) PROGRAM

The GIS Program is "designed to promote employment stability and avoid layoffs". The GIS Program encourages General Motors to place a high priority on making jobs available to long-service employes who are on indefinite layoff. It also requires that GM provide benefits to eligible employes until jobs have been found for them. These benefits take the following form:

⊚ **GIS Income Benefits** after you have exhausted all SUB Plan entitlement;

⊚ **GIS Health Care and Life Insurance Coverages,** including supplemental hospital, surgical, and medical coverage and life insurance; and

⊚ **GIS Redemption Payment,** if offered by GM, instead of future GIS benefits.

## ELIGIBILITY FOR GIS BENEFITS

You may be eligible for GIS benefits if you were at work for GM on or after March 1, 1982, and subsequently are laid off under any seniority layoff provisions (except inverse) due to:

⊚ reduction in force;

⊚ discontinuance of an operation or facility; or

⊚ your inability to do the work offered by the plant, although you are able to do other work in the plant if you had more seniority.

You will not be eligible if your layoff is for disciplinary reasons or is a consequence of:

⊚ any strike, slowdown, work stoppage, picketing or any labor dispute of any kind involving employes;

⊚ any fault attributable to you, the employe; or

⊚ any war, hostile act of a foreign power, sabotage, insurrection or any act of God.

If you were at work on or after October 8, 1990 and laid off thereafter, you must have 10 or more years of seniority as of your last day worked prior to a qualifying layoff in order to be GIS eligible. If you were laid off before October 8, 1990, you must have 15 or more years of seniority on your last day worked, or 10 or more years of seniority in the event of a plant closing (including a layoff beginning within 5 years prior to the date of the plant closing announcement).

If you enter the Armed Services of the United States, you will be deemed to be on leave of absence and will not be entitled to any GIS benefits or payments. However, if you are on short term active duty of 30 days or less (generally for National Guard, Reserve or similar unit required military training), and otherwise would be on a qualifying layoff for all or part of such period of active duty, you will be deemed to be on a qualifying layoff, and, if otherwise eligible for GIS benefits, will receive a maximum of two GIS income benefits in a calendar year.

Generally, you will not be eligible for any GIS benefits, if at any time after being informed of a layoff you (1) refuse or fail to appear for a GM job interview, (2) refuse a GM job offer that you have no right to refuse under your local seniority agreement, or (3) refuse a JOBS Bank assignment, provided GM offers to pay travel expenses or a relocation allowance if the interview or job is more than 50 miles from both your address of record and the last company facility at which you worked. During a one-year immunity period following layoff (or until you exhaust your SUBenefits, if a shorter period), you may refuse a GM job offer from outside your Appendix A-Area Hire area, without affecting your eligibility under the GIS Program. However, no such immunity period is provided if (1) the GM location from which you are laid off is not included in an Appendix A-Area Hire area, or (2) your job offer is from a GM facility in the same Appendix A-Area Hire area.

37

Also, you must not have broken seniority during continuous layoff from GM unless under the time-for-time provisions of the collective bargaining agreement.

## GIS Benefit Application Requirements

To receive a benefit you must file an application covering each full week of layoff within 60 days after the end of that week. GIS Benefit application forms are available (1) at your home plant, caretaker unit, or Regional Personnel Center, where applicable, or (2) by mail from the:

> GIS Administrator
> GM Regional Personnel Center — Flint
> 4300 S. Saginaw St.
> P. O. Box 1962
> Flint, Michigan 48501-1962

For each full week of layoff for which you apply, you must:

- be on a qualified layoff;

- have exhausted all layoff benefit entitlement under any other GM Plan or Program;

- either be working for another employer, be able and available for work under the Public Employment Service definition, be participating in an approved vocational training program, or be wholly and continuously disabled for more than one week and under a doctor's care (GIS eligibility ceases when T&PD pension eligibility begins or after you have been paid a cumulative total of 52 weekly GIS benefits by reason of disability);

- be actively registered for work with the applicable Public Employment Service, except when eligible while disabled under the Program;

- report on a timely basis any income and insurance coverages from other sources, statutory benefits and changes in employment status; and

- accept suitable employment with another employer as arranged by GM, an agent of GM or by the Public Employment Service.

## Amount of GIS Benefit

Your GIS benefit level is calculated on the basis of your highest weekly, 40 hour, before-tax, straight-time earnings (including cost-of-living allowance) during the 13 weeks prior to layoff (52 weeks in a plant closing situation).

If you had 10 but less than 16 years of seniority as of your last day worked, your GIS benefit level will be 50% of your weekly earnings. If you had 16 or more years of seniority as of your last day worked, your benefit level will be 50% of your weekly earnings, plus 1% more for each full year of seniority in excess of 15. The maximum GIS benefit level is the lesser of (1) 75% of your weekly earnings, or (2) the amount of your regular SUBenefit level.

If you become disabled, your benefit amount will be based upon the lesser of your (1) weekly S&A benefit rate, or (2) GIS benefit level.

Your GIS benefit will be reduced by such things as:

- the amount of any applicable statutory benefits;

- the amount of any disability, termination and supplemental unemployment benefit pay;

- 80% of income from other sources; and

- any outstanding debts owed to GM, or to the Trustees of any GM benefit plan or program.

---

**EXAMPLE:**

- An assembler with a spouse and two dependent children living and working in Detroit, Michigan, is laid off with 18 years of seniority and an hourly rate of **$16.34** (including cost-of-living allowance).

- This assembler's GIS benefit level is the smaller of (1) 53% of weekly before-tax pay ($16.34 x 40 hrs. = $653.60 x 53% = **$346.41**), or (2) his regular SUBenefit level of

$455.70. In this example, the GIS benefit level is **$346.41**.

- In the event of disability, this assembler could be eligible for a cumulative total of 52 weeks of disability benefits, payable at the lesser of his (1) GIS benefit level (determined opposite), or (2) weekly S&A rate of $390.00. In this example, the weekly amount payable during such disability would be **$346.41**.

---

**38**

# GIS HEALTH CARE AND LIFE INSURANCE COVERAGES

GIS Health Care and Life Insurance coverages for eligible employes become available when Corporation-paid coverages provided under the Health Care and Life and Disability Benefits Programs cease during layoff (see page 36). GIS Health Care and Life Insurance coverages cease when your eligibility for GIS benefits is terminated. These coverages generally will be suspended when your eligibility for GIS benefits is suspended. Under certain circumstances, however, you may continue these coverages by paying the required contributions. At the time of layoff, you will be given a notice explaining your continuance privileges.

## GIS Health Care and Life Insurance include . . .

- Corporation-paid hospital, surgical and medical coverage, which is **supplementary to any other health care coverage for which you or your dependents may be eligible,** and for which you do not pay more than one-half the cost. GIS Health Care coverage does not include dental, vision, prescription drug, or hearing aid coverage.

When your Corporation-paid coverages under the regular GM Health Care Program cease, you will have three choices, as follows: (1) Corporation-paid GIS coverage only; (2) GIS coverage plus up to 12 months of self-paid continuation of prescription drug, hearing aid and vision coverages; or (3) full self-paid continuation in the regular GM Program for 12 months.

- Corporation-paid life insurance equal to $12,000.

# GIS REDEMPTION PAYMENT

If you are eligible for GIS benefits, you may elect to receive a GIS redemption payment, if made available by GM, in lieu of any future GIS benefits. A GIS redemption payment will be payable automatically if you receive a separation payment under the SUB Plan.

## To Qualify You Must . . .

- make application for a redemption payment within 60 months of the start of your layoff, and be able and available for work, or be working for another employer at the time of application; and

- be otherwise eligible for GIS benefits.

Your GIS redemption payment will be $5,000, reduced by such things as, but not limited to,

(1) GIS benefits received and (2) remaining debts you may owe to GM or to the Trustees of any GM benefit plan or program. Receipt of a GIS redemption payment cancels your future GIS eligibility, unless you return to GM and work an additional 15 years.

Your seniority rights are not affected by receipt of a redemption payment.

# TERMINATION OF YOUR GIS BENEFITS

Your eligibility for all GIS benefits will terminate permanently (even though you may not have applied for, or have not yet become eligible to receive, GIS benefits) upon the earliest of your:

- death;

- retirement, except for a disability retirement wherein GM determines you have recovered, retirement benefits are no longer payable and you do not return to work at GM;

- acceptance of a GIS redemption payment;

- loss of years of seniority, except under the time-for-time provisions of the collective bargaining agreement;

- refusal to apply for statutory benefits that could, or would, offset GIS benefits, if GM requests that you do so;

- failure to file an application for GM employment, in accordance with the applicable collective bargaining agreement provisions;

- failure to report, within 60 days, required information that would offset GIS benefits; or

refusal of, or failure to appear for, a GM job interview (except for good cause), refusal of any JOBS Bank assignment, or refusal to accept a job offer at any GM facility, when you also are offered, as may be applicable, relocation allowance or reimbursement of reasonable interview expenses; provided, however, that if the job offer is from outside your Appendix A-Area Hire area you may refuse such offer during a one-year immunity period following layoff (or until exhaustion of SUBenefits, if a shorter period) without affecting your eligibility under the GIS Program. No such immunity period is provided, however, if (a) you are laid off from a GM facility not covered by Appendix A-Area Hire, or (b) your job offer is from a GM facility in the same Appendix A-Area Hire area.

## SUSPENSION OF YOUR GIS BENEFITS

Your eligibility for GIS benefits will be suspended (even though you may not have applied for, or have not yet become eligible to receive, GIS benefits) if with respect to "non-GM" employment within 50 miles of your address of record, or the Company facility where you last worked, you:

- refuse, or fail to appear for, an employment interview (unless for good cause) or fail to accept an offer of "suitable employment" if referred by GM, an agent of GM or a Public Employment Service, unless the new job is expected to result in pay of less than 120% of your existing weekly income from any current employment; or

- terminate "suitable employment" arranged for by GM, its agent or Public Employment Service for any reason over which you have some degree of control; or

- cease to work for any reason prior to working full-time for 13 consecutive weeks, if such employment resulted in the reinstatement of suspended GIS benefits; or

- cease to work because of a strike or personal leave, for more than one week; or

- exhaust your cumulative 52-week period of eligibility for GIS benefits by reason of disability, and subsequently become unavailable for work due to any illness, injury or disability. In this situation, however, your GIS Health Care and Life Insurance coverages would continue.

If your GIS benefits are suspended for reasons other than disability, you must obtain other full-time employment before you again can be eligible for GIS benefits. GIS Health Care and Life Insurance coverages may be continued, at your expense, during such suspension period.

## GIS BENEFIT OVERPAYMENTS

Any GIS benefit overpayment must be repaid, unless (a) the cumulative overpayment is $3 or less, or (b) the overpayment was caused by GM error and notice of the overpayment was not given to you within 1 year of the date the overpayment was created.

If you fail to repay any GIS overpayment within 30 days of notification, your future GIS benefits will be reduced. If GIS benefits are not payable, and the overpayment is not repaid, GIS Health Care and Life Insurance coverages will be suspended 90 days following notification to you. General Motors maintains the right to make deductions for overpayments from any present or future amounts which are, or may become, payable to you.

40



# When You Retire

## ELIGIBILITY

You are eligible to participate in the Pension Plan when you acquire seniority. The Pension Plan provides monthly pension benefits when you retire with 5 or more years of credited service. Monthly pension benefits also are payable when you retire at age 65, or older, with one or more years of credited service.

**Normal retirement** age is age 65.

**Early voluntary retirement** may be as early as age 60 and prior to age 65. Or it can be as early as age 55 and prior to age 60, if your years of credited service and age total 85 or more. You may retire at any age if you have 30 or more years of credited service.

**Mutually satisfactory retirement** may be as early as age 55 (age 50 in the closing of a "remote" plant or under a negotiated special separation program) and prior to age 65, if you meet the required Standards.

**Disability retirement** may be at any age prior to age 65 if you become totally and permanently disabled (see page 46).

Pension Plan benefits are in addition to Social Security benefits (see page 48). References to Social Security in this booklet are based on the Social Security provisions in effect on January 1, 1991.

## RETIREMENT AT AGE 62 OR LATER

Your monthly basic (lifetime) pension benefit is determined by your basic benefit rate times your years of credited service.

Your basic benefit rate depends on your benefit class code (Schedule I) and your retirement date (Schedule II), as follows:

### Schedule I

| For Job Classifications* Having a Maximum Base Hourly Rate of | Benefit Class Code |
|---|---|
| Less than $16.16 | A |
| $16.16 but less than $16.38 | B |
| $16.38 but less than $17.31 | C |
| $17.31 and over | D |

*Held by the employe for the greatest number of calendar days during the 24 months immediately preceding his last day worked.

41

## Schedule II

| Benefit Class Code | Retirement Date and Monthly Basic Benefit Rate Per Year of Credited Service | | |
|---|---|---|---|
| | 10-1-90 through 9-1-91 | 10-1-91 through 9-1-92 | 10-1-92 and After |
| | $ | $ | $ |
| A | 28.35 | 29.50 | 30.70 |
| B | 28.60 | 29.75 | 30.95 |
| C | 28.85 | 30.00 | 31.20 |
| D | 29.10 | 30.25 | 31.45 |

For example, an assembler with 30 years of credited service who retires June 1, 1991, at age 62, would receive a monthly basic benefit as follows:

Basic benefit rate ........................ $ 28.35
Years of credited service ............. ×    30
Monthly basic benefit .................. $850.50

In addition, a Special Benefit, as described on page 48, would be payable monthly after age 65, or earlier, while you are enrolled in Medicare Part B.

## After-Retirement Increases in Basic Benefit Rate

Your monthly basic benefit rate will be increased periodically after your retirement. The dates and amounts of these increases are shown in the following table:

| Date and Amount of Increase in Monthly Basic Benefit Rate Per Year of Credited Service | |
|---|---|
| 10-1-91 | 10-1-92 |
| $ | $ |
| 1.15 | 1.20 |

For example, the $850.50 monthly basic benefit of an assembler with 30 years of credited service who retired June 1, 1991, would increase by $70.50 ($2.35 × 30), to $921.00 ($850.50 + $70.50), by October 1, 1992.

42

# EARLY VOLUNTARY RETIREMENT — PRIOR TO AGE 62
## If You Have 30 or More Years of Credited Service

Until age 62 and one month, your monthly basic benefit amount will be reduced for age. The reduced basic benefit will be supplemented, so that you will have a total monthly benefit amount as shown in the following table.

| Retirement Date and Total Monthly Benefit Amount for Determining Early Retirement Supplement Prior to Age 62 and One Month | | |
|---|---|---|
| 10-1-90 through 9-1-91 | 10-1-91 through 9-1-92 | 10-1-92 and After |
| $ 1,600.00 | $ 1,700.00 | $ 1,800.00 |

## After-Retirement Increases in Total Monthly Benefit Amount

Your total monthly benefit amount will be increased periodically after your retirement with 30 or more years of credited service. The dates and amounts of these increases are shown in the following table:

| Date and Amount of Increase in Total Monthly Benefit Amount | |
|---|---|
| 10-1-91 | 10-1-92 |
| $ 100.00 | $ 100.00 |

After age 62 and one month, the early retirement supplement will cease and monthly basic benefits, as described on page 42, no longer will be reduced because of your age at retirement. In addition, a Special Benefit, as described on page 48, will be payable monthly after you attain age 65, or earlier, while you are enrolled in Medicare Part B. As early as age 62, you also may apply for reduced Social Security old age benefits.

43

## If You Have Less Than 30 Years of Credited Service

If you retire voluntarily before age 62 and one month with less than 30 years of credited service, you will receive monthly basic benefits, as described on page 42. This basic benefit amount will be reduced for age at retirement. In addition, you will receive a monthly "interim" supplement, payable until age 62 and one month. The amount of this supplement is based on your age at retirement, as follows:

| Age at Retirement | Monthly Amount* of "Interim" Supplement Per Year of Credited Service | | |
|---|---|---|---|
|  | 10-1-90 | 10-1-91 | 10-1-92 |
|  | $ | $ | $ |
| 55 | 11.00 | 12.00 | 12.90 |
| 56 | 12.95 | 14.10 | 15.20 |
| 57 | 15.70 | 17.05 | 18.40 |
| 58 | 18.40 | 20.00 | 21.55 |
| 59 | 20.55 | 22.40 | 24.10 |
| 60 | 23.75 | 25.85 | 27.85 |
| 61 | 23.75 | 25.85 | 27.85 |

*Prorated for intermediate ages computed on the basis of the number of complete calendar months by which you are under the age you will attain on your next birthday.

After age 62 and one month, you will continue to receive a monthly basic benefit reduced for age, if your age and credited service at retirement total less than 85. If your age and credited service at retirement total 85 or more, you will receive at age 62 and one month a monthly basic benefit unreduced because of your age at retirement. You also may apply for reduced Social Security old age benefits as early as age 62.

If you retire under any type of retirement after age 62 with less than 30 years of credited service, you will receive a monthly basic benefit, as described on page 42. You also may be eligible to receive Social Security old age benefits immediately upon your retirement. In addition, a Special Benefit, as described on page 48, will be payable monthly after you attain age 65, or earlier, while you are enrolled in Medicare Part B.

44

## "EARLY RETIREMENT" AND "INTERIM" SUPPLEMENTS — LIMITATIONS

If, after retirement, you earn more in a calendar year than the following amounts, any supplement payable prior to age 62 and one month will be reduced by $2 for each $1 of your excess earnings:

| Calendar Year | Annual Earnings Limitation Amount |
|---|---|
| 1991 | $ 15,000 |
| 1992 | 15,000 |
| 1993 | 15,000 |

The earnings limitation is waived for any mutual retirement, if receiving an early retirement supplement, with benefits payable commencing on or after October 1, 1990 and prior to September 14, 1993.

If you retire voluntarily and become eligible for a Social Security Disability Insurance Benefit (SSDIB), your monthly supplement will be reduced by the temporary benefit amount in effect at the time of your SSDIB award.

## MUTUALLY SATISFACTORY RETIREMENT

You may be retired under conditions mutually satisfactory to you and to GM after age 55 (age 50 in the event of a closing of a GM plant in an area where no other GM plant is located, or under a negotiated special separation program). In such event, you will receive a monthly basic benefit as described on page 42.

In addition, you may receive a monthly temporary benefit until you reach age 62 and one month or, if earlier, until you become eligible for a Social Security Disability Insurance Benefit.

The amount of your monthly temporary benefit will be based on your years of credited service, up to 30, and your retirement date, as shown in the next column.

If you retire with 30 or more years of credited service, you also could receive a monthly early retirement supplement, payable until age 62 and one month. The total monthly benefit amount, including the temporary benefit amount shown below, is shown on page 43. In addition, a Special Benefit, as described on page 48, will be payable monthly after you attain age 65, or earlier, while you are enrolled in Medicare Part B.

| Retirement Date | Monthly Temporary Benefit | |
|---|---|---|
| | Per Year of Credited Service | Maximum |
| 10-1-90 to 9-1-91 | $ 25.00 | $ 750.00 |
| 10-1-91 to 9-1-92 | 27.20 | 816.00 |
| 10-1-92 & After | 29.30 | 879.00 |

45

## DISABILITY RETIREMENT

After five months of continuous disability, you may be eligible, upon application, for a monthly disability pension benefit. To be eligible, you (1) need at least 10 years of credited service and (2) must become totally and permanently disabled before age 65. If you become eligible, this benefit will cease if you (1) recover from total and permanent disability, or (2) become gainfully employed for purposes other than rehabilitation.

Your monthly basic pension benefit rate will be the same as if you had retired at or after age 62, as shown on page 42. Your rate will be multiplied by your credited service at the time of your disability retirement. In addition, if Social Security determines that you are not eligible for disability benefits under the Social Security Act, you may receive an additional temporary pension benefit from GM each month.

This monthly temporary benefit will be computed the same as for retirement under mutually satisfactory conditions, as described on page 45. The temporary benefit is payable to age 62 and one month, or, if earlier, to the age you become eligible for Social Security Disability Insurance Benefits.

If you have 30 or more years of credited service and are under age 62, you also may be eligible to receive a monthly early retirement supplement, payable to age 62 and one month (see page 43). In addition, a Special Benefit, as described on page 48, will be payable monthly after you attain age 65, or earlier, while you are enrolled in Medicare Part B.

## CREDITED SERVICE

Any calendar year in which you have 1,700 or more paid hours will count as a full year of credited service. Holiday pay, paid absence allowance, jury duty pay, bereavement pay and vacation pay allowance are included in paid hours. If you have less than 1,700 paid hours, you will receive proportionate credit, to the nearest 1/10 of a year, based on your paid hours.

In figuring your credited service, hours at premium pay are considered as straight-time hours.

If you are on an approved military leave, or on a disability leave and receive workers compensation, you may receive credited service for such absence.

If you were on layoff during 1951 through 1967, or during 1979 through 1983, upon application, you may receive credited service for all, or part, of such absence. The amount of credited service you will receive will depend on your years of seniority as of January 1, 1968, December 10, 1973, October 1, 1979, or October 1, 1984, as may be applicable.

Commencing with the calendar year 1968, you are eligible for credited service for each calendar week of sick leave or layoff in a year during which you receive pay for 170 or more hours. After 1970, up to 1,530 hours may be credited for a sick leave or layoff which continues into the following year. An employe placed on layoff on or after March 1, 1982, with 10 or more years of seniority, may be credited with up to 1,700 additional hours for the period of continuous absence due to the layoff.

For retirement with benefits payable commencing on or after October 1, 1990, your credited service prior to January 1, 1966 will equal the greater of your (1) seniority, or (2) credited service, on December 31, 1965.

## Foundry/Asbestos Service

An employe with seniority on or after October 1, 1990, who at retirement has more than 10 years of credited service accrued on certain job classifications in foundry or asbestos operations, at designated GM locations, will receive additional credited service.

## Annual Statement

Each year you will be given a statement showing your:

- Credited service under the Pension Plan for the preceding calendar year; and

- Total credited service up to the end of the preceding calendar year.

If you have any questions concerning the correctness of your credited service, as shown on the statement, you should contact your supervisor or the local or regional personnel department.

## LOSS OF CREDITED SERVICE

You will lose all credited service under the Pension Plan if you quit, are discharged, or break seniority for any other reason. However, if you have 5 or more years of credited service, your pension benefits are vested (see page 61). If you are re-employed by GM and reacquire seniority, your credited service may be reinstated, upon proper application. If you have prior credited service which has not been reinstated, you should make application for its reinstatement. Application forms are available at the local or regional personnel department.

## ALTERNATE "SERVICE" TO DETERMINE VESTED PENSION

If you break seniority before age 65 and have less than 5 years of credited service, but have 5 years of "service", as determined herein, you would be eligible for a vested benefit. For example, if you have only 4 years of credited service, but have 5 years of "service", the 5 years' "service" would provide you a vested benefit. However, the monthly benefit amount would be based on 4 years of credited service.

You first become eligible to be covered for the "service" provision when you (1) attain age 21, or (2) complete 1 year of "service", whichever is later. You get 1 year of "service" when you complete 750 hours of "service" in a 12 consecutive month period, beginning with your employment date. You complete an hour of "service" for each hour for which you are paid by GM for working, or for having been entitled to work.

No "service" is granted for any (1) period of employment prior to age 18, or (2) year in which you are paid by GM for working less than 750 hours.

A 1-year break in "service" will occur if you do not complete 375 hours of "service" in any 12 consecutive month period. Hours paid for vacation and sickness or disability, which are not worked, may be counted to prevent a break in "service". In addition, certain periods of absence because of pregnancy, childbirth, adoption or child care immediately following birth or placement of a child related to adoption, may be counted after October 1, 1985, to prevent a break in "service". You will lose your years of "service" if the number of consecutive 1-year breaks equals, or exceeds, the greater of (1) the aggregate years of "service" you had before such break, or (2) 5 years.

## BENEFITS FOR SURVIVING SPOUSE UPON EMPLOYE'S DEATH AFTER RETIREMENT

After retirement, you can provide a monthly benefit for your surviving spouse in the event of your death. Survivor benefits will not be payable unless (1) you have been married to your spouse for one year, and (2) you and your spouse both are living on the date the coverage otherwise would be effective. You will be deemed to have elected the surviving spouse coverage at retirement, unless you reject it. **This automatic election can be rejected by a married employe only with the written consent of the spouse, witnessed by the GM plan representative or a notary public.** See pages 52 through 55 for more information.

An employe separated with deferred vested benefits has automatic surviving spouse protection at commencement of vested benefits. See page 53 for details of this surviving spouse coverage. **Such protection can be rejected by a married former employe only with the written consent of the spouse, witnessed by the GM plan representative or a notary public.**

If you retire due to total and permanent disability before age 55 with less than 30 years of credited service, you may provide an actuarially determined 50% joint and survivor option for your spouse. See page 55 for more information.

## SPECIAL BENEFIT

Each retired employe and eligible surviving spouse, who is (1) age 65 or over, (2) receiving a pension benefit, and (3) enrolled in Medicare Part B on or after January 1, 1991, will receive an additional monthly benefit amount. This amount is provided under the Health Care Program. It will be included in the monthly pension check, as follows:

| 1-1-91 through 12-1-91 | 1-1-92 through 12-1-92 | 1-1-93 and After |
|---|---|---|
| $ 29.90 | $ 31.80 | $ 38.50* |

*Or the "Medicare" Part B premium amount, if less

This benefit also is payable, upon application, to a pensioner or eligible surviving spouse who is (1) receiving GM pension benefits, (2) under age 65, and (3) enrolled in Medicare Part B.

On and after January 1, 1991, retirees and surviving spouses who were enrolled in Medicare Part B coverage as of October 1, 1990, or who first become eligible for Medicare Part B coverage on or after that date, must be enrolled in Medicare Part B as a condition for receipt of the Special Benefit. Any recipient who is enrolled in Medicare Part B coverage on or after January 1, 1991, will have the Special Benefit discontinued for periods during which Medicare Part B enrollment is not maintained. Special Benefit payments after January 1, 1991 are not taxable while enrolled in Medicare Part B.

The special benefit is **not** payable to any:

(1) former employe receiving a deferred vested pension benefit, or (2) surviving spouse receiving a survivor benefit resulting from a deferred vested pension benefit.

Not more than one special benefit is payable to any individual for any one month.

## WORKERS COMPENSATION OFFSET

Workers compensation benefits paid to retired employes will be deducted from GM pension benefits otherwise payable. No such deduction will be made where workers compensation payments are paid under a claim filed within two years after breaking seniority.

## APPLICATION FOR PENSION

You may apply for pension benefits on a form which is available at the local or regional personnel office.

## SOCIAL SECURITY

Social Security benefits are in addition to your GM pension benefits. You and GM contribute equally to the cost of your Social Security benefits. Your share of the cost is deducted from your pay. Social Security old age benefits may begin as early as age 62 in a permanently reduced amount. For employes who become age 65 prior to the year 2003, benefits are payable in full if they begin at, or after, age 65.

Social Security Disability Insurance Benefits may begin at any age.

Your spouse's Social Security benefit at age 65 generally will be equal to one-half of your unreduced Social Security benefit, unless your spouse is eligible for a higher benefit based on your spouse's earnings. Your spouse may receive a permanently reduced benefit commencing as early as age 62 (age 60 if your spouse is a widow or widower).

The table on the following page may help you estimate your monthly Social Security benefit. The table is based on the Social Security provisions in effect on January 1, 1991.

48

| If You Retire at Age: | ESTIMATED MONTHLY SOCIAL SECURITY OLD AGE BENEFITS FOR RETIREMENT IN 1991 | | | | | |
|---|---|---|---|---|---|---|
| | And Social Security Commences When You and Your Spouse Are | | | | | |
| | Age 65 | | | Age 62 | | |
| | Pensioner | Spouse | Total | Pensioner | Spouse | Total |
| | $ | $ | $ | $ | $ | $ |
| 65 | 1,022 | 511 | 1,533 | --- | --- | --- |
| 62 | 1,012 | 506 | 1,518 | 810 | 405 | 1,215 |
| 60 | 1,010 | 505 | 1,515 | 808 | 404 | 1,212 |
| 55 | 991 | 496 | 1,487 | 793 | 397 | 1,190 |

**NOTE:** Amounts are rounded to the nearest dollar. In all instances, you and your spouse are assumed to be the same age. You and your spouse may receive lower benefits from Social Security than those shown above if you earned less than the maximum wages subject to Social Security taxes. These amounts are based on assumptions which were reasonable at the time estimates were made. Social Security benefits actually payable reflect individual and national average earnings, as well as fluctuations in the consumer price index. Therefore, before retiring, you should obtain an estimate from your local Social Security office, based on your personal earnings history.

## LIFE INSURANCE AND HEALTH CARE COVERAGES

When you are retired from active service and are receiving benefits under the Pension Plan (except deferred vested benefits), your basic life and extra accident insurance, as well as your health care coverages, will be continued consistent with Program provisions. Extra accident insurance ceases when you reach age 65. Survivor income benefit insurance ceases when you retire. However, survivor income benefit insurance is provided to age 65 for retirees receiving total and permanent disability benefits under the Pension Plan.

Optional and/or dependent life insurance in force when you retire may be continued to age 70, provided (1) your basic life insurance remains in force, and (2) you pay the required monthly contributions.

49



# In The Event Of Death

## LIFE AND DISABILITY BENEFIT PROGRAM COVERAGES

Basic life, extra accident and survivor income benefit insurance coverages begin on the first day of the month following the month in which your employment commences. If you are not at work on the day your basic life, extra accident and survivor income benefit insurance coverages otherwise would begin, these coverages begin the day you return to work.

### If You Die Before Age 65 . . .

your beneficiary will receive the basic life insurance benefit shown on page 51. **You may name anyone you wish as your beneficiary. You may change your beneficiary at any time.**

Your beneficiary may receive this benefit under the Beneficiary's Total Control Account (TCA) Program. The TCA Program provides your beneficiary with total control of the proceeds from your basic life insurance. A personalized checkbook allows your beneficiary to easily use all, or a portion, of the money. Funds left with the insurance company earn interest at competitive rates. Several investment options also are available under TCA. A separate brochure describing TCA options in more detail is available, upon request, at the office which administers your life insurance.

An additional benefit, called extra accident insurance, may be payable to your beneficiary for death, or to you for loss of certain bodily members, or loss of eyesight as the result of an accident. For extra accident insurance to be payable, (1) loss must occur within two years of the accident, and (2) your death must occur within one year following the accident. Your loss or death must not be due to disease, self-inflicted

injury or any act of war. Three times the scheduled benefit amount of extra accident insurance in force may be payable if death results from an accidental bodily injury caused solely by employment with GM.

### If You Are Placed on a Qualifying Layoff . . .

under the Guaranteed Income Stream (GIS) Benefit Program and have the required years of seniority, you may be eligible for $12,000 of life insurance under the GIS Benefit Program.

This $12,000 life insurance amount would become effective at the expiration of the period during which your insurance under the Life and Disability Benefits Program was continued without cost to you.

### To Apply for Life and Extra Accident Insurance Benefits . . .

a beneficiary needs to make a claim on a form provided by GM for that purpose and return it to the office which administers your life insurance.

50

| BASIC LIFE AND EXTRA ACCIDENT INSURANCE BEFORE AGE 65 (1) FOR EMPLOYES AT WORK ON OR AFTER OCTOBER 1, 1990 | | | |
|---|---|---|---|
| Your Base Hourly Rate (2) | Basic Life Insurance | Extra Accident Insurance | Total Insurance |
| Under  $6.59 | 15,000 | 7,500 | 22,500 |
| 6.60 -   6.94 | 15,500 | 7,750 | 23,250 |
| 6.95 -   7.29 | 16,500 | 8,250 | 24,750 |
| 7.30 -   7.64 | 17,000 | 8,500 | 25,500 |
| 7.65 -   7.99 | 18,000 | 9,000 | 27,000 |
| 8.00 -   8.34 | 19,000 | 9,500 | 28,500 |
| 8.35 -   8.69 | 19,500 | 9,750 | 29,250 |
| 8.70 -   9.04 | 20,500 | 10,250 | 30,750 |
| 9.05 -   9.39 | 21,500 | 10,750 | 32,250 |
| 9.40 -   9.74 | 22,000 | 11,000 | 33,000 |
| 9.75 -  10.09 | 22,500 | 11,250 | 33,750 |
| 10.10 -  10.44 | 23,500 | 11,750 | 35,250 |
| 10.45 -  10.79 | 24,500 | 12,250 | 36,750 |
| 10.80 -  11.14 | 25,500 | 12,750 | 38,250 |
| 11.15 -  11.49 | 26,000 | 13,000 | 39,000 |
| 11.50 -  11.84 | 27,000 | 13,500 | 40,500 |
| 11.85 -  12.19 | 27,500 | 13,750 | 41,250 |
| 12.20 -  12.54 | 28,500 | 14,250 | 42,750 |
| 12.55 -  12.89 | 29,500 | 14,750 | 44,250 |
| 12.90 -  13.24 | 30,000 | 15,000 | 45,000 |
| 13.25 -  13.59 | 31,000 | 15,500 | 46,500 |
| 13.60 -  13.94 | 32,000 | 16,000 | 48,000 |
| 13.95 -  14.29 | 32,500 | 16,250 | 48,750 |
| 14.30 -  14.64 | 33,500 | 16,750 | 50,250 |
| 14.65 -  14.99 | 34,000 | 17,000 | 51,000 |
| 15.00 -  15.34 | 35,000 | 17,500 | 52,500 |
| 15.35 -  15.69 | 36,000 | 18,000 | 54,000 |
| 15.70 -  16.04 | 36,500 | 18,250 | 54,750 |
| 16.05 -  16.39 | 37,500 | 18,750 | 56,250 |
| 16.40 -  16.74 | 38,000 | 19,000 | 57,000 |
| 16.75 -  17.09 | 38,500 | 19,250 | 57,750 |
| 17.10 -  17.44 | 39,500 | 19,750 | 59,250 |
| 17.45 -  17.79 | 40,500 | 20,250 | 60,750 |
| 17.80 -  18.14 | 41,000 | 20,500 | 61,500 |
| 18.15 -  18.49 | 42,500 | 21,250 | 63,750 |
| 18.50 -  18.84 | 43,000 | 21,500 | 64,500 |
| 18.85 -  19.19 | 44,000 | 22,000 | 66,000 |
| 19.20 -  19.54 | 44,500 | 22,250 | 66,750 |
| 19.55 -  19.89 | 45,500 | 22,750 | 68,250 |
| 19.90 -  20.24 | 46,500 | 23,250 | 69,750 |
| 20.25 & Over | 47,000 | 23,500 | 70,500 |

(1)  The amount of your basic life insurance is reduced monthly commencing at age 65. This continuing life insurance is described on page 60.

(2)  For this purpose, includes premium for necessary continuous 7-day operations, but does not include overtime, night shift premium, or any cost-of-living allowance.

51

# SURVIVOR INCOME BENEFIT INSURANCE

## Your Survivors May Be Eligible . . .

for a monthly survivor income benefit, in addition to basic life and extra accident insurance benefits, if you die before you retire. Coverage is provided to age 65 for an employe receiving total and permanent disability benefits under the Pension Plan.

Two kinds of monthly survivor income benefits are provided under the Life and Disability Benefits Program: a transition benefit and a bridge benefit.

## A Transition Benefit . . .

of $450 per month may be payable to your eligible survivors for up to 24 months.

However, the monthly transition benefit will be $250 if the survivors are, or become, eligible for certain Social Security benefits.

## A Bridge Benefit . . .

of $450 per month may be payable to your surviving spouse. To be eligible, (1) your spouse must be at least age 45 as of the date of your death, or (2) if under age 45 as of the date of your death, your surviving spouse's age, when combined with your years of participation under the Life and Disability Benefits Program, must total 55 or more. In either case, your surviving spouse must have been married to you for at least one year.

The bridge benefit will begin after payment of the 24th transition benefit. Bridge benefits cease if the surviving spouse (1) remarries, (2) attains either age 62 or the age at which full widow's or widower's insurance benefits or old age insurance benefits become payable under Social Security, or (3) dies.

Bridge benefits are not payable for any month for which a surviving spouse could qualify for a mother's or father's insurance benefit under Social Security, whether or not your surviving spouse actually receives the mother's or father's benefit.

## To Apply for Survivor Income Benefits . . .

an eligible survivor needs to make a claim on a form provided by GM for that purpose and return it to the office which administers your life insurance.

## An Eligible Widow or Widower . . .

will have survivor income benefits reduced by any benefits to which the surviving spouse is entitled under the Pension Plan.

# PENSION SURVIVOR BENEFITS

## Death Prior to Retirement — If Eligible to Retire

The surviving spouse of an employe who dies before retirement can be automatically provided a monthly income for life under the Pension Plan. To be eligible, the surviving spouse must have been married to the deceased employe at least one year prior to the employe's death. This benefit is available if the deceased employe would have been eligible to retire voluntarily, immediately prior to his death, as follows:

- at age 65 or older with 1 or more years of credited service, or

- at age 60 or older with 10 or more years of credited service, or

- at age 55 or older with years of age and credited service totaling 85 or more, or

- under age 55 with 30 or more years of credited service.

52

The monthly benefit for the eligible survivor is determined as though the employe had retired voluntarily on the date of death and had not rejected the pension survivor coverage. This survivor benefit amount would be the same as under the survivor coverage available during retirement. This benefit is described in the chart on page 54.

## Pre-Retirement Survivor Protection for Death Prior to Retirement — If Not Eligible to Retire

If an employe dies before retirement and was not eligible to retire voluntarily immediately prior to death, pre-retirement survivor coverage can provide a monthly income for life to the eligible surviving spouse, provided:

- the employe has at least 5 years of credited service as explained on pages 46-47, and

- the spouse has been married to the employe for at least one year immediately prior to the employe's death.

An employe separated with deferred vested benefits has this pre- retirement coverage in effect until commencement of deferred vested benefits.

Any monthly benefit amount payable to an eligible surviving spouse is based on the monthly deferred vested benefit amount that would have been payable at age 65 to the deceased employe (see page 61).

Any monthly benefit amount payable to an eligible surviving spouse is equal to 50% of the deferred vested benefit amount. The survivor benefit commences to be payable, unreduced for age, when the deceased employe would have attained age 65. At the election of the eligible survivor, the benefit may commence to be payable, reduced for age, at the earliest age the deceased employe could have retired voluntarily.

## Death After Retirement

If you have (1) been married at least one year when the survivor coverage becomes effective (generally at retirement), and (2) not rejected the coverage (with your spouse's written consent), a lifetime monthly benefit will be provided automatically for your surviving spouse in the event of your death. An employe separated with deferred vested benefits may apply for this coverage when benefits commence. To provide a survivor benefit, you must accept a reduction in the amount of your lifetime monthly basic benefit.

**To waive the surviving spouse coverage, you must obtain the written consent of your spouse, witnessed by the GM plan representative or a notary public.**

## If Your Spouse Dies or You Are Divorced

You may revoke the regular survivor coverage after it becomes effective if (1) your designated spouse dies, or (2) you are divorced by final court decree. If you revoke this coverage, your basic benefit would be restored to the amount payable without the coverage. Restoration is effective the third month after proper notice and documents are received by the Corporation. Your previously designated survivor no longer would be eligible for a benefit following your revocation.

If you marry, or remarry, and you had not previously rejected the survivor coverage when it was available to you, you may elect, or re-elect, the coverage with respect to your new spouse.

This chart provides answers to some of the more common questions asked about pension survivor coverage.

| QUESTIONS | ANSWERS |
|---|---|
| **PRE-RETIREMENT** ||
| Is the pre-retirement survivor benefit the same as the regular surviving spouse benefit? | No. The pre-retirement survivor benefit is 50% of your age 65 deferred vested benefit. The regular, post-employment, survivor benefit is 60% of your reduced age 62 basic benefit. |
| How do I elect the pre-retirement survivor coverage? | The pre-retirement survivor coverage is automatic. |
| How long is the pre-retirement survivor coverage in effect? | The pre-retirement survivor coverage is in effect until you become, or could become, eligible for the regular survivor coverage. The regular survivor coverage is available when you attain the earliest age at which you would be eligible to retire voluntarily. |
| **POST-EMPLOYMENT** ||
| When does the regular survivor coverage become effective? | The regular survivor coverage becomes effective at the later of: (1) your retirement, (2) one year of marriage, if married when the coverage otherwise would have been effective, or (3) your attainment of age 55 following disability retirement with less than 30 years of service. |
| What information must I supply to GM? | Proof of your marriage, proof of your spouse's age and your spouse's Social Security number. |
| What would be the reduction in my basic pension while I am living if my spouse and I are within five years of the same age? | 5% of your age 62 basic pension benefit. |
| What would be the reduction if my spouse is more than five years younger than I am? | The 5% reduction would increase by 1/2% for each 12 months of age difference in excess of five years. |
| What monthly benefit would be payable to my surviving spouse after my death? | The regular survivor benefit is 60% of your reduced age 62 basic benefit. |
| Can I revoke the regular survivor coverage if (1) my spouse dies, or (2) we are divorced? | Yes, in both cases. To do so, you must provide GM a copy of the death certificate or certified copy of final court decree of divorce which does not prohibit revocation of the coverage. Revocation is effective the first of the third month following receipt by GM of evidence satisfactory to GM of the spouse's death or your divorce. |
| If I remarry after I retire, may I elect the regular survivor coverage for my new spouse? | Yes, provided you previously had not rejected the regular survivor coverage when it was available to you. You must apply within one year of marriage for the coverage to be effective. |

54

## Joint and Survivor Coverage

If you retire due to total and permanent disability, before age 55 with less than 30 years of credited service, joint and survivor (J&S) coverage will be provided automatically for your spouse. The J&S coverage would pay your spouse 50% of your actuarially reduced monthly basic benefit, in the event you die before your spouse.

The J&S coverage is applicable only if you are married (1) on the date the coverage becomes effective, and (2) throughout the one year period ending on the date of your death. J&S benefit payments to the survivor commence on the first of the month following the month you would have attained age 55.

You can revoke the J&S coverage if (1) your spouse dies, or (2) you are divorced before you attain age 55. Revocation is effective the first of the third month following receipt by GM of evidence satisfactory to GM of the spouse's death or your divorce. Otherwise, this coverage cannot be canceled until you attain age 55.

The regular survivor coverage (described on pages 52-54) becomes available on the first of the month following your attainment of age 55, whether or not you reject the J&S coverage. This means that you may (1) reject the J&S coverage prior to age 55, and (2) still be eligible for the regular survivor coverage at age 55.

# HEALTH CARE COVERAGES FOR SURVIVORS

Health care coverage is not available to any (1) surviving spouse of a former employe eligible only for deferred vested pension benefits, or (2) spouse or former spouse receiving, or eligible to receive, only a pre-retirement survivor benefit under the Pension Plan. Therefore, the following paragraphs of this section apply only to a surviving spouse who is eligible for coverage under the Health Care Program.

## If You Die Prior to Eligibility for Health Care . . .

but after becoming eligible for survivor income benefits under the Life and Disability Benefits Program (see page 52), your surviving spouse may enroll for **self-paid core health care coverages.** These coverages can be continued while receiving survivor income benefits. Eligible dependents can be included if the surviving spouse elects such coverages.

## If You Die After Becoming Eligible for Health Care . . .

coverage for your dependents will cease at the end of the month in which you die. **If there is no surviving spouse, any surviving dependents are eligible for COBRA continuation only.**

## If You Die Before You are Eligible to Retire Voluntarily . . .

your surviving spouse will be eligible to continue health care coverages (other than dental and vision), while receiving survivor income benefits under the Life and Disability Benefits Program. Coverage for dependent children may be continued while your surviving spouse is eligible to continue coverage and while they continue to meet the eligibility criteria for dependent children. The full cost of this protection must be paid for by the surviving spouse. However, if your surviving spouse is (1) eligible for **both** transition and bridge survivor income benefits, or (2) ineligible for bridge benefits solely because of being age 60 or older as of your date of death, GM will pay the full cost of health care coverages **for the first six months** in which transition benefits are payable (or would have been payable).

## If You Die After Retirement, or After You are Eligible to Retire Voluntarily Under the Pension Plan . . .

health care coverages that were available to you will be provided to your surviving spouse and eligible dependents. GM will pay the full cost.

## If You Die as a Result of an Accidental Bodily Injury Caused Solely by Employment with GM . . .

GM will pay the full cost of health care coverages for your surviving spouse and eligible dependents, until the earlier of the date when your spouse (1) dies, or (2) remarries.

Your surviving spouse also will be provided Corporation-paid coverages if you die (1) while an active employe age 65 or older, or (2) after terminating your seniority at or after age 65 (for any reason other than discharge for cause) and have Corporation-paid coverages in effect.

**A surviving spouse age 65 or older who is eligible, but is not enrolled for Medicare Part B coverage, is not eligible for GM payment for any health care coverages. Coverages may be continued on a self-paid basis until Medicare Part B coverage is obtained. After enrollment in Part B, coverage may be reinstated and continued while Medicare Part B enrollment is maintained.**

## IN ADDITION TO THE COVERAGES PROVIDED AT NO COST TO YOU, THE FOLLOWING PROTECTION IS AVAILABLE UNDER THE LIFE AND DISABILITY BENEFITS PROGRAM:

## OPTIONAL LIFE INSURANCE

### To Provide Additional Protection for Your Beneficiary . . .

you may enroll for optional life insurance in amounts of $10,000, $20,000, $30,000, $40,000, $50,000, $75,000, or $100,000.

### This Additional Coverage is Available . . .

to employes with at least one year of seniority who are insured for basic life insurance. This coverage may be continued until age 70 or retirement, if later, while basic life insurance is in force.

### You May Name . . .

anyone you wish as your beneficiary or beneficiaries. The beneficiary need not be the same as you designate for your basic life insurance.

If your beneficiary is entitled to a benefit of $6,000 or more, benefits will be payable automatically under the Beneficiary's Total Control Account Program, as described on page 50.

### You Contribute . . .

the full cost of optional life insurance. The GM National Benefit Center, which administers all of your life insurance coverages, can inform you of the current monthly contribution rate for your age group. You may contact the Center toll-free at 1-800-633-3900, or TDD: 1-800-872-8682 (for hearing/speech impaired). Rates are subject to change by the insurance company, based on group experience.

# DEPENDENT LIFE INSURANCE
## You May Enroll for Dependent Life Insurance . . .

covering your spouse and each eligible dependent child. You can choose from one of the following schedules:

| Dependent | Amounts of Insurance | | | |
|---|---|---|---|---|
| | Schedule I | Schedule II | Schedule III | Schedule IV |
| Spouse | $5,000 | $10,000 | $15,000 | $20,000 |
| Child | $2,000 | $ 4,000 | $ 6,000 | $ 8,000 |

## You Are Eligible . . .

for this coverage if you have at least one year of seniority, have an eligible dependent, and are insured for basic life insurance. Generally, an eligible dependent includes your spouse and dependent children over 14 days of age.

## You Are The Beneficiary . . .

for dependent life insurance. If an eligible dependent should die from any cause while you are insured for dependent life insurance, benefits are payable to you in a lump-sum or, if the benefit from a single claim is $6,000 or more, benefits will be payable automatically under the Beneficiary's Total Control Account Program, as described on page 50.

## You Contribute . . .

the full cost of dependent life insurance. The GM National Benefit Center, which administers all of your life insurance coverages, can inform you of the current monthly contribution rate for your age group. Rates are subject to change by the insurance company, based on group experience.

## You May Continue . . .

dependent life insurance to age 70 or, if you continue to work for GM after age 70, you may continue this insurance to the date your active employment ceases.

## If You Die . . .

while dependent life insurance is in effect, your surviving spouse may continue this coverage. Coverage can be continued while your spouse is eligible for either (1) a survivor income benefit under the Life and Disability Benefits Program, or (2) a survivor benefit under the Pension Plan. Your surviving spouse must pay the required monthly contribution as a deduction from these survivor benefits. Your surviving spouse may continue this coverage until the earliest of (1) remarriage, (2) age 70, or (3) death.

Additional information concerning optional and dependent life insurance is available in the announcement folder which describes these coverages. This information may be obtained upon request to the GM National Benefit Center at the toll-free number 1-800-633-3900, or TDD: 1-800-872-8682 (for hearing/speech impaired).



# General Information
## About Your Benefits

## GM PAYS THE FULL COST . . .

**of the Pension Plan, SUB Plan, GIS Program, Profit Sharing Plan, life insurance (other than optional and dependent life) and disability benefit coverages** after you become eligible while you are in active service. General Motors also pays for the cost of health care coverages, with the exception of contributions that may be required for sponsored dependent coverage, or self-paid continuation, or for copayments or sanctions required under the rules of the Health Care Program. In addition, certain HMOs or PPOs, if elected, may require an enrollee contribution. The amounts of the Pension Plan contributions are determined actuarially. GM SUB Plan contributions are determined weekly based on (1) the average level of benefit payments over the prior 13 week period, and (2) the trust Fund level as of October 8, 1990, subject to the Combined JOBS/SUB Maximum Financial Liability Cap. Periodic GM GIS Program contributions are made to maintain the trust fund at a specified level in relation to the amounts of the average benefits paid and the initial contribution to the fund, subject (in the aggregate) to the Maximum Company Liability Amount. The amount of GM's contribution to the Profit Sharing Plan is determined by a formula set forth in the Plan. The contribution amounts under the Life and Disability Benefits Program are determined by the carrier and GM based on claim experience. The contribution amounts for the self-insured Health Care Program also are based on claim experience. Optional and dependent life insurance coverages are made available by GM, but the full cost is borne by employes. The amount of any employe contributions to the Personal Savings Plan is determined by provisions set forth in this Plan.

## RECOVERY OF BENEFIT OVERPAYMENTS

If any benefit paid to you should not have been paid, or should have been paid in a lesser amount, or if there is an outstanding loan not repaid under the Guaranteed Income Stream (GIS) Relocation Loan Program, and you fail to promptly repay the amount, the overpayment or loan may be recovered from any monies then payable, or which may become payable, to you in the form of wages or benefits payable under a GM benefit plan (excluding The GM Hourly-Rate Pension Plan and the Personal Savings Plan). Health Care Program overpayments may be recovered from wages or other benefit plans or programs, as appropriate. Overpayments under other plans or programs will not be offset against health care benefits.

If you wish, you may direct GM to withhold an amount up to 10% of your (1) Personal Savings Plan, or (2) monthly pension benefit, to repay the benefit overpayment or the full amount of the loan.

## LIFE AND DISABILITY BENEFITS AND HEALTH CARE COVERAGES

**For Employes Returning From Permanent Layoff**

◉ **Life and Disability Coverages**

Upon return to active work from permanent layoff, you will be eligible for sickness and accident and extended disability benefit coverage on the first day you are at work, after you have received earnings for 12 pay periods within a calendar year following your return to work. If you become disabled prior to meeting this earnings eligibility requirement, you may be eligible for reinstated sickness and accident benefits, as described on page 33.

◉ **Health Care Coverages**

Upon return to active work from layoff, any coverages discontinued while on layoff will be reinstated, on a Corporation-paid basis, the day you return to work.

58

## For Employes On Non-Disability Leave

If you are granted a non-disability leave of absence, you will be given a notice explaining (1) your life and disability benefit and health care program continuance privileges, and (2) any monthly contributions you may have to make.

### ⊛ Life and Disability Coverages

Coverage may be continued for the following periods, after the month in which you last worked prior to an approved leave of absence, other than for disability.

- For the first month, basic life, extra accident, survivor income benefit insurance, sickness and accident, and extended disability benefit coverages in force are continued at no cost to you.

- Thereafter, you may continue basic life, extra accident and survivor income benefit insurance coverages, up to 11 months, provided you contribute 50¢ per month per $1,000 of basic life insurance.

If you are granted a non-disability leave of absence because of a medical condition that may be expected to result in total disability in the future (e.g., anticipated surgery or termination of pregnancy), sickness and accident and extended disability benefit coverages, which are discontinued at the end of the month following the month in which you last worked, may be reinstated. For disability coverages to be reinstated, you must (1) have been making contributions to continue your basic life insurance, and (2) present medical evidence satisfactory to GM that you are totally disabled. Reinstatement will be made effective as of the date you present satisfactory medical certification of your disability. GM will contribute the full cost of your life and disability coverages. Such contributions will start the first of the month in which you present evidence satisfactory to GM of your total disability.

You must make the required monthly contributions to continue optional and dependent life insurance while your basic life insurance remains in force.

### ⊚ Health Care Coverages

Your health care coverages as an active employe end at the end of the month in which you are last in active service.

- Thereafter, you may continue coverages, other than dental, on a self-paid basis, for up to 12 months while your seniority remains intact.

- If you are granted a non-disability leave of absence in anticipation of a later disability, and if you continue your coverages on a self-paid basis, you will be eligible for reinstatement of Corporation-paid coverages, and for continuation of such coverages while you are on disability leave of absence.

## For Employes Terminating Employment

If you (1) cease active work at or after age 60, but before age 65, (2) had 5 or more years of participation at the end of the month in which you attained age 60, and (3) were insured from age 60 to the date you cease work, you may continue your basic life and extra accident insurance to the end of the month in which you attain age 65, provided you contribute 50¢ per month per $1,000 of basic life insurance.

If you terminate employment with GM at age 65 or older for any reason other than discharge for cause, your health care coverages will be continued consistent with program provisions.

## CESSATION OF COVERAGE

Health care coverages cease at the end of the month in which you quit voluntarily or are discharged. COBRA and conversion privileges are set forth on page 68. Basic life, extra accident, and survivor income benefit insurance, as well as sickness and accident, and extended disability benefit coverages, cease on the day you quit voluntarily or are discharged. If your employment is terminated for any other reason, except retirement, all coverages continue until the end of the month in which your seniority is broken.

However, in any case where an employe files a grievance protesting loss of seniority, life insurance and disability coverages will remain in effect until the end of the month in which seniority is broken. While the grievance is on appeal, an employe may continue life insurance, and all health care coverages, by making the required monthly contributions.

Optional and dependent life insurance cease at the end of the month in which you attain age 70; however, if you continue to work beyond age 70, such insurance will cease at the end of the month preceding your retirement date. If you quit voluntarily or are discharged, all insurance ceases immediately. If you leave GM for any other reason, except retirement, insurance continues until the end of the month in which your seniority is broken, at which time all coverages cease. If you fail to make a required monthly contribution, insurance will cease at the end of the month preceding the month for which the contribution was due. Dependent life insurance coverage ceases for any person when that person no longer is an eligible dependent.

Conversion privileges are set forth on page 61.

## YEARS OF PARTICIPATION UNDER THE LIFE AND DISABILITY BENEFITS PROGRAM

### Prior to September 1, 1950 . . .

years of participation, in general, equal your seniority as of September 1, 1950.

### For the Period September 1, 1950 to October 1, 1975 . . .

you receive credit prior to age 65 while insured for life insurance, plus any period while on military leave. If you are not insured for a period in excess of 24 consecutive months, and your seniority is broken, you lose credit for prior years of participation.

If your credited service under the Pension Plan is greater than your years of participation, credited service may be used instead of years of participation.

### On and After October 1, 1975

For insurance purposes, your credited service accrued on and after October 1, 1975 under the Pension Plan will be added to your years of participation under the Life and Disability Benefits Program as of September 30, 1975. In addition, if you work beyond age 68, your years of participation will include the greater of (1) all periods during which you are insured for basic life insurance after the month you attain age 68 and prior to the date your seniority is broken, or (2) any credited service accrued under the Pension Plan after you attain age 68.

## CONTINUING INSURANCE AFTER AGE 65

If you have 10 or more years of participation when you reach age 65, your basic life insurance will be continued, without cost to you, for your lifetime. However, the amount of your basic life insurance will be reduced by 2% each month, until the continuing amount equals 1-1/2% for each year of participation, times the amount in force at age 65.

For example, an employe with 30 years of participation, who has $37,500 of basic life insurance at age 65, would have the amount of coverage reduced by $750 each month:

$$\$37,500 \times 2\% = \$750$$

and $16,875 of continuing life insurance after all reductions, as follows:

$$1\text{-}1/2\% \times 30 = 45\% \times \$37,500 = \$16,875$$

The minimum amount of continuing life insurance is $4,500.

While you are at work for GM after age 65, all of your basic life insurance is continued for you, subject to the age 65 reduction provisions. In addition, (1) years of participation which you accrue after age 65, and (2) any changes in your pay rate after age 65, will be used in determining the amount of your continuing life insurance.

60

## PROGRAM CONVERSION PRIVILEGES

**During the 31 days following cancellation of your life insurance and/or health care coverages . . .**

- you may convert, at your expense, all, or part, of your basic life, optional life and survivor income benefit insurance to an individual policy, without medical examination. Dependent life insurance may be converted only by your dependents. Any type of life insurance policy, except term insurance, then being issued by Metropolitan Life Insurance Company may be selected. Application may be made at any local life insurance sales office of Metropolitan Life, or at its home office, One Madison Avenue, New York, New York 10010.

- you may obtain, at your expense, whatever "direct pay" individual contract for basic health care (but not for prescription drugs, hearing aid, vision or dental) coverage then is available from the carrier through which you have been enrolled. Application may be made in accordance with a notice which you will receive from the carrier, or from your GM employing unit.

## LIFE INSURANCE CERTIFICATES

Certificates containing all the detailed provisions of insured benefit coverages you have under the group policies issued to General Motors Corporation by its insurance carriers will be made available to you, upon request to the GM National Benefit Center at 1-800-633-3900, or TDD: 1-800-872-8672 (for hearing/speech impaired).

## DEFERRED VESTED PENSION IF SEPARATED

If you (1) lose your credited service for any reason other than retirement, and (2) have at least 5 years of credited service you will be eligible for a deferred vested pension benefit. The benefit is payable at age 65 without reduction. It is payable after age 55, and prior to age 65, on a reduced basis. You may apply for the deferred vested pension benefit within 60 days of your earliest eligibility, or at any time thereafter.

Application may be made to GM on a form furnished to you after you lose credited service (Form HRP-11G).

Your monthly pension benefit, commencing at age 65, will be based on the deferred vested basic benefit rate in effect for your job classification on the date your seniority is broken, as shown on pages 41-42, times your years of credited service.

Eligibility for a deferred vested pension is not affected by receipt of a separation payment, nor is any SUB separation payment affected by eligibility for a deferred vested pension.

Prior to commencement of deferred vested pension benefits, survivor protection is provided for your spouse (see page 53).



# Procedures For Handling Questions Or Disputes About Your Benefits

If you have questions, or wish further information about your benefits, you should contact the location which administers your benefits.

Each benefit program described in this booklet contains a procedure for appealing the denial in whole or in part of any application for benefits. Should you disagree with a decision denying you benefits, you may appeal the decision under the applicable benefit program's appeal procedures. If that procedure does not apply to your claim for benefits, you may appeal in writing within sixty (60) days to the Plan Administrator.

The Employe Benefit Plans Committee (EBPC) has been delegated authority to construe, interpret, and administer the employe benefit plans. Decisions of the EBPC are final and binding.

Under certain circumstances, you also may wish to discuss your questions with one of the local union benefit representatives. Provisions with respect to such discussion, and procedures for making appeals, are set forth below.

## PERSONAL SAVINGS PLAN

If your claim for Personal Savings Plan benefits is denied, in whole or in part, written notice will be provided to you as soon as practicable, but no later than 90 days after receipt of your claim. This notice will include specific reasons for the denial. The notice also will refer to the Plan provisions upon which the denial is based. In addition, the notice will include a description of any additional information that may be needed if the claim is to be resubmitted. An explanation of the procedure by which you may have your denied claim reviewed also will be included in the notice. The review procedure is summarized below.

Within 60 days after you receive the notice that your claim is denied, in whole or in part, you may make a written request to have your claim reviewed. As part of the review you may submit any written comments that you feel may support your claim. You also may review pertinent documents related to your claim. A written decision on your request for review will be furnished to you within 60 days (120 days if special circumstances require an extension of time) after your written request for review is received. This written decision on the review will include the specific reasons for the decision. It also will set forth specific reference to plan provisions upon which the decision is based.

## PROFIT SHARING PLAN

If you disagree with a determination concerning a denial of a Profit Sharing payment, you may, within a reasonable period of time, as established by the Corporation, submit a request to the Corporation for a full and fair review of the decision denying your request.

## LIFE AND DISABILITY AND HEALTH CARE COVERAGES

If you (1) disagree with a carrier or local plan determination concerning a denial or suspension of your benefit claim, (2) have any question regarding lack of coverage, or (3) are concerned about an anticipated claim, you may request the assistance of one of the local union benefit representatives or health care administrators to provide information about your problem. If you are not satisfied with this information, you may request the local union benefit representative to review your problem with the local management representative. If these representatives cannot

62

resolve your problem, your case may be referred by the local union benefit representative to the International Union and GM for further consideration. If your case involves a denial of benefits, and the International Union and GM cannot resolve the issue, the International Union may request GM to have your case reviewed by the appropriate carrier.

Procedures for obtaining impartial medical determinations in sickness and accident and extended disability benefit claims have been developed by GM and the Union. These medical determinations are final and binding upon you, GM, the Union, and the insurance company.

## SUB

You may request the presence of one of the local union benefit representatives, to provide information concerning the payment, denial, or appeal of a SUBenefit or separation payment.

If you disagree with a GM determination as to eligibility for, or amount of, benefits you may, within 30 days of the determination, appeal to your local SUB committee.

If your local SUB committee cannot resolve your claim, you may request the committee to refer your claim to the GM-UAW SUB Board of Administration. In the absence of a local SUB committee at your location, you may appeal directly to the Board of Administration. If the Board members cannot agree, the Board may appoint an impartial chairman to resolve the dispute. The Board or the impartial chairman's decision will be binding on all parties.

## GIS

You may request the presence of one of the local union benefit representatives, to provide information concerning the payment, denial, or appeal of a GIS benefit or redemption payment.

If you disagree with a GM determination, as to eligibility for or amount of benefits, you may, within 70 days of the determination, appeal to your local GIS committee.

If your local GIS committee cannot resolve your claim, you may request the committee to refer your claim to the GM-UAW GIS Board of Administration. In the absence of a local GIS committee at your location, you may appeal directly to the Board of Administration. If the Board members cannot agree, the Board may appoint an impartial chairman to resolve the dispute. The Board or the impartial chairman's decision will be binding on all parties.

## PENSION

If you are about to retire and have questions with respect to eligibility, and computation of your pension benefits, or if you have applied for additional credited service and do not agree with management's determination with respect to your application, you may (1) contact the local or regional office responsible for administration of your benefits, or (2) request the presence of a local union benefit representative. Requests for the benefit representative will be granted in a timely manner under a rule of reason.

If you do not agree with a GM decision that has been made with respect to (1) your age, (2) the amount of your credited service, or (3) the computation of your benefits, you may appeal this decision to your local pension committee. If (1) the local pension committee is unable to agree on your appeal, or (2) the committee agrees but you do not, your case may be referred to the GM-UAW Pension Board of Administration. If the Board members fail to agree, the Board may appoint an impartial chairman to resolve the dispute. The decision of the (1) Board, or (2) impartial chairman, will be binding on all parties.

63



# Information Related To The Employee Retirement Income Security Act of 1974 (ERISA)

## TYPES OF PLANS

The GM Pension Plan is a defined benefit plan providing trusteed pension benefits to employes who retire, and to their eligible survivors. The GM Personal Savings Plan is a defined contribution plan providing benefits to employes who elect to participate in this Plan. The GM Life and Disability Benefits Program is a welfare benefit plan providing life and disability coverages to employes. The GM Health Care Program is a welfare benefit plan that provides self-insured benefits to employes and their eligible dependents. The GM SUB Plan and the GM GIS Program are welfare benefit plans, and provide trusteed benefits while employes are absent from work due to layoff.

Pension, SUB, and GIS benefits are provided through the NBD Bank, N.A. Personal Savings Plan benefits are provided through the Bankers Trust Company. All life insurance coverages, as well as health care benefits for certain employes, are provided through the Metropolitan Life Insurance Company. Health care benefits for other employes are provided through additional carriers, such as Blue Cross/Blue Shield, a number of local plans providing these coverages, and health maintenance organizations. General Motors is responsible for administration of the benefit plans described in this booklet.

## PLAN YEAR

December 31 is the end of the plan year for the Life and Disability Benefits Program, Health Care Program, SUB Plan, GIS Program, and Personal Savings Plan. Records of these plans are kept on a calendar year basis. The Pension Plan operates on a fiscal year basis ending September 30.

## NAMED FIDUCIARY

The Finance Committee of General Motors Corporation is the named fiduciary of the benefit plans described in this booklet.

## ADMINISTRATOR

General Motors Corporation is the sponsoring employer and administrator of the benefit plans described in this booklet. The administrator's address is Room 8-227, General Motors Building, Detroit, Michigan 48202.

## IDENTIFICATION NUMBER

GM's employer identification number is 38-0572515. Plan numbers are as follows:

| PLAN | |
|---|---|
| Name | Number |
| Pension ................................... | 003 |
| Personal Savings ........................ | 014 |
| Life and Disability ...................... | 503 |
| SUB ....................................... | 505 |
| GIS ........................................ | 508 |
| Health Care .............................. | 525 |
| VTEP ...................................... | 526 |

## LEGAL PROCESS

Service of legal process on General Motors Corporation may be made at any office of the CT Corporation. The CT Corporation, which maintains offices in all 50 States, is the statutory agent for service of legal process on GM. The procedure for making such service generally is known to practicing attorneys. Service of legal process also may be made upon GM, at the Service of Process Office, Room 7-227, New Center One Building, Detroit, Michigan 48202.

64

## PARTICIPANT RIGHTS

As a participant in General Motors benefit plans, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled by law to:

Examine, without charge, at the plan administrator's office and at other locations, all plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan administrator with the U. S. Department of Labor, such as annual reports and plan descriptions.

Obtain copies of all plan documents, and other plan information, upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.

Receive a summary of the plan's annual financial report.

Obtain once a year, free of charge, upon written request, a statement of the total pension benefits accrued and the nonforfeitable (vested) pension benefits (if any), or the earliest date on which benefits will become nonforfeitable (vested).

File suit in a federal court, if any materials requested are not received within 30 days of request, unless the materials were not sent because of matters beyond the control of the administrator.

## FIDUCIARY RESPONSIBILITIES

In addition to creating rights for plan participants, ERISA imposes obligations upon the persons who are responsible for the operation of employe benefit plans.

These persons are referred to as "fiduciaries" in the law. Fiduciaries must (1) act solely in the interest of the plan participants, and (2) exercise prudence in the performance of their plan duties.

If you feel you are improperly denied a benefit, you may wish to follow the appeal procedures described on pages 62-63. If after exhausting this procedure you continue to claim entitlement to denied benefits, you have a right to file suit in a federal court, or request assistance from the U. S. Department of Labor.

If you have any questions about the above statement, or your rights under ERISA, you may wish to contact the plan administrator, or the Division of Technical Assistance and Inquiries Administration at (202) 523-8776.

## BENEFIT GUARANTEE

Certain benefits under the GM Pension Plan are guaranteed by the Pension Benefit Guaranty Corporation (PBGC) if the plan terminates. However, the PBGC guarantees only (1) normal-age retirement benefits, (2) early retirement benefits (up to the amount accrued for normal retirement), and (3) certain disability and survivor's pensions.

The PBGC guarantees vested benefits at the level in effect on the date of plan termination.

However, if benefits have been increased within five years before plan termination, the benefit increases may not be guaranteed. No benefit increase that has been in effect for less than 12 full months before the plan terminates is guaranteed. Moreover, there is a statutory ceiling on the amount of an individual's monthly benefit that PBGC guarantees. You may wish to address any inquiries you may have to: Pension Benefit Guaranty Corporation, 2020 K Street, N. W., Washington, D. C. 20006 (telephone number: (202) 778-8800).

## GENERAL MOTORS RIGHT TO AMEND, MODIFY, SUSPEND OR TERMINATE

The Corporation reserves the right to amend, modify, suspend or terminate any of its employe benefit plans or programs by action of its Board of Directors provided, however, that no such action shall alter the Plan, or its operations, in respect to employes who are represented under a collective bargaining agreement, in contravention of the provisions of any such agreement, as long as any such agreement is in effect. The benefits to which an employe is entitled are determined solely by the provisions of the applicable benefit program. Absent an express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provision not provided for under the applicable benefit program, or to change the eligibility criteria or any other provisions of such program.

65

## Hourly-Rate Employes Pension Plan

In the event that the Pension Plan is partially, or totally, terminated, the amount of assets available to provide benefits shall be allocated in the levels of priorities stated below, less expenses for administration or liquidation.

1. In the case of benefits payable as an annuity:

   (i) in the case of benefits in pay status three years prior to termination (at the lowest pay level in that period and at the lowest benefit level under the Plan during the three years prior to termination) and

   (ii) in the case of benefits which would have been in pay status three years prior to termination had the participant been retired (and had his benefits commenced then, at the lowest benefit level under the Plan during the three years prior to termination),

2. All other benefits of individuals under the Plan which are guaranteed under the Plan termination insurance provisions of ERISA, determined without regard to Section 4022 of ERISA,

3. All other nonforfeitable benefits under the Plan, and

4. All other benefits under the Plan.

In the event of termination, or partial termination, of the Plan, the right of all affected employes to benefits accrued to the date of such termination, partial termination or discontinuance, to the extent funded as of such date, are nonforfeitable.

## Life and Disability Benefits Program and Health Care Program

Upon termination, or partial termination, of the Program, coverage will cease as of the effective date of termination, or partial termination.

## Supplemental Unemployment Benefit Plan

Upon termination of the Plan, for one year, unless the fund is sooner exhausted, assets remaining in the trust fund shall be used to pay expenses of administration and to pay benefits to eligible employes. After one year, assets remaining in the trust fund will be used to benefit participants.

## Guaranteed Income Stream Program

Upon termination of the Program, benefits under the Program shall continue for eligible employes laid off during the period of the 1982, 1984, 1987, and 1990 Collective Bargaining Agreements and eligible for a benefit thereunder — subject to the Maximum Company Liability Amount. Any trust fund assets remaining after expiration of any benefit entitlement for such eligible employes, will be used to benefit participants, subject to the Maximum Company Liability Amount.

## Personal Savings Plan

Upon termination, or partial termination, of the Personal Savings Plan, no further savings will be made to the accounts of participants. Participants will maintain entitlement to vested benefits held in their respective accounts.

66

## TRUSTEES

### Trustees of the Pension Plan, who accumulate assets through which pension benefits are provided, are as follows:

Bankers Trust Company
280 Park Avenue
New York, New York 10015

Mellon Bank, N.A.
1 Mellon Bank Center
Pittsburgh, Pennsylvania 15258

Chase Manhattan Bank, N.A.
1211 Avenue of the Americas
New York, New York 10036

NBD Bank, N.A.
611 Woodward Avenue
Detroit, Michigan 48232

### Trustees of the SUB Plan, who accumulate assets through which SUBenefits are provided, are as follows:

Bankers Trust Company
280 Park Avenue
New York, New York 10015

Continental Illinois National Bank
and Trust Company of Chicago
231 South LaSalle Street
Chicago, Illinois 60690

Citibank
153 East 53rd Street
New York, New York 10022

NBD Bank, N.A.
611 Woodward Avenue
Detroit, Michigan 48232

### The Trustee of the GIS Program, who accumulates assets through which GIS benefits are provided, is:

NBD Bank, N.A.
611 Woodward Avenue
Detroit, Michigan 48232

### The Trustee of the Personal Savings Plan, who accumulates assets through which Personal Savings Plan benefits are provided, is:

Bankers Trust Company
280 Park Avenue
New York, New York 10015

## COLLECTIVE BARGAINING AGREEMENT

The Hourly-Rate Employes Pension Plan, Life and Disability Benefits Program, Health Care Program, Supplemental Unemployment Benefit Plan, Guaranteed Income Stream Benefit Program, Profit Sharing Plan and Personal Savings Plan, each as described in this booklet, are maintained pursuant to a collective bargaining agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. A copy of the agreement may be obtained upon your written request to the plan administrator.

67



# Consolidated Omnibus Budget Reconciliation Act (COBRA) Continuation

(The following notice is required under COBRA at the time you become eligible for Corporation-paid health care benefits.)

The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended requires most employers sponsoring group health plans to offer employes and their families the opportunity to buy a temporary extension of health coverage (called "COBRA Continuation Coverage") at a contribution rate slightly above group rates in certain instances where coverage under the employer's plan is lost. For COBRA purposes, a "loss of coverage" means any change in the terms or conditions of your coverage. This notice is intended to inform you, in a summary fashion, of your rights and obligations under COBRA. Both you and your spouse, if applicable, should take the time to read this notice carefully.

## When COBRA Applies

COBRA applies to you if you have coverage as an active employe, as an employe on disability leave, or as a dependent of one of the above.

## Employe Information

As an employe, you have a right to choose COBRA Continuation Coverage if you "lose" your group health coverage because of (1) a reduction in your hours of employment, or (2) the termination of your employment (for reasons other than gross misconduct on your part).

In some situations, you may "lose coverage" but have a limited opportunity to continue some alternative coverage under the Program. In such cases, the options available will be explained to you. You will be required to choose between COBRA and Program continuation.

## Retiree Information

At the time you retire, you and your eligible dependents may continue your health care coverages under the GM Program, as noted on page 49. Alternatively, you or your dependents may elect to continue coverages for up to 18 months under COBRA. If you elect COBRA, you waive your rights to GM Program continuation. Further, if you elect GM Program continuation, you waive your rights to COBRA.

## Spouse Information

If you are the spouse of a covered employe, you have the right to choose COBRA Continuation Coverage if you lose group health coverage for any of the following three reasons:

(1) The death of your spouse;

(2) A termination of your spouse's employment (for reasons other than gross misconduct) or reduction in your spouse's hours of employment sufficient to cause a loss of coverage(s); or

(3) Divorce from your spouse.

## Dependent Children Information

In the case of a dependent child of a covered employe, the child has the right to COBRA Continuation Coverage if group health coverage is lost for any of the following four reasons:

(1) The death of the covered employe;

68

(2) The termination of the covered employe's employment (for reasons other than gross misconduct) or reduction in the hours of employment sufficient to cause a loss of coverage(s);

(3) Parents' divorce; or

(4) The dependent ceases to be a "dependent child", under the terms of the Program.

## General Information

Under COBRA, the employe or a family member has the responsibility to inform General Motors of a divorce, legal separation, or a child losing dependent status under the plan, **within 60 days** from the date on which eligibility ceases.

In the event of an employe's reduction in hours, termination of employment, death, or retirement, GM (or a COBRA Administrator acting for GM) is responsible for notifying you or your dependent(s) of the right to choose COBRA Continuation Coverage. Under the law, you or your dependent(s) have 60 days from the date you (1) would lose coverage, or (2) are notified of your rights, to inform GM that you want COBRA Continuation Coverage.

If you do not choose COBRA Continuation Coverage and do not have alternative continuation rights under the GM Program, your group health coverage will end. You may be eligible for a "conversion contract" from the carrier administering your coverage when eligibility ceases. A conversion policy offers limited coverages and is a private contract between you and the carrier.

If COBRA Continuation Coverage is chosen, it is coverage which, as of the time it is being provided, is identical to that provided under the plan to similarly situated employes or dependents. The law requires that you be afforded the opportunity to maintain COBRA Continuation Coverage for up to 36 months, unless coverage was lost because of a termination of employment or reduction in hours, in which case the maximum continuation period is 18 months. In addition, any employe or dependent determined to be disabled by the Social Security Administration under Title II or XVI may be eligible to extend this 18 month period for an additional 11 months at a higher contribution rate. However, the law also provides that your eligibility for COBRA Continuation Coverage may end earlier for any of the following four reasons:

(1) GM no longer provides group health coverage to any of its employes;

(2) The contribution rate for the COBRA Continuation Coverage is not paid;

(3) The individual becomes covered under another employer-paid group health plan; or

(4) The individual becomes eligible for Medicare.

You do not have to show that you are insurable to choose COBRA Continuation Coverage. However, under the law, you must pay the contribution rate for continued coverage. The law also provides that at the end of the 18 month or 36 month continuation period, you must be offered an individual conversion policy, if that option then is provided under the GM plan.

If you have any questions or if you have changed marital status, or you or your spouse have changed address, please notify the office that administers your health care benefits.

69

# When You Or An Immediate Family Member Purchase A New GM Vehicle

The General Motors Employe New Vehicle Purchase Program and the General Motors New Vehicle Purchase Program for Immediate Family Members provide eligible participants the opportunity to purchase new GM vehicles under either of two options. Under Option 1, vehicles are ordered and purchased through a GM dealer at dealer cost. Under Option 2, vehicles are purchased directly from a GM dealer at the best negotiated price and GM then issues the purchaser a 5% refund allowance or the purchaser may have the 5% allowance paid directly to the dealer.

General information concerning these Programs is set forth below. Additional information can be obtained by calling the Vehicle Purchase Center toll free at 1-800-235-4646.

## WHO IS ELIGIBLE FOR THE NEW VEHICLE PURCHASE PROGRAMS?

- To be eligible to purchase a new GM vehicle under the Employe Program, you must be an employe or the spouse of an employe.
- A laid off employe may participate in the Program during the first 12 months of layoff (24 months with 10 or more years of seniority). Generally, an eligible employe who is on an approved leave of absence may participate during the first 12 months of such leave. However, employes on disability leaves may participate during the entire period of the disability leave.
- Employes who are voluntary quits, or are discharged, may not participate in the Program even if they had ordered a vehicle prior to the effective date of separation.
- Eligible participants under the Program for Immediate Family Members include: parents, children and siblings of the eligible employe. Also, parents and children of the spouse of an eligible employe may participate.
- All vehicles purchased under the Programs must be for the *personal* use of: the employe, the employe's spouse, or other eligible participants. Title and registration cannot be in the name of anyone other than one or more eligible participants, except such vehicle may be registered jointly in the name of an eligible family member and their spouse, and the vehicle must *not* be for the personal use of any other individual.

## WHICH VEHICLES MAY BE PURCHASED UNDER THE PROGRAMS?

- Only new and unused GM passenger cars and light duty trucks (including vans) are eligible for purchase under the Programs.
- Dealer demonstrators, driver training vehicles, leased vehicles and used vehicles are not eligible under the Programs.

## CAN I PURCHASE THE GM PROTECTION PLAN AT A SPECIAL PRICE?

The GM Protection Plan is available at substantial savings when you purchase a vehicle under Option 1 or Option 2 of the Programs. Please ask your salesperson for further information and an application form.

70

## HOW DO I OBTAIN AUTHORIZATION TO PURCHASE A VEHICLE UNDER THESE PROGRAMS?

An authorization code may be obtained by calling the Vehicle Purchase Center at 1-800-235-4646 and giving your name, social security number and year of birth. A computerized Voice Response system will process your call and respond with an authorization code. You may use this code to purchase a vehicle for yourself or provide it to an eligible family member for their use. Only one authorization code may be used per vehicle purchased. The toll free number may be called at any time 24 hours a day seven days a week.

## ADDITIONAL INFORMATION

The General Motors New Vehicle Purchase Programs offer you and your immediate family an excellent opportunity to purchase a new GM vehicle at a substantial savings. Additional information can be obtained by calling the Vehicle Purchase Center toll free at 1-800-235-4646.

An employe SmartLease Program is available to participants under both Option 1 and Option 2. Your dealer can provide details of this program.

71

# A Check List Of Important Items
# To Remember

INFORM the office which administers your benefits if . . .

- you change your address
- your marital status changes
- your dependents change
- you become disabled
- your spouse dies
- your beneficiary dies
- you desire to change your beneficiary
- you, your spouse or a dependent become eligible for Medicare Part B
- you are laid off and secure other employment
- you become eligible for Social Security Disability Insurance Benefits
- you want survivor coverage and are eligible for it

USE your Social Security number in all of your communications to General Motors.

CONTACT your local Social Security office if you have any questions about Social Security or Medicare.

72

# NOTES

D I Brookens Information

| CMS PENSION CASE NOTES for D I Brookens |
|---|
| NOTES |
| 05/20/2004 Tamara Hudson (8750) Recvd DRO from John Stull, Esq. date stamped 05-17-04, pended, sent ack letters and fwd doc to Bill. |
| 06/04/2004 11:29 AM - Simone Harvey (8401) review was completed by Bill; audit complete; forwarding Order to myself for processing. 06/09/2004 11:43 AM - Simone Harvey (8401) forwarding Order to Kay to review. Based on noted in CMS. 06/11/2004 01:21 PM - Simone Harvey (8401) mpf requested for Joann Kitchen 07/29/2004 01:54 PM - Simone Harvey (8401) called atty Stull and left vmm -- need AP date of birth AND est of sso payable as of 3-1-1992. 07/30/2004 02:03 PM - Simone Harvey (8401) atty returned call w/ AP dob: 7-27-1937 08/06/2004 01:02 PM - Simone Harvey (8401) AP benefit will be set up eff 9/04 retro to 3/1/92 per direction of Joann Kitchen, GM Legal. Check is over $20,000 - approved by Joann. 11/05/2004 11:08 AM - Simone Harvey (8401) qualification letter sent; holding docs in case of follow-up or questions from Joann and/or atty. |
| 06/23/2004 03:36 PM - Bill Schaffer Jr. (5231) Issue: Attorney John Stull for ap had called inregards to an update on file. John seeks to know if info was received and if QDRO has qualified or not.Action: Adv attorney John Stull that according to documentation the info is still being gathered and as soon as info has been received than both parties will receive correspondence as to whether or not QDRO has been qualified. 07/19/2004 11:47 AM - Weka Golden (5102) Issue: AP Atty John Stull called to inqure about: Qdro Action: Advised case in follow up for 8/15/04, review process can take upto 90 days. |
| 07/14/2004 11:12 AM - Eleana Kay Mann (8522) sent reminder to JoAnn Kitchen that case still needs to be resolved. She is on shut down right now but message will be available when she returns. |
| 07/14/2004 12:01 PM - Tamara Hudson (8750) Recvd a letter date stamped 7-6-04 from Atty John Stull. Fwd doc to Kay Mann 12/07/2004 10:33 AM - Eleana Kay Mann (8522) case is being handled by GM EB. Closing cms case. |
| 08/06/2004 03:09 PM - Barb Bates (8159) given case from Kim Brown processed in pars restoring history to recalc NWST 08/24/2004 12:47 PM - Barb Bates (8159) processed in pars -- adjustment will be in 10/01 ck--sent E-Mail to Kevin for approval to pay 25,221.23 08/25/2004 09:28 AM - Barb Bates (8159) received okay to pay--first ck going out 10/01 |
| 04/16/1998 - Lamonica Parker (4192) Wife of deceased ee inquiring about benefits...Widow.....Delsie Brookens...married in 1959.d.o.b........7/27/1937s.s # . died 3/1/1991...Ee was on sick leave at the time of death...Deceased EEis in pars 402 only ! 04/20/1998 - William Skrzypek (6495) - Assigned case to Jennifer Eastes. |
| 04/29/1998 - Jennifer Eastes (7716) Gathered Data, Printed 11G, and printed REA letter 04/29/1998 - Jennifer Eastes (7716) forwarded case to team leader for audit. 04/30/1998 - William Skrzypek (6495) - Audited, ok, put in vested status, input data of death in pars, returned. 05/04/1998 - Jennifer Eastes (7716) Mailed letter |
| 11/07/2000 - Letter was sent to Surviving Spouse requesting copies of certain proofs, to determine eligibility for REA benefit. The master pension file has already been checked to locate any proofs which may have been sent to PAC in the past. The Survivor was only asked to send in those which were not in the file.If Svr. is eligible for benefit immediately, we will contact them.. Otherwise, they will not be notified until 3 months before the Participant s 65th birthday. If Svr. has specific questions, please build a Call Case for Angela Moss. |
| 11/14/2002 09:02 AM - Barbara Brady (7420) EE is in INTD status. type code 90. please re-invest EE. 11/18/2002 12:16 PM - Juleen Hamilton-jones (2385) EE is deceacease with no Svr re-vest |
| 11/18/2002 09:45 AM - Randy Ellison (5087) Issue: Ex spouse called about her possible benefits. She stated that had prev ben informed thaty she was ineligible. Action: Verified that she was not |

Delsie Brookens Information

| PENSION CASE NOTES for Delsie Brookens |
|---|
| **NOTES** |
| 10/28/2004 12:38 PM - Brenda Martin (8501) Recvd misc mail... fwded to Keta. 11/04/2004 12:44 PM - LaKeta Holmes (8368) received a ltr from atty John M. Stull regarding Delsie Brookens. Delsie is the svring spouse. The svr received retro pension benefits. The svr s benefit commenced 3/92. The 3/92 money was included in the 10/04 ck. The atty is asking that interest be paid to the svr. There was nothing signed by the svr authorizing the release of information to the atty. I sent the svr a ltr informing interest does not accrue on the pension. I informed the pension is based on Mr. Brookens years of service and a basic benefit rate. I sent the ltr from the atty to imaging. |





AUGUST 24, 2004

DEAR BENEFIT RECIPIENT:

RECENT CHANGES TO YOUR PENSION RECORDS HAVE RESULTED IN AN ADJUSTMENT
TO YOUR BENEFITS.  DETAILED BELOW IS THE ADJUSTMENT REASON AND THE

EFFECT OF THE CHANGE ON YOUR BENEFITS.

ADJUSTMENT REASON: MANUAL INPUT-NEW START

| BENEFIT PERIOD | PREVIOUS AMOUNT | CORRECTED AMOUNT | ADJUSTMENT AMOUNT |
|---|---|---|---|
| 1992 | .00 | 1523.43 | 1523.43 |
| 1993 | .00 | 2031.24 | 2031.24 |
| 1994 | .00 | 2031.24 | 2031.24 |
| 1995 | .00 | 2031.24 | 2031.24 |
| 1996 | .00 | 2031.24 | 2031.24 |
| 1997 | .00 | 2031.24 | 2031.24 |
| 1998 | .00 | 2031.24 | 2031.24 |
| 1999 | .00 | 2031.24 | 2031.24 |
| 2000 | .00 | 2031.24 | 2031.24 |
| 2001 | .00 | 2031.24 | 2031.24 |
| 2002 | .00 | 2031.24 | 2031.24 |
| 2003 | .00 | 2031.24 | 2031.24 |
| 1/04 | .00 | 169.27 | 169.27 |
| 2/04 | .00 | 169.27 | 169.27 |
| 3/04 | .00 | 169.27 | 169.27 |
| 4/04 | .00 | 169.27 | 169.27 |
| 5/04 | .00 | 169.27 | 169.27 |
| 6/04 | .00 | 169.27 | 169.27 |
| 7/04 | .00 | 169.27 | 169.27 |
| 8/04 | .00 | 169.27 | 169.27 |
| TOTAL | .00 | 25221.23 | 25221.23 |

INCLUDED IN YOUR NEXT MONTHLY CHECK DATED 10/01/2004, WILL BE THE
ADJUSTED AMOUNT OF $  25221.23.

IF YOU HAVE ANY QUESTIONS WITH RESPECT TO YOUR BENEFITS, YOU SHOULD
DIRECT YOUR CORRESPONDENCE TO THE ADDRESS SHOWN BELOW.  ALWAYS INCLUDE
YOUR RETIREMENT IDENTIFICATION NUMBER, 19007-R194289268, IN YOUR
CORRESPONDENCE.

                    PENSION ADMINISTRATION CENTER
                    P.O. BOX 5014
                    SOUTHFIELD MI  48086-5014

                GENERAL MOTORS CORPORATION



GENERAL MOTORS CORPORATION
HOURLY PENSION PLAN

GPC GPM H1 Y N N N 00013056 A

September 01, 2004

Check Number:    0047565389
Check Amount:    $169.27

3 09012004    0047565388  00013056

DELSIE BROOKENS
P.O. BOX 9042
NEWARK, DE  19714-9042

Deduction Code Explanation on Reverse Side

GENERAL MOTORS CORPORATION
HOURLY PENSION PLAN

**NON-NEGOTIABLE CHECK STUB**

| CISCO Code / Unit Name | | | Retirement Number | | | Date |
|---|---|---|---|---|---|---|
| 19087 / SCG-WILMINGTON ASSEMBLY | | | R*****9258 | | | 09/01/2004 |
| Gross Amounts | | | Deductions | | | |
| Description | Current | YTD | Description | Current | YTD | |
| TRST | 169.27 | 169.27 | | | | |
| Total | 169.27 | | Total Deductions | .00 | | |

| | 0047565389 | Net Pay |
|---|---|---|
| | | $  169.27 |

-148-

Pension Administration Center
P.O. Box 5014
Southfield, Michigan 48086-5014
1-800-659-2006
Telecommunication Device for the Deaf
1-800-659-3811

CCL12 (Rev. 07/00)

*(handwritten)* MSLTR

February 7, 2001

Delsie Brookens
PO Box 9442
Newark, DE 19714

Re: D BROOKENS

Dear Delsie Brookens:

The Pension Administration Center recently received information that identified you as the surviving spouse of the above referenced former employee of General Motors Corporation.

Based on the provisions of the General Motors Hourly-Rate Employees Pension Plan or the General Motors Retirement Program for Salaried Employees, to be eligible to receive a deferred vested benefit, you must have been married to the former employee for at least one year prior to their date of death.

In order for us to validate your eligibility for a benefit, please provide a copy of the following documents in the return envelope enclosed for your convenience:

* Your Social Security Card          * Death Certificate
* Your Birth Certificate             * Marriage Certificate

Once the documents have been reviewed, we will contact you to inform you of your eligibility, and the process for commencing the benefit in the event you are eligible.

If you have any questions, please call the Pension Administration Center at 1-800-659-2000. Our hours are Monday through Friday, from 7:00 a.m. - 6:00 p.m. Eastern Time. Please have your deceased spouse's social security number available when calling so our customer service representatives may assist you more efficiently.

Sincerely,

Pension Administration Center

*(handwritten)* Enclosed please find you documentation requested

CERTIFICATE OF DEATH
State of Delaware

Shady Grove, Penn.

Delaware    New Castle    Newark    253 Maytheld Road

White

Harry C. Smith, Jr.    Spicer-McILEkin Funeral Home, Inc.
2506 N. DuPont Pkwy., New Castle, DE

Not pronounced by a physician. Obviously dead.

Reportedly hanged himself.
Found    Garage of residence

a. Asphyxia
b. Hanging

I certify this is an actual copy of the official record filed with this office.

Delaware 19802

0.75254

STATE OF DELAWARE
STANDARD CERTIFICATE OF BIRTH 2250

VITAL STATISTICS PLACE OF BIRTH—

State File No.
Registered No. 6640

County.....New Castle.....................State of Delaware
Hundred.........................or Village.
City.....Wilmington.........No...Homoeopathic Hospital., Del.....Ward
(If birth occurred in a hospital or institution, give its NAME instead of street and number)

2. Full name of child....Delina Ethel Gooden................... (If child is not yet named, make supplemental report, as directed)

| 3. Sex | 4. Twin, triplet, or other | 5. Number, in order of birth | 6. Legitimate | 7. Date of Birth July 27th 1937 |
| female | | | | |

PATERNAL — MATERNAL

| 8. FULL NAME | Merrill Harvey Gooden | | Mary Ross Andreas |
| 9. Residence | Newark, Del. R. D. #1 | | Newark, Del. R. D. #1 |
| 10. Color or race | white | 11. Age at last birthday 21 (years) | 12. Color or race white | 13. Age at last birthday 22 (years) |
| 14. Birthplace | Maryland | | 15. Birthplace Delaware |
| 16. Trade, profession | Laborer | | 17. Trade, profession housewife |
| 18. Industry or business | Motors Starters | | 19. Industry or business home |
| 20. Date last worked | present 2 | | 21. Date last worked present 3 |

CERTIFICATE OF ATTENDING PHYSICIAN OR MIDWIFE

I hereby certify that I attended the birth of this child, who was born alive July 27, 1937 at the hour stated.

(Signed) Dr. Martin B. Pennington, M.D.

Address 2517 W. 6th St.

AUG 5 1937

---

I CERTIFY THAT THIS IS A TRUE
COPY OF THE ORIGINAL RECORD
ISSUED - WILMINGTON, DELAWARE

DATE     AUG 22 1995

STATE REGISTRAR
OFFICE OF VITAL STATISTICS
DIVISION OF PUBLIC HEALTH

# This is to Certify

That on the 21st day of January

in the year of our Lord 1857

Mr. David I. Brookens

of Shady Grove, Pa.

and

Miss Delsie E. Gooden

of Wilmington, Dela.

WERE BY ME UNITED IN

# Marriage

at 102 Delaware Avenue, Elkton, Maryland

According to the ordinance of God and the Laws

of the State of Maryland

Witness

Rev. R. J. Stangill

JOHN M. STULL

ATTORNEY AT LAW
SUITE 700
1300 NORTH MARKET STREET
POST OFFICE BOX 1947
WILMINGTON, DELAWARE 19899-1947

---

(302) 654-0399
Fax: (302) 654-0884

*Rec. 8/31/07*
*From Fidelity*
*Durham, N.C.*

May 27, 2005

Pension and CISA Administration Center
Attn: PART
P. O. Box 5014
Southfield, MI 48086-5014

       Re:    **Alternate Payee Status of Delsie E. Brookens of GM**
           **Employee David I. Brookens (Deceased) SSN**
                 **Request for Interest on delayed payment of**
           **Survivor Benefits of Delsie E. Brookens**

Dear Sirs:

       This letter is to acknowledge with thanks on behalf of my Client Delsie Brookens who recently received delayed payment of back benefits as a result of the entry of a QDRO in New Castle County Family Court. I have previously enclosed a copy of the summary of these back benefit payments as a reference for your use with this letter claim for interest on these delayed benefits.

       The reason for this correspondence is to again call your attention to a recent Third Circuit case which was issued in June, 2004. This case provides legal support for an additional claim based on the award of back benefits and is comprised of "interest" on these delayed benefits. The authority for a claim for an additional amount characterized as interest is found in the decision of Skretvedt v. DuPont Company, et.al., 372 F.3d 193 (3d Cir.2004), and is dated June 16, 2004. As you will note from this opinion, interest on delayed benefits payments under an ERISA plan has now been authorized as an equitable claim even under the strictures of Great-West v. Knudsen, and regardless of whether the Plan involved pays the benefits under court order, or voluntarily. We therefore do ask that you consider such an additional claim as we would propose here and as I have attempted to calculate below. You should also note from the opinion cited that the Court seeks to impose a rate of "interest" that compensates on the basis of the value of the retained funds to the fiduciary, namely the Pension Trust.

JOHN M. STULL, ESQ.

PART, GM Pension Administration Center
May 27, 2005
Page 2

By taking the Total Benefits amount of $25,221.23 as indicated as shown on the previously attached reference of yearly totals, and restating these benefits as an annuity measured in monthly payments over a twelve and 2/3rds year period, the average amount due but unpaid is one-half of the total, or $12,610. Applying an average interest rate of 15% to such an unpaid balance computes to a yearly interest amount of $1,890. Multiplying this yearly interest amount by 12.6, or the number of years the average balance is outstanding, further computes to a total interest amount of $23,810. There is also case authority in Delaware to provide for interest on "interest" which is due as a delayed payment of said "interest." This case authority starts with a federal funds rate of, say, 5% and adds 5%, for a total rate of 10%. This approach dictates an interest amount of $1,780.

We would therefore make a claim for $23,810 as "interest" due on the September, 2004, payment of delayed benefits payments which have now been paid, plus $1,780, for a total of $25,590. Thank you for your past considerations. If your process requires correspondence with Ms. Brookens directly, please copy this office on any mailings. Otherwise, you may respond directly to the writer if the matter needs further discussion or elaboration as to the case citation above.

Failing any resolution from the above proposal, a federal claim will be filed in the District of Delaware to give impetus to the transaction.

Yours very truly,

John M. Stull
Counsel to Delsie Brookens

JMS/prs

QRSQ (12/00)

**Pension and CISA Administration Center**
P.O. Box 5014
Southfield, Michigan 48086-5014
**1-800-659-2000**
Telecommunication Device for the Deaf
1-800-659-8811

November 5, 2004

John M Stull, Esq.
1300 N. Market St, Ste 700
Po Box 1947
Wilmington, DE 19899-1947

Participant: D I Brookens
SSN:
Alt Payee: Delsie E Brookens, Esq.
SSN:
Order Entered: 05/12/2004

On behalf of General Motors, the Plan Administrator, we have determined that the Order submitted for review is a Qualified Domestic Relations Order (QDRO) pursuant to Section 206(d)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, and Section 414(p) of the Internal Revenue Code of 1986 (IRC), as amended.

The Alternate Payee will be designated the surviving spouse for purposes of the Plan's pre-retirement surviving spouse benefit. The Alternate Payee is entitled to 100% of this benefit.

Survivor benefits to the Alternate Payee commenced effective September 1, 2004. The Alternate Payee's monthly surviving spouse benefit has been determined to be $169.27 per month. However, in October 2004, the Alternate Payee received a retroactive payment amount of $25,221.23, representing the monthly benefit for that month plus the benefits owed retroactive to March 1, 1992.

With respect to the matter of interest on the benefits payable to the Alternate Payee, the GM Hourly-Rate Employees Pension Plan does not contain any provision for the payment of interest. The Pension Administration Center is not able to deviate from the Plan language in processing the benefit payment. Any further inquiry on this matter must be addressed to the Plan Administrator at: Plan Administrator

GM Hourly-Rate Employees Pension Plan
General Motors Corporation
PO Box 300
MC: 482-C26-A68
300 Renaissance Center
Detroit, MI 48265-3000

The Order does not require the Plan to provide any other benefits to the Alternate
Payee.  If you have any questions, please write to the Pension and CISA Administration
Center at the address shown at the top of this letter.

Pension Assignment Review Team (PART)
Pension and CISA Administration Center

cc:  D I Brookens
     Delsie E Brookens, Esq.


     SRH

0412091020977

With respect to the matter of interest on the benefits payable to the alternate payee, the General Motors Hourly-Rate Employees Pension Plan does not contain any provision for the payment of interest. The Pension Administration Center is not able to deviate from the Plan language in processing the benefit payment. Any further inquiry on this matter must be addressed to the Plan Administrator at:

Plan Administrator

GM Hourly-Rate Employees Pension Plan
General Motors Corporation

PO Box 300

MC: 482-C26-A68

300 Renaissance Center

Detroit, MI   48265-3000

CISCO: 19007  H/S: H

RECIPIENT CODE:  SVR
RECIPIENT NAME:  DELSIE                        BROOKENS

| CHECK CLASS | ADJ YEAR | REASON CODE | TOTAL ADJ AMT | ADJ AMT PENDING | MONTHLY ADJ AMT | ADJ % |
|---|---|---|---|---|---|---|
| TRST | 92 | NWST | 1354.16 | 1354.16 | .00 | 1.00 |
| TRST | 93 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 94 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 95 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 96 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |

M057: *** CONTINUED PRESS PA1 KEY FOR NEXT PAGE
IFS2162 12:39:09 TERMINAL IN RESPONSE MODE - ENTER PA1 OR PA2 THEN AWAIT REPLY
'3: STATUS CODES        PF5: OFFSETS          PF6: AUTH DEDUCTIONS
'7: INF HISTORY         PF8: PAID HISTORY     PF9: RETIREMENT INDICATIVE

PENSION AND RETIREMENT SYSTEM ( CRMF425P )            08/26/04 12:41:59
              ADJUSTMENTS TO BENEFITS INQUIRY

                                              CISCO: 19007   H/S: H

RECIPIENT CODE:  SVR
RECIPIENT NAME:  DELSIE                    BROOKENS

| CHECK<br>CLASS | ADJ<br>YEAR | REASON<br>CODE | TOTAL<br>ADJ AMT | ADJ AMT<br>PENDING | MONTHLY<br>ADJ AMT | ADJ<br>% |
|---|---|---|---|---|---|---|
| TRST | 97 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 98 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 99 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 00 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 01 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |

      M057: *** CONTINUED PRESS PA1 KEY FOR NEXT PAGE
DFS2162 12:39:09 TERMINAL IN RESPONSE MODE - ENTER PA1 OR PA2 THEN AWAIT REPLY
F3: STATUS CODES        PF5: OFFSETS          PF6: AUTH DEDUCTIONS
F7: INF HISTORY         PF8: PAID HISTORY     PF9: RETIREMENT INDICATIVE

                                                    CISCO: 19007   H/S: H

RECIPIENT CODE:   SVR
RECIPIENT NAME:   DELSIE                    BROOKENS

| CHECK<br>CLASS | ADJ<br>YEAR | REASON<br>CODE | TOTAL<br>ADJ AMT | ADJ AMT<br>PENDING | MONTHLY<br>ADJ AMT | ADJ<br>% |
|---|---|---|---|---|---|---|
| TRST | 02 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 03 | NWST | 2031.24 | 2031.24 | .00 | 1.00 |
| TRST | 04 | NWST | 1354.16 | 1354.16 | .00 | 1.00 |

       M002: INQUIRY DISPLAYED SUCCESSFULLY
FS2162 12:39:09 TERMINAL IN RESPONSE MODE - ENTER PA1 OR PA2 THEN AWAIT REPLY
3: STATUS CODES          PF5: OFFSETS          PF6: AUTH DEDUCTIONS
7: INF HISTORY           PF8: PAID HISTORY     PF9: RETIREMENT INDICATIVE

0412091029 77

1692.70
22,343.64
1,354.16

25,390.50   RETRO Amt
+      169.07   9/04

25,559.77

Reference:

—3rd Circuit Opinion        Sent
8th     "              (6-30th)
DuPont Co Case             Sind
   — need Comment on

MS Transaction

...n Participant: D.L B...kens - RNum: R194289268

...urly Status: Hourly
...se Number: 4464088
...se Type: PART - Estimate Hourly
...se Status: Open
...se Owner: MZ0G17

...ansaction: Default
...llow-Up Date:
...eated: 8/3/2004 Trans #: 2
...eated By: DZT3SF
...tached:

Check over
$20, R@D
over by
JK

...03/2004 07:29 AM - Kimberly Brown (8217) $169.27/mo @ 3-1-92.

$169.27 ?? showed this fee  10 × 169.27 = 1692.70   (mar. Dec. = 10mo)
$1523.43   or  9 × 169.27 = 1523.43
                He turned 55  2/24/92

'92:
'93: 2,031.24
'94
'95
'96
'97
'98
'99
'00
'01
'02
'03
'04: 1,354.16
9/04: 169.27

22,343.64      11 yr. × 2031.24 = 22,343.64

8 × 169.27 = 1354.16

Ret @ 80 ??  @ 25,221.23

$25,390.50
$ ?   + 169.27  (3/92)

$25,559.77

QRSCALC (12/00)

## PART Calculation Worksheet

| Date | Reason for calc: |
|------|------------------|
|      |                  |

| Participant: | Alternate Payee: |
|--------------|------------------|
| D J Brookens | Delsie E Brookens, Esq |
| 254   Reybold Road | Po Box 9042 |
| Newark, DE 19702-3609 | Newark, DE 19714-9042 |
| H/S: H, Status: Retired,  CISCO: 19007 | Order Entered: 05/12/2004 |

**Alternate Payee's Benefit Entitlement:**

| Amount | n/a |
|--------|-----|
| Early Supplement | n/a |
| Early Subsidy | n/a |
| Plan Increases | n/a |
| Commencement | July 1, 2004 |
| Duration | n/a |
| Surviving Spouse | Pre-Total |

169.27 X 43.1% X 50% = 36.48

−165−

GM DELPHI

# Pension Administration Center
P.O. Box 5014
Southfield, Michigan 48086-5014
(800)-659-2000
Telecommunication Device for the Deaf
(800) 659-9311

## Pension Administration Center
## FAX COVER SHEET

*[handwritten: To: Simone Harvey Part fax 248 265-8093]*

DATE: June 9, 2004
TO: JoAnn Kitchen
PHONE:
FAX:

FROM: KAY MANN          PHONE: 248-265-8522
                        FAX:   248-265-8024

RE: D. Brookens
SSN:

*[handwritten: See my authorization note below us, an email — per our conversation (Kitchen) 7-2-04]*

Number of pages including cover sheet:  11

☐ Urgent
☒ For your review and reply
☐ For your information only

Message:   See attached order. You and I discussed this case a few weeks ago. (see CMS notes attached). I'd dq' this order because of para. 5 (lump sum retro to 1991) but the nunc pro tunc language adds a new twist. Pls run this by Stuart or Dan and see if they want to qualify it w/ retro payment. Note, p. was not retirement eligible at death, so REA benefit would only be payable sometime after 1991, on an age reduced basis. We wouldn't go back to 1991, regardless of the order.  I'll give the file back to Simone Harvey, so please communicate w/ her re: what to do (so won't be delayed until I am in the office) She is at 8401

### NOTICE OF CONFIDENTIALITY

The information contained in and transmitted with this facsimile is:

   SUBJECT TO THE ATTORNEY - CLIENT PRIVILEGE
   ATTORNEY WORK PRODUCT OR CONFIDENTIAL

It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, or use or reliance upon the information contained in and transmitted with this facsimile by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this facsimile in error, please notify the sender at the number above immediately. Any facsimile erroneously transmitted to you should be immediately returned to the sender by US Mail or if authorization is granted by the sender, destroyed.

(Time faxed:

*[handwritten: Kay — Unless you and Simone discover something really "not in good order" in the QDO or MPF, I say nunc protunc wins — go back to 3/1/92, REA age-reduced — NO Interest — then monthly payments ongoing  JoAnn K 7/2/04]*

Revised 12/29/98
g:\forms\faxsheet

JUN 09 2004 14:05

06/21/2004 22:43    913-865-4584    300-26-TC    PAGE 02/10

# QDRO REVIEW FORM    DOD: 3-5-91

Qualified: _____

Audited by: _____

Disqualified: _____

Participant: David Brookins    SSN: _____    DOB: _____

Alternate Payee: Delsie Brookins    SSN: _____    DOB: _____

Date Retired: _____    Active: _____    Deferred Vested: ✓    Salaried _____    Hourly: _____

GM: ✓    Delphi: _____    Sold Unit: _____    Rec'd: 5/17/04    Entered: 5/1/04    True Copy: ✓

Plan Name: (Y) or N or N/A (w/ Vacate or Amended Order)

Amount: _____ Survivor Benefit _____

**Early Retirement Supplement:** assumed at Monthly
N/A
_____ Proportional
_____ Percent: _____ %
_____ Awards Subsidy (DQ w/ AP life)
_____ Accrued (DQ)
_____ None

**Post-Retirement Increases:** (DQ w/ AP life)
N/A
_____ Proportional    assumed at monthly
_____ Percent: _____ %    unless N life
_____ COLA
_____ None

**Commence:**
_____ Earliest retirement age or later
_____ Must commence at earliest retirement age
_____ Participant's Retirement
✓ Other: 7/1/04

**Duration:**
N/A
_____ Participant's Life (Assumed / Stated)
_____ Alternate Payee's Life
_____ Choice (DQ)
_____ Unclear (DQ)
_____ AP in pay status (P life / AP life) (DQ if changed)

**Pre-Retirement Surviving Spouse Benefits:**
_____ Based on Alternate Payee's benefit (DQ w/ AP life)
_____ Proportional
Other: _____ Lump Sum _____

_____ None
✓ Total

Prospect...    NO Lump Sum Benefit

**Post-Retirement Surviving Spouse Benefits:**
_____ Based on Alternate Payee's benefit (DQ w/ AP life)
_____ Proportional
Other: _____

_____ None
✓ Total

_____ AP on crop 42z? Yes - (No) - N/A (circle one)    _____ Current Spouse on crop 42z? Yes - (No) - N/A (circle one)

Interest, etc. ✓    Savings _____    Withdrawal _____    RTW _____    Admin _____    Estate/Beneficiary ✓

**Update Community Property Settlement Indicator**

Qualified:
_____ 340

Disqualified:
✓ 340

□  If it is a **SALARIED RETIREE** and Order **QUALIFIES**, must do **YEAR END SPREADSHEET**

G:\Pen\Pen\Forms\Review Form.doc
Last revision date: 1/14/02

1

JUN 03 2004 14:05

06/21/2004  22:43    313-665-4584                300-26-TC                              PAGE  03/10

**JOHN M. STULL**

ATTORNEY AT LAW

SUITE 700

1300 NORTH MARKET STREET

POST OFFICE BOX 1947

WILMINGTON, DELAWARE 19899-1947

—

(302) 654-0399

Fax: (302) 654-0884

May 13, 2004

MAY 17 2004

Pension and CISA Administration Center

Attn: PART

P. O. Box 5014

Southfield, MI 48086-5014

Legal File - Imaged Only

Re:    Survivor Benefits; Alternate Payee Status of Delsie E.
Brookens of GM Employee David I. Brookens
(Deceased) SSN #_____, Certified QDRO from
Family Court of State of Delaware; Request for
Survivor Benefits of Delsie E. Brookens #

Dear Sirs:

       I respond to the April 29, 2004 letter from Eleana Kay Mann,
Account Specialist, who suggested I correspond with your unit for review of the
QDRO submitted herewith so as to retrieve survivor benefits under the pension
rights of David I. Brookens, deceased. My prior letter dated February 23, 2004,
contained additional information so as to claim these benefits for Ms. Brookens
from the date Mr. Brookens died. We reiterate those claims here and request that
your review include these claims and authority for retroactive benefits, based on
the enclosed QDRO, signed by the Family Court.

       You should also note that the QDR Order is issued "nunc pro
tunc," or effective as of April 30, 1990. This means that the Order should operate
prospectively from the date Mr. Brookens died, subsequent to the date the Order is
effective. Should your review need additional information or other legal authority
to justify Ms. Brookens' benefits claims which have existed for the last 13 years, I
would be pleased to enter discourse with either your Legal Department or with any
local counsel you designate, here in Delaware or nearby states.

       Thank you for your consideration and cooperation to date. If

5-12-04

—168—

JOHN M. STULL, ESQ.

PART, GM Pension Administration Center
May 13, 2004
Page 2

your process requires correspondence with Ms. Brookens directly, please copy this office on any mailings.  Otherwise, you may respond directly to the writer.

Yours very truly,

*(signature)*

ohn M. Stull

JMS/prs
enclosure

04120091029977

IN THE FAMILY COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

IN RE THE MARRIAGE OF:              )
                                    )
DELSIE E. BROOKENS                  )
    Petitioner,                     )      File No. CN89-1013
                                    )      Petition No. 1580-8
    and                             )
                                    )
DAVID I. BROOKENS (Deceased),       )
    Respondent,                     )
    and                             )
Estate of David I. Brookens (R/W No. 99562).  )

## STIPULATED AMENDED QUALIFIED DOMESTIC RELATIONS ORDER

WHEREAS, the parties to this action were married on January 1, 1959, and divorced by this Court on December 26, 1989;

WHEREAS, this Court had prior jurisdiction and has continuing personal jurisdiction over both parties (through their representatives, and/or their marital interests as represented by property rights) in this action, in addition to jurisdiction to enter an Order (QDRO) formalizing survivor benefits by Order directed to the Plan Administrator of the General Motors Hourly-Rate Pension Plan and/or the General Motors Retirement Program for Salaried Employees, as may be applicable herein, and jurisdiction of the subject matter of this divorce action;

WHEREAS, the parties to this action and the Court intended to and do intend, by and through their representatives, that an Order be entered herewith to be a Qualified Domestic Relations Order as that term is used in the Retirement Equity Act of 1984, P.L. 98-397 (hereinafter "QDRO"); and

WHEREAS, the parties have previously stipulated that the Court shall enter an

Order in the format representing this Order,

NOW, therefore, it is hereby ordered by the Court this *12th* day of *May*,

*nunc pro tunc April 30, 1990,*

200*4*, as follows:

1. <u>Definitions</u>: as used in this Order:

   (a) The term "Participant," means DAVID I. BROOKENS. whose last known

address is 254 Reybold Road, Newark, DE 19702-3609.

   (b) The term "Alternate Payee," means DELSIE E. BROOKENS, whose last

known address is P.O. Box 9042, Newark, Delaware 19714-9042.

   (c) The term "Plan" means either or both the General Motors Retirement

Program for Salaried Employees, and/or the General Motors Hourly-Rate Employees

Pension Plan, as applicable, and as each such plan is currently in effect.

   (d) The term "Plan Administrator" means that individual or entity appointed

as such pursuant to the terms of the respective Plan.

2. The Alternate Payee is the former spouse of the Participant.

3. This Order is entered pursuant to 13 <u>Del.C.</u> Section 1513 governing the

equitable distribution of marital property (as that term is defined therein) between

spouses and former spouses in divorce actions.

4. The Plan Administrator for the General Motors Retirement Program for

Salaried Employees and/or the General Motors Hourly-Rate Employees Retirement

Plan ("Plan") is ordered and directed to pay to Alternate Payee, Delsie E. Brookens, a

survivor benefit based on the amount of pension entitlement of Participant, as

available as of death of Participant in accordance with the terms of either or both

Plans and based on Alternate Payee status of Delsie E. Brookens as former spouse. Participant was deceased March 5, 1991, and prior to such time Alternate Payee was entitled to elect to receive a survivor benefit pursuant to provisions of a QDRO.

5.  The Plan Administrator is ordered to pay the above described survivor benefit from either or both Plans as would be available to a spousal survivor of Participant as of the date of his death on March 5, 1991, in an amount determined by either or both Plans to Alternate Payee, in an accumulated amount from and after March 5, 1991, to current date, via lump sum, with accumulated interest thereon, as soon as administratively possible following entry of this Order.

6.  Copies of this Order shall be sent by ordinary mail by counsel for the parties (J. M. Stull, Esq.) to the Plan Administrator(s) which Plan Administrator(s) shall, pursuant to 29 U.S.C. Section 1056(d) (3)(G):

(a)  Promptly notify both the Participant's Estate and the Alternate Payee of receipt of the Order by the Plan Administrator(s) and the procedures of the Plan used to determine the qualified status of Domestic Relations Orders;

(b)  Within a reasonable period of time after receipt of a copy of this Order, determine whether this Order is a QDRO and notify the Court, the Participant's Estate and the Alternate Payee, and

(c)  Pending the determination of whether or not this Order is a QDRO establish such records as shall be necessary under the Plan(s) to determine the amounts which would have been payable to the Alternate Payee during such period since the death of Participant (3/5/91) and the date this Order has been entered and determined to be a Qualified Domestic Relations Order pursuant to 29 U.S.C. Section 1056(d)(3)(H)(i).

-172-

7. This Order is intended to be a qualified domestic relations order ("QDRO") made pursuant to the Retirement Equity Act of 1984 and provisions of this Order shall be administered and interpreted in accordance with that Act.

8. In the event this Order is subsequently modified by this or any other Court of competent jurisdiction, the Plan(s) shall have no duty to comply with such modification until and unless

(a) The Plan Administrator has received a copy of the Order setting forth such modification and,

(b) It is determined that each Order making such a modification be construed in conjunction with the original Order and all other modifications of this Order, to be a QDRO in accordance with each Plan's QDRO determination procedures.

9. This Court retains jurisdiction on this matter to amend this Order in accordance with comments and communications received from the Plan administrator in connection with the certification of this Order as a QDRO pursuant to each Plan's Administrator's QDRO Determination Procedures.

10. The parties shall use their best efforts taking such steps as shall be reasonable and appropriate to cause the Plan Administrator to comply with those provisions of this Order addressed to it.


_Delsie E. Brookens_
DELSIE E. BROOKENS

_David L. Brookens_____ (Executor, Executrix)
REPRESENTATIVES OF ESTATE OF DAVID I. BROOKENS

DAVID I. BROOKENS JR.

0412091C2977

SO ORDERED THIS *12th* DAY OF *May* , 2004, *nunc/pro tunc*

*April 30, 1990.*

*Alison Whitmer Tumas*

JUDGE *ALISON WHITMER TUMAS*

FAMILY COURT OF DELAWARE
FOR NEW CASTLE COUNTY
I hereby certify that the foregoing
is a true copy of the original as same
appears in the records of this Court this
Date *May 18, 2004*
By *Dee Lynn Laughin*
Clerk of Court

JUN 09 2004 14:06                                PAGE.08

CMS Transaction

Plan Participant: D I Brookens - RNum: R194289268

Hourly Status: Hourly
Case Number: 4337197
Case Type: EB - GM
Case Status: Closed
Case Owner: JZJVZJ

Transaction: Receive Notification
Follow-Up Date:
Created: 4/29/2004   Trans #: 1
Created By: JZJVZJ
Attached:

04/29/2004 10:41 AM - Eleana Kay Mann (8522) vme from GM EB forwarding call from atty John Stahl asking for information about order. Called him to ask for SSN.

04/29/2004 10:42 AM - Eleana Kay Mann (8522) vme from Stahl w/ ssn. Issue is survivor benefits for former spouse of deceased participant. passing case to Simone, - pls bring docs to me so I can respond to atty. Thanks.
04/29/2004 03:50 PM - Eleana Kay Mann (8522) responded to letter from atty. sent qdro booklet. document he sent is not a QDRO but it does attempt to reserve the SSO. I discussed w/ JoAnn Kitchen and she agrees we should let him prepare a QDRO.

GM   DELPHI

**Pension Administration Center**
P.O. Box 5014
Southfield, Michigan 48086-5014
(800) 659-2000
Telecommunication Device for the Deaf
(800) 659-8811

*Pension Administration Center*
*FAX COVER SHEET*

DATE: July 15, 2004
TO: JoAnn Kitchen,  GM EB
PHONE:
FAX:

FROM:   KAY MANN          PHONE: 248-265-8522
                         FAX:      248-265-8024

RE:    Brookens   (Atty Stull issue)
SSN:

Number of pages including cover sheet:  *3*

☒ **Urgent**
☐  For your review and reply
☐  For your information only

Message:

This came in - related to the prior docs that were sent to you in June.  Coincidently, I sent you an e-mail this week, following up on the earlier correspondence.

### NOTICE OF CONFIDENTIALITY

The information contained in and transmitted with this facsimile is:

SUBJECT TO THE ATTORNEY - CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT OR CONFIDENTIAL

It is intended only for the individual or entity designated above.  You are hereby notified that any dissemination, distribution, copying, or use or reliance upon the information contained in and transmitted with this facsimile by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this facsimile in error, please notify the sender at the number above immediately.  Any facsimile erroneously transmitted to you should be immediately returned to the sender by US Mail or if authorization is granted by the sender, destroyed.

(Time faxed:              )

Revised 12/29/98
g:\forms\faxsheet

# JOHN M. STULL

ATTORNEY AT LAW
SUITE 700
1300 NORTH MARKET STREET
POST OFFICE BOX 1947
WILMINGTON, DELAWARE 19899-1947

---

(302) 654-0399
Fax: (302) 654-0884

June 30, 2004

Pension and CISA Administration Center
Attn: PART
P. O. Box 5014
Southfield, MI 48086-5014

Re:    Survivor Benefits; Alternate Payee Status of Delsie E.
       Brookens of GM Employee David I. Brookens
       (Deceased) SSN ·          ; Certified QDRO from
       Family Court of State of Delaware; Supplemental
       Request for interest applied to delay in payment of
       Survivor Benefits of Delsie E. Brookens

Dear Sirs:

I have previously responded May 13, 2004, to the April 29, 2004 letter from Eleana Kay Mann, Account Specialist, who suggested I correspond with your unit for review of the QDRO submitted therewith so as to retrieve survivor benefits under the pension rights of David I. Brookens, deceased. My prior letter dated February 23, 2004, contained additional information so as to claim these benefits for Ms. Brookens from the date Mr. Brookens died. I presented those claims and requested that your review include these claims and the case authority provided to you for retroactive benefits, based on a QDRO, signed by the Family Court and submitted May 13, 2004. I now provide you with further case authority to support our claims for compensation to Ms. Brookens for her not receiving survivor benefits payments timely over the last 13 years.

In addition to the back benefits, we here provide you with a reference for our claim for "interest" or other compensation on these delayed benefits, the authority for which is found in the recent Third Circuit decision in the matter of Skretvedt v. DuPont Company, et.al., with a cite of 2004 U.S.App. LEXUS 11944, dated June 16, 2004. As you will note from this opinion, interest

JOHN M. STULL, ESQ.

PART, GM Pension Administration Center
June 30, 2004
Page 2

on delayed benefits payments under an ERISA plan has now been authorized as an equitable claim even under the strictures of <u>Great-West v. Knudsen</u>, and regardless of whether the Plan involved pays the benefits under court order, or voluntarily. We therefore do ask that you provide us either with your conclusions as to the above claim(s), or indicate when we can anticipate payment or other finalization of these matters, to include appropriate compensation.

Thank you for your consideration and cooperation to date. If your process requires correspondence with Ms. Brookens directly, please copy this office on any mailings. Otherwise, you may respond directly to the writer.

Yours very truly,

John M. Stull

JMS/prs

GM   DELPHI

# Pension Administration Center
## P.O. Box 5014
### Southfield, Michigan 48086-5014
#### (800) 659-2000
Telecommunication Device for the Deaf
(800) 659-8811

*7/14 sent e'mail*
*→ JoAnn - need Response*
*to issue.*

0412110129977

## Pension Administration Center
## FAX COVER SHEET

DATE: June 9, 2004
TO: JoAnn Kitchen
PHONE:
FAX:

FROM:   KAY MANN            PHONE:  248-265-8522
                            FAX:     248-265-8024

RE:  D. Brookens
SSN:

Number of pages including cover sheet:  *11*

- ☐ **Urgent**
- ☑ **For your review and reply**
- ☐ **For your information only**

Message:   See attached order. You and I discussed this case a few weeks ago. (see CMS notes attached). I'd dq' this order because of para. 5 (lump sum retro to 1991) but the nunc pro tunc language adds a new twist. Pls run this by Stuart or Dan and see if they want to qualify it w/ retro payment. Note, p. was not retirement eligible at death, so REA benefit would only be payable sometime after 1991, on an age reduced basis. We wouldn't go back to 1991, regardless of the order.   I'll give the file back to Simone Harvey, so please communicate w/ her re: what to do (so won't be delayed until I am in the office)   She is at 8401

### NOTICE OF CONFIDENTIALITY

The information contained in and transmitted with this facsimile is:

SUBJECT TO THE ATTORNEY - CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT OR CONFIDENTIAL

It is intended only for the individual or entity designated above.  You are hereby notified that any dissemination, distribution, copying, or use or reliance upon the information contained in and transmitted with this facsimile by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this facsimile in error, please notify the sender at the number above immediately.  Any facsimile erroneously transmitted to you should be immediately returned to the sender by US Mail or if authorization is granted by the sender, destroyed.

(Time faxed:            )

Revised 12/29/98
g:\forms\faxsheet

Reviewed by: _____    (Original) / Amend / Vacate    Audited by: _____
(circle one)

# QDRO REVIEW FORM    DOD: 3-5-91

Qualified: _____                                    Disqualified: _____

Participant: David Brookens    SSN: _____    DOB: 2/24/37

Alternate Payee: Delsie Brookens    SSN: _____    DOB: _____

Date Retired: _____  Active: _____  Deferred Vested: ✓  Salaried: _____  Hourly: _____

GM: ✓  Delphi: _____  Sold Unit: _____  Rec'd: 5/17/04  Entered: 5/17/04  True Copy: ✓

Plan Name: Ⓨ or  N  or  N/A (w/ Vacate or Amended Order)

Amount: _____ Survivor Benefit _____

**Early Retirement Supplement:** assumed w/ Monthly
N/A _____ Proportional
_____ Percent: _____ %
_____ Awards Subsidy (DQ w/ AP life)
_____ Accrued (DQ)
_____ None

**Post-Retirement Increases:** (DQ w/ AP life)
N/A _____ Proportional    assumed w/ monthly unless ★ life
_____ Percent: _____ %
_____ COLA
_____ None

**Commence:**
_____ Earliest retirement age or later
_____ Must commence at earliest retirement age
_____ Participant's Retirement
✓ Other: 7/1/04

**Duration:** N/A
_____ Participant's Life (Assumed / Stated)
_____ Alternate Payee's Life
_____ Choice (DQ)
_____ Unclear (DQ)
_____ AP in pay status (P life / AP life) (DQ if changed)

**Pre-Retirement Surviving Spouse Benefits:**
_____ Based on Alternate Payee's benefit (DQ w/ AP life)
_____ Proportional
Other: _____ Lump Sum _____    _____ None    ✓ Total    Prospective

NO Lump Sum Benefit after death

**Post-Retirement Surviving Spouse Benefits:**
_____ Based on Alternate Payee's benefit (DQ w/ AP life)
_____ Proportional
Other: _____    _____ None    ✓ Total

_____ AP on crop 42z? Yes - (No) - N/A (circle one)    _____ Current Spouse on crop 42z? Yes - (No) - N/A (circle one)

Interest, etc. ✓  Savings _____  Withdrawal _____  RTW _____  Admin _____  Estate/Beneficiary ✓

## Update Community Property Settlement Indicator

**Qualified:**                          **Disqualified:**
_____ 340                               ✓ 340

☐ If it is a **SALARIED RETIREE** and Order **QUALIFIES**, must do **YEAR END SPREADSHEET**

g:\Part\Part\Forms\Review Form.doc
last revision date: 11/14/02

**JOHN M. STULL**

ATTORNEY AT LAW
SUITE 700
1300 NORTH MARKET STREET
POST OFFICE BOX 1947
WILMINGTON, DELAWARE 19899-1947

---

(302) 654-0399
Fax: (302) 654-0884

May 13, 2004

MAY 17 2004

Pension and CISA Administration Center
Attn: PART
P. O. Box 5014
Southfield, MI 48086-5014

Re:  **Survivor Benefits; Alternate Payee Status of Delsie E.
Brookens of GM Employee David I. Brookens
(Deceased) SSN            ; Certified QDRO from
Family Court of State of Delaware; Request for
Survivor Benefits of Delsie E. Brookens**

Dear Sirs:

I respond to the April 29, 2004 letter from Eleana Kay Mann,
Account Specialist, who suggested I correspond with your unit for review of the
QDRO submitted herewith so as to retrieve survivor benefits under the pension
rights of David I. Brookens, deceased. My prior letter dated February 23, 2004,
contained additional information so as to claim these benefits for Ms. Brookens
from the date Mr. Brookens died.  We reiterate those claims here and request that
your review include these claims and authority for retroactive benefits, based on
the enclosed QDRO, signed by the Family Court.

You should also note that the QDR Order is issued "nunc pro
tunc," or effective as of April 30, 1990.  This means that the Order should operate
prospectively from the date Mr. Brookens died, subsequent to the date the Order is
effective.  Should your review need additional information or other legal authority
to justify Ms. Brookens' benefits claims which have existed for the last 13 years, I
would be pleased to enter discourse with either your Legal Department or with any
local counsel you designate, here in Delaware or nearby states.

Thank you for your consideration and cooperation to date.  If

5-12-04

JOHN M. STULL, ESQ.

PART, GM Pension Administration Center
May 13, 2004
Page 2


your process requires correspondence with Ms. Brookens directly, please copy this
office on any mailings.  Otherwise, you may respond directly to the writer.



                                    Yours very truly,

                                    John M. Stull

JMS/prs
enclosure

IN THE FAMILY COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

IN RE THE MARRIAGE OF:　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
DELSIE E. BROOKENS　　　　　　　　　　)
　　　　Petitioner,　　　　　　　　　　　)　　File No. CN89-10130
　　　　　　　　　　　　　　　　　　　　)　　Petition No. 1580-89
　　and　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
DAVID I. BROOKENS (Deceased),　　　　　)
　　　　Respondent,　　　　　　　　　　　)
　　and　　　　　　　　　　　　　　　　　)
Estate of David I. Brookens (R/W No. 99562).　)

## STIPULATED AMENDED QUALIFIED DOMESTIC RELATIONS ORDER

WHEREAS, the parties to this action were married on January 21, 1959, and divorced by this Court on December 26, 1989;

WHEREAS, this Court had prior jurisdiction and has continuing personal jurisdiction over both parties (through their representatives, and/or their marital interests as represented by property rights) in this action, in addition to jurisdiction to enter an Order (QDRO) formalizing survivor benefits by Order directed to the Plan Administrator of the General Motors Hourly-Rate Pension Plan and/or the General Motors Retirement Program for Salaried Employees, as may be applicable herein, and jurisdiction of the subject matter of this divorce action;

WHEREAS, the parties to this action and the Court intended to and do intend, by and through their representatives, that an Order be entered herewith to be a Qualified Domestic Relations Order as that term is used in the Retirement Equity Act of 1984, P.L. 98-397 (hereinafter "QDRO"); and

WHEREAS, the parties have previously stipulated that the Court shall enter an

Order in the format representing this Order,

NOW, therefore, it is hereby ordered by the Court this /2*th*/ day of *May* ,
*nunc pro tunc April 30, 1990,*
200*f*, as follows:

    1.  <u>Definitions</u>: as used in this Order:

    (a)  The term "Participant," means DAVID I. BROOKENS, whose last known

address is 254 Reybold Road, Newark, DE 19702-3609.

    (b)  The term "Alternate Payee," means DELSIE E. BROOKENS, whose last

known address is P. O. Box 9042, Newark, Delaware 19714-9042.

    (c)  The term "Plan" means either or both the General Motors Retirement

Program for Salaried Employees, and/or the General Motors Hourly-Rate Employees

Pension Plan, as applicable, and as each such plan is currently in effect.

    (d)  The term "Plan Administrator" means that individual or entity appointed

as such pursuant to the terms of the respective Plan.

    2.  The Alternate Payee is the former spouse of the Participant.

    3.  This Order is entered pursuant to 13 <u>Del.C.</u> Section 1513 governing the

equitable distribution of marital property (as that term is defined therein) between

spouses and former spouses in divorce actions.

    4.  The Plan Administrator for the General Motors Retirement Program for

Salaried Employees and/or the General Motors Hourly-Rate Employees Retirement

Plan ("Plan") is ordered and directed to pay to Alternate Payee, Delsie E. Brookens, a

survivor benefit based on the amount of pension entitlement of Participant, as

available as of death of Participant in accordance with the terms of either or both

Plans and based on Alternate Payee status of Delsie E. Brookens as former spouse.

Participant was deceased March 5, 1991, and prior to such time Alternate Payee was

entitled to elect to receive a survivor benefit pursuant to provisions of a QDRO.

5.  The Plan Administrator is ordered to pay the above described survivor benefit

from either or both Plans as would be available to a spousal survivor of Participant as

of the date of his death on March 5, 1991, in an amount determined by either or both

Plans to Alternate Payee, in an accumulated amount from and after March 5, 1991, to

current date, via lump sum, with accumulated interest thereon, as soon as

administratively possible following entry of this Order.

6.  Copies of this Order shall be sent by ordinary mail by counsel for the parties (J.

M. Stull, Esq.) to the Plan Administrator(s) which Plan Administrator(s) shall,

pursuant to 29 U.S.C. Section 1056(d) (3)(G):

(a)  Promptly notify both the Participant's Estate and the Alternate Payee of

receipt of the Order by the Plan Administrator(s) and the procedures of the Plan used

to determine the qualified status of Domestic Relations Orders;

(b)  Within a reasonable period of time after receipt of a copy of this Order,

determine whether this Order is a QDRO and notify the Court, the Participant's Estate

and the Alternate Payee, and

(c)  Pending the determination of whether or not this Order is a QDRO establish

such records as shall be necessary under the Plan(s) to determine the amounts which

would have been payable to the Alternate Payee during such period since the death of

Participant (3/5/91) and the date this Order has been entered and determined to be a

Qualified Domestic Relations Order pursuant to 29 U.S.C. Section 1056(d)(3)(H)(i).

7.  This Order is intended to be a qualified domestic relations order ("QDRO") made pursuant to the Retirement Equity Act of 1984 and provisions of this Order shall be administered and interpreted in accordance with that Act.

8.  In the event this Order is subsequently modified by this or any other Court of competent jurisdiction, the Plan(s) shall have no duty to comply with such modification until and unless

(a)  The Plan Administrator has received a copy of the Order setting forth such modification and,

(b)  It is determined that each Order making such a modification be construed in conjunction with the original Order and all other modifications of this Order, to be a QDRO in accordance with each Plan's QDRO determination procedures.

9.  This Court retains jurisdiction on this matter to amend this Order in accordance with comments and communications received from the Plan administrator in connection with the certification of this Order as a QDRO pursuant to each Plan's Administrator's QDRO Determination Procedures.

10.  The parties shall use their best efforts taking such steps as shall be reasonable and appropriate to cause the Plan Administrator to comply with those provisions of this Order addressed to it.

_Delsie E. Brookens_
DELSIE E. BROOKENS

_David I. Brookens Jr_____ (Executor, Executrix)
REPRESENTATIVES OF ESTATE OF DAVID I. BROOKENS
DAVID I. BROOKENS JR.

0412091 02977

SO ORDERED THIS *12th* DAY OF *May*        , 200*4*, *nunc/pwo tunc*
*April 30, 1990.*

*alison whitmer turner*
JUDGE    *ALISON WHITMER TUMAS*

FAMILY COURT OF DELAWARE
FOR NEW CASTLE COUNTY
I hereby certify that the foregoing
is a true copy of the original as same
appears in the records of this Court this
Date _____
By _____
Clerk of Court

RETIREMENT INDICATIVE DATA INQUIRY

CISCO: 19007   H/S: H

RETIREE: D                    I              BROOKENS
DATE OF BIRTH: 02 24 1937    DATE OF DEATH: 03 05 1991   SEX: M

| RETIREMENT DATE | RETIREMENT TYPE CODE | DATE OF APPLICATION | RETIREMENT STATUS CODE | AGE AT RETIREMENT | ANNUAL REV-YR | SSN CONTACT |
|---|---|---|---|---|---|---|
| 03 01 2002 | 90 | | VSTD | 65 00 | | N |

| - UNION - CODE  GEO | MEDICAL CODE | IRC415 LIMIT | PRIM-MIN ELIGIBLE | SUPPLEMENT REDUCTION AMT | GAB NUMBER |
|---|---|---|---|---|---|
| UAW    A | | 0.00 | | 0.00 | |

| BENEFIT CLASS CODE | CREDITED SERVICE ATOT  A/E  BTOT | EQUIVALENT MO PAY | AVERAGE MO SALARY | DIVORCE OPTION COST | ERISA MIN AMT |
|---|---|---|---|---|---|
| A | 27.90   A | 2728.27 | 0.00 | 0.00 | 0.00 |

LAST DAY WORKED: 09 06 1990   DATE SERVICE/SENIORITY BROKEN: 03 05 1991

M002: INQUIRY DISPLAYED SUCCESSFULLY

PF4: AGE/OPTION FACTORS    PF5: EMPLOYE CONTRIBUTIONS
PF6: SURVIVOR ENTITLEMENT   PF7: IN-FORCE HISTORY        PF8: CHECK ISSUE INQUIRY

died; age 54
81+ points
not retirement elig. @ death.

**CMS Transaction**

Plan Participant: D I Brookens - RNum: R194289268

Hourly Status: Hourly
Case Number: 4337197
Case Type: EB - GM
Case Status: Closed
Case Owner: JZJVZJ

Transaction: Receive Notification
Follow-Up Date:
Created: 4/29/2004    Trans #: 1
Created By: JZJVZJ
Attached:

04/29/2004 10:41 AM - Eleana Kay Mann (8522) vme from GM EB forwarding call from atty John Stahl asking for information about order. Called him to ask for SSN.

04/29/2004 10:42 AM - Eleana Kay Mann (8522) vme from Stahl w/ ssn. Issue is survivor benefits for former spouse of deceased participant. passing case to Simone, - pls bring docs to me so I can respond to atty. Thanks.
04/29/2004 03:50 PM - Eleana Kay Mann (8522) responded to letter from atty. sent qdro booklet. document he sent is not a QDRO but it does attempt to reserve the SSO. I discussed w/ JoAnn Kitchen and she agrees we should let him prepare a QDRO.



GM DELPHI

**Pension and CISA Administration Center**
P.O. Box 5014
Southfield, Michigan 48086-5014
(800) 659-2000
April 29, 2004
www.pension-administration.com

John M. Stull
Attorney at Law
1300 North Market Street, STE 700
PO Box 1947
Wilmington, DE 19899-1947

RE: David L. Brookens (deceased)

Dear Mr. Stull,

This is in response to your letter addressed to JoAnn Kitchen of General Motors Employee Benefits Staff dated February 23, 2004. The letter has been forwarded to the Pension Administration Center for response.

Mr. Brookens died March 5, 1991 and was divorced from his spouse, Delsie Brookens at that time. The Separation and Property Division Agreement dated April 30, 1990 contains a statement that Mr. Brookens was to designate Delsie as a beneficiary for any survivor benefits from his employer provided pension plan. Mr. Brookens was a participant in the General Motors Hourly-Rate Employees Pension Plan and was not eligible to retire at the date of his death. A former spouse is entitled to pre-retirement survivor benefits only if a Qualified Domestic Relations Order has preserved that right. The Separation Agreement you sent does not satisfy the QDRO requirements of the Employee Retirement Income Security Act of 1984, as amended, Section 206(d). Therefore, no survivor benefits are preserved for Delsie by that document. Because the Separation Agreement does demonstrate an intent to preserve the survivor option, a DRO can be prepared, entered with the court and submitted to the PAC for review. If 'qualified', it will be implemented prospectively based on the date received by the Center.

I am enclosing a QDRO booklet for your information and to assist you if you want to prepare a DRO assigning the survivor benefit. The booklet is designed for a broader use than just survivor benefits, so some sections will not apply to the Brookens case. The order you submit should address just the survivor benefit. Because Mr. Brookens was not eligible to retire at his date of death the only benefit available is the Pre-retirement survivor option.

Once prepared, the order should be submitted to the Pension Administration Center for review. It can be sent to the attention of PART, the team that handles QDROs. The address is in the booklet.

Sincerely,

COPY

Eleana Kay Mann
Account Specialist

RETIREMENT INDICATIVE DATA INQUIRY

CISCO: 19007   H/S: H

RETIREE: D           I           BROOKENS
DATE OF BIRTH: 02 24 1937   DATE OF DEATH: 03 05 1991   SEX: M

| RETIREMENT DATE | RETIREMENT TYPE CODE | DATE OF APPLICATION | RETIREMENT STATUS CODE | AGE AT RETIREMENT | ANNUAL REV-YR | SSN CONTACT |
|---|---|---|---|---|---|---|
| 03 01 2002 | 90 | | VSTD | 65 00 | | N |

| - UNION - CODE   GEO | MEDICAL CODE | IRC415 LIMIT | PRIM-MIN ELIGIBLE | SUPPLEMENT REDUCTION AMT | GAB NUMBER |
|---|---|---|---|---|---|
| UAW   A | | 0.00 | | 0.00 | |

| BENEFIT CLASS CODE | CREDITED SERVICE ATOT   A/E   BTOT | EQUIVALENT MO PAY | AVERAGE MO SALARY | DIVORCE OPTION COST | ERISA MIN AMT |
|---|---|---|---|---|---|
| A | 27.90   A | 2728.27 | 0.00 | 0.00 | 0.00 |

LAST DAY WORKED: 09 06 1990   DATE SERVICE/SENIORITY BROKEN: 03 05 1991

M002: INQUIRY DISPLAYED SUCCESSFULLY

PF4: AGE/OPTION FACTORS    PF5: EMPLOYE CONTRIBUTIONS
PF6: SURVIVOR ENTITLEMENT  PF7: IN-FORCE HISTORY    PF8: CHECK ISSUE INQUIRY

54 age @ death
28
82 pts. (rounded)

SURVIVOR BENEFITS ENTITLEMENT INQUIRY

CISCO: 19007  H/S: H

RETIREE: D             I             BROOKENS

***SURVIVOR INDICATIVE DATA***
SOC SEC NUMBER: 000000000
NAME:
DATE OF BIRTH              DATE OF DEATH                SEX

| BENEFIT ELEMENT | SURVIVOR AMOUNT | SURVIVOR OPTION CODE | OPT EFF DATE | COMM DATE |
|---|---|---|---|---|
| SBSC | .00 | NONE | 03 05 1991 | 03 01 2002 |
| SPRM | | NONE | 03 05 1991 | |
| SSPY | | NONE | 03 05 1991 | |

TOTAL:        0.00

M002: INQUIRY DISPLAYED SUCCESSFULLY

PF3: RETIREMENT INDICATIVE    PF4: AGE/OPTION FACTORS
PF5: EMPLOYE CONTRIBUTIONS    PF7: IN-FORCE HISTORY

JOHN M. STULL

ATTORNEY AT LAW
SUITE 700
1300 NORTH MARKET STREET
POST OFFICE BOX 1947
WILMINGTON, DELAWARE 19899-1947
---
(302) 654-0399
Fax: (302) 654-0884

February 23, 2004

Ms. JoAnn Kitchen
General Motors Local Headquarters
Employee Benefits, 482C12B36
300 Renaissance Center
P. O. Box 300
Detroit, MI 48265

Re:   **Survivor Benefits; Alternate Payee Status of Delsie E.
Brookens of GM Employee David I. Brookens
(Deceased) SSN#**              **Separation and
Property Division Agreement as QDRO; Request for
Survivor Benefits of Delsie E. Brookens**

Dear Ms. Kitchen:

I am taking the liberty of contacting you regarding a survivor
benefit in the above matter based on an Agreement between the two individuals
who have been divorced by Family Court decree in New Castle County, Delaware.
Mr. Brookens died in 1991 and it now appears that the attorney for the parties in
the divorce never submitted a formalized "QDRO" requesting that Delsie E.
Brookens be certified as an alternate payee of Mr. Brookens, based on the survivor
benefits provided under his GM Pension plans. I have enclosed a copy of this
"Settlement and Property Division Agreement" dated April 30, 1990, signed by
the parties and acknowledged by a "Master" for the Family Court as being "So
Ordered" on the 30th day of April, 1990. As such, it is part of the Family court
record of New Castle County, Delaware.

In addition to the Agreement, I enclose Marriage and Divorce
documents, Mr. Brookens Death Certificate, and a copy of the last letter by which
these benefits were denied by the Pension Administration Center dated January 23,
2002. I also have enclosed a copy of a District Court case from the District of

JOHN M. STULL, ESQ.

Ms. JoAnn Kitchen, Employee Benefits, General Motors
February 23, 2004
Page 2

New Jersey which is factually close, if not "on point," to this situation. In Sum, the Court holds that where the Property Settlement Agreement (PSA) includes a direction that the spouse receive survivor benefits, and contains other basics, such as an address of last residence of the parties and a reference to the employed spouse's pension plan(s), the PSA operates as a "QDRO." Also enclosed is a chart showing an entitlement under one of the plans that would have provided Mr. Brookens a pension. Since Mr. Brookens died approximately one year prior to his 55th birthday, his death in 1991 would have precipitated survivor benefits in 1992, at his age 55. See the case of Smith v. Estate of Smith, (No.99-5973, 2/19/03) (D.N.J.) [30 EBC 1911].

The Brookens' "PSA" is clear as to the designation of Delsie E. Brookens as a surviving spouse. See Article V. Retirement/Employment Benefits, at B. Since Mr. Brookens did not remarry prior to his death, and died while still employed by GM, his survivor benefits which were required under the Retirement Equity Act of 1985 remain to be paid by the plan(s) to a valid claimant. It is urged that you so find Ms. Brookens such a qualified claimant, and, indeed, the only qualified claimant. We therefore request that Ms. Brookens be paid her rightful survivor benefits from the date of Mr. Brookens earliest retirement age (55) as determined and calculated by the plan(s), i.e., from 1992 forward to present date. We also request that interest on delayed payments be included in this sum.

If this summary and document presentation is deficient, please contact me by phone if more convenient.

Thank you again for your past cooperation in helping me to finalize a prior client's rightful entitlements (Ms. Janice Bramble).

Yours very truly,

John M. Stull

JMS/prs
enclosures

SEPARATION AND PROPERTY DIVISION AGREEMENT

THIS AGREEMENT, made this _30_ day of _April_,
1990, by and between DELSIE E. BROOKENS ("Wife") and DAVID I.
BROOKENS ("Husband"),

WITNESSETH:

WHEREAS, Wife and Husband legally married on January 21,
1959, and were divorced on December 26, 1989, by Order of the
Family Court of the State of Delaware (Petition No. 1580-89); and

WHEREAS, the parties desire to adjust and settle all
questions pertaining to their respective rights in the property
exclusive to the other, in any property owned by them jointly or
as tenants by the entireties, in marital property, for spousal
support, counsel fees, and all ancillary property or support
matters as are or could be encompassed under Delaware statutes
relating to determination of all rights arising out of marital
and domestic relationship;

NOW, THEREFORE, IT IS HEREBY AGREED, by the parties as
follows:

## I.  DISPOSITION OF PROPERTY

A.    Husband may continue to reside in the marital residence
located at 254 Reybold Road, Newark, Delaware, until June, 1993,
at which time the residence shall be listed with a licensed real
estate broker and sold and the net proceeds split equally between
the parties. Husband shall be responsible for all upkeep and

1

maintenance on the home and shall promptly pay all taxes and utilities charges for the residence. If the parties disagree on a listing price for the property, each shall choose an appraiser to value the property with the listing price of the property to be determined by averaging the two appraisals. Husband shall be responsible for making all necessary repairs to prepare the home for sale including but not limited to bathroom and kitchen repairs. Neither party shall mortgage or otherwise encumber, transfer, lease, or otherwise convey any interest in the marital property without the prior written consent of the other.

B.    The parties agree to convey the real property located at 268 Reybold Road, Newark, Delaware, to their son, Merrill.

C.    Husband's train collection shall be sold at public auction on June 23, 1990, by Ted Mauer in Lionville, Pennsylvania, and the proceeds used first to satisfy the debts of the parties described on Exhibit "A" with any remaining proceeds to be divided equally between the parties.

D.    Wife shall retain as her sole property the 1988 Chevrolet Cavalier which she currently drives. All other motor vehicles shall be the sole property of Husband.

E.    The remaining personalty shall be divided between the parties by separate agreement.

## II.    ALIMONY

It is the mutual desire of the parties that hereafter they shall each maintain and support themselves separately and independently of the other. Accordingly, and in consideration of

2

this Agreement, Wife releases and discharges Husband, absolutely and forever, for the rest of her life, from any and all claims and demands, past, present and future, for alimony and support, both pendente lite and permanent, other than the assumption of debts outlined below; and Husband releases and discharges Wife, absolutely and forever, for the rest of his life, from any and all claims and demands, past, present and future, for alimony and support, both pendente lite and permanent.

## III.  DEBTS

A.   Husband shall be responsible for paying the following debts:   Sears, Meridan Mortgage, Mortgage Insurance, Credit Union, GMAC, and any restitution ordered by the Superioor Court of the State of Delaware in connection with Husband's sentencing for any criminal charges.

B.   Wife shall be responsible for the following debts: Visa, Discover, Macy's, J.C. Penney's, and Mellon Bank Educational Loan.

C.   From and after the date of this Agreement, the parties covenant and agree that they will not pledge or attempt to pledge the credit of the other, nor will they contract or attempt to contract any debts or obligations in the name or on behalf of each other, nor will they incur any liability on behalf of the other or make any charge against any account of which the other is liable, and as to any debts or obligations incurred or contracted by them from and after the date of this Agreement, each will be responsible for his or her own debts or liabilities

3

and shall hold and save the other harmless, and indemnify the other, from any such debts or obligations.

## IV. INSURANCE

A.    Husband shall maintain Wife as beneficiary on every life insurance policy which he owns outright, or is listed as the primary owner thereon, or owns or controls by reason of his employment.

B.    Each party shall be responsible for providing his or her own medical/health insurance coverage either through their employer or a private health care insurer.

## V.  RETIREMENT/EMPLOYMENT BENEFITS

A.    Wife shall have and/or retain sole right, title and interest in and to her retirement/employment benefits accrued both heretofore and hereafter, including by way of example and not by way of limitation, all pension benefits, profit sharing plans, thrift plans and stock purchase plans.

B.    Husband shall designate Wife irrevocably as survivor beneficiary of any insurance or pension benefits provided through Husband's employment to which Wife would have been entitled as a surviving spouse had the parties not divorced.

## VI.  BANK ACCOUNTS

Each party shall retain all right, title and interest to all checking and/or saving accounts and/or brokerage accounts currently standing in their respective names.

4

## VII.  GENERAL MATTERS

A.    Each party accepts the division of property as provided herein in full settlement and satisfaction of any and all claims and rights against the other whatsoever (including but not by way of limitation, dower, courtesy, support, alimony, suit money, attorney's fees and all rights under the law of testacy and intestacy, including the right to claim against the spouse's Will) which he or she ever has, now has or might ever have, against the other or against his or her heirs, administrators, executors or assigns by reason of their relationship as husband and wife or otherwise.

B.    Each party, his or her heirs, administrators, executors or assigns shall, at the request of the other party, at any time and from time to time hereafter, take any and all steps in executing and delivering any and all instruments and assurances that the other party may reasonably require for the purpose of giving full force and effect to the provisions of this Agreement.

C.    This Agreement may be offered in evidence in any such suit and, if acceptable to the Court, may be incorporated by reference in the decree and the decree shall be in conformity with the provisions hereof and shall in no respect impair or modify the same. Notwithstanding such incorporation, this Agreement shall not be merged in the decree, but shall survive the same, and shall be binding and conclusive on the parties for all time.

5

D.   This Agreement contains the entire understanding of the parties and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.

E.   Any modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality of this Agreement. The failure of either party to insist upon strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or similar nature.

F.   Reconciliation of Husband and Wife shall not invalidate or otherwise affect the terms of this Agreement.

G.   Any and all powers of attorney existing between the parties are hereby terminated.

H.   This Agreement is a Delaware contract and is to be interpreted and construed in accordance with the law of Delaware.

I.   Each party acknowledges that he or she has either received independent legal advice prior to signing this Agreement or has been advised of his or her rights to have same. Each of the parties further declare that he or she has signed this Agreement freely and voluntarily with full knowledge of the other party's income, debts and property.

J.   If either party fails in due performance of his or her obligations hereunder, the other party shall have the right, at his or her election, to sue for damages, for a breach of this Agreement or to enforce the law or in equity the same and seek such legal remedies as may be available. Nothing herein contained

6

shall be construed to restrict or impair the offended party's right to exercise this election. In the event of such a breach, the offending party shall be obligated to pay the reasonable and necessary costs, including such reasonable legal fees incurred by the other to enforce or protect his or her rights hereunder. The amount of such reasonable costs and attorney's fees shall be determined by the Court having jurisdiction over the subject matter hereof to the extent that such Court will assume the responsibility in respect thereto.

K.    All of the clauses, provisions, paragraphs and sections of this Agreement are severable. If any clause or provision hereof shall be determined to be void or invalid, or breached by either party, all remaining clauses, provisions, paragraphs and sections shall continue to be independently binding and effective. If any clause, provision, paragraph or section of this Agreement shall be determined to be void or invalid in part or degree, the valid part or degree of such clause, provision, paragraph or section shall continue to be valid.

L.    Each party acknowledges that the provisions herein made of him or her are fair, adequate, reasonable and satisfactory to him or her. Accordingly, each accepts the same in full and final settlement and satisfaction of any and all claims and rights that they may now or hereafter have against the other and accepts the same as a fair disposition of Marital Property pursuant to 13 Del. C. §1513 and is intended to be an Agreement within the meaning of 13 Del. C. §1513(b)(2).

7

M.    As to these covenants and promises, the parties hereto severally bind themselves, their heirs, personal representatives and assigns and consent to the entry of this agreement as an order of the Court settling all matters ancillary to the divorce.

IN WITNESS WHEREOF, the parties hereto have signed, sealed and acknowledged this Agreement.

_____    _____ (SEAL)
                           DELSIE E. BROOKENS

_____    _____ (SEAL)
                           DAVID I. BROOKENS

SO ORDERED, this _30_ day of _____Apr_____, 1990.


_____
Master

8

EXHIBIT "A"

Visa

Discover

Macy's

J.C. Penney's

Mellon Bank

Sears

GMAC

Meridan Mortgage

Credit Union

# This is to Certify

That on the ___21st___ day of January

in the year of our Lord 19__59__

Mr. ___David I. Brookens___

of ___Shady Grove, Pa.___

and

Miss ___Delsie E. Gooden___

of ___Wilmington, Dela___

WERE BY ME UNITED IN

# Marriage



at ___102 Delaware Avenue, Elkton, Maryland___

According to the ordinance of God and the Laws

of the State of ___Maryland___

_____ ⎫
                ⎬ Witnesses
_____ ⎭

Wm. R. Stengill



# The Family Court of the State of Delaware

IN RE THE MARRIAGE OF:                    )              NEW CASTLE   COUNTY
                                          )
DELSIE E. BROOKENS                        )
                          Petitioner,     )
                                          )              Petition No. 1580-89
    AND                                   )
                                          )
DAVID I. BROOKENS                         )
                          Respondent.     )              DIVORCE

## FINAL DECREE

HAVING REVIEWED THE FINDINGS AND RECOMMENDATIONS OF THE
   Master, evidencing satisfaction of the requirements
   of the Delaware Divorce and Annulment Act, Title 13,
   Chapter 15 of the Delaware Code, and no notice of
   appeal having been filed by either party within 15
   days from   12/7/89   , the date of the Master's
   findings and recommendations,

IT IS ORDERED THAT THE PETITIONER AND RESPONDENT ARE
   DIVORCED FROM THE BONDS OF MATRIMONY.



Executed this date   12/26/89          _____
                                                    JUDGE

**Pension Administration Center**
P.O. Box 5014
Southfield, Michigan 48086-5014
**1-800-659-2000**
Telecommunication Device for the Deaf
1-800-659-8811

January 23, 2002

Delsie Brookens
PO Box 9042
Newark, DE 19714

Re: David Brookens, Sr

Dear Delsie Brookens:

The Pension Administration Center has reviewed the documents that you provided to substantiate your eligibility for deferred vested pension benefits, based on the above referenced deceased former employee's employment with General Motors Corporation.

In accordance with the provisions of the General Motors Hourly-Rate Employees Pension Plan or the General Motors Retirement Program for Salaried Employees, the benefit is payable *only* to a surviving spouse if the marriage was in effect for at least one year prior to the former employee's date of death. As you did not meet this requirement, there is no benefit payable.

If you have any questions, please call the Pension Administration Center at 1-800-659-2000 between the hours of 7:00 a.m. and 6:00 p.m., Eastern Time. Please have your deceased spouse's social security number available when calling the Center so our representatives may assist you more efficiently.

Sincerely,

Pension Administration Center

VITAL
STATISTICS
LOCAL REG NO.

CERTIFICATE OF DEATH
State of Delaware    (107)
DEPARTMENT OF HEALTH AND SOCIAL SERVICES

STATE FILE NUMBER

DECEDENT: After certificate has been signed by attending physician and completed entirely by funeral director, remove carbon, file parts 1 and 2 and use body.

1. DECEDENT'S NAME (FIRST, MIDDLE, LAST)
David    J.    Brookens, Sr.

2. SEX
Male

4. AGE (YRS) | 5B. UNDER 1 YEAR MO-DAYS | 5C. UNDER 1 DAY HOURS MINUTES
54

6. CITY AND STATE (OR FOREIGN COUNTRY)
Grady Grove, Penna.

7. U.S. ARMED FORCES?
☒ YES  ☐ NO

☐ CONSENT  ☒ NOT GRANTED

10A. PLACE OF DEATH
☐ INPATIENT  ☐ EMER/OUTPATIENT  ☐ DOA
☐ NURSING HOME  ☒ RESIDENCE  ☐ OTHER

10B. COUNTY OF DEATH
New Castle

11. MARRIED, WIDOWED, DIVORCED, (SPEC.)
Divorced

12. IF WIFE, GIVEN MAIDEN NAME
No Record

☐ LIVING
☐ DECEASED

15A. DECEDENT'S USUAL OCCUPATION
Assembler

10C. CITY, TOWN, OR LOCATION OF DEATH
Newark

15B. KIND OF BUSINESS/INDUSTRY
Automobile

16. RESIDENCE - STATE
Delaware

16B. COUNTY
New Castle

16C. CITY, TOWN, OR LOCATION
Newark

17. INSIDE CITY LIMITS?
☒ (YES OR NO)  No

16F. ZIP CODE
19702

18. WAS DECEDENT OF HISPANIC ORIGIN? (SPECIFY NO OR YES, SPECIFY CUBAN, MEXICAN, PUERTO RICAN, ETC.)
☒ NO  ☐ YES

BLACK, WHITE, ETC (SPECIFY)
White

HIGH ST GRADE COMPLETED
ELEMENTARY/SECONDARY (1-12) 12  COLLEGE (1-4 or 5+)

PARENTS:
19. FATHER'S NAME (FIRST, MIDDLE, LAST)
Arthur Brookens

20. MOTHER'S NAME (FIRST, MIDDLE, MAIDEN SURNAME)
Frederica Dentler

INFORMANT:
20A. INFORMANT'S NAME (TYPE/PRINT)
Delsie E. Brookens

DISPOSITION:
21A. METHOD OF DISPOSITION
☒ BURIAL  ☐ CREMATION  ☐ OTHER (SPECIFY)
☐ DONATION  ☐ REMOVAL FROM STATE

21B. NAME OF CEMETERY, CREMATORY, OR OTHER PLACE)
Delaware Veterans
Memorial Cemetery

21C. LOCATION (CITY, TOWN, STATE)
Bear, Delaware

22A. SIGNATURE OF FUNERAL DIRECTOR
Harvey C. Smith, Jr.

22B. LICENSE NUMBER (OF LICENSEE)
381

23. NAME AND ADDRESS OF FACILITY
Spicer-Mullikin Funeral Home, Inc.
1000 N. DuPont Pkwy., New Castle, DE

PRONOUNCING PHYSICIAN ONLY:
24. REGISTRARS SIGNATURE

25. DATE FILED (MO, DAY, YR)
MAR 12 1991

26. TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED
Not pronounced by a
physician. Obviously dead.

26B. LICENSE NUMBER

26C. DATE SIGNED (MO, DAY, YR)

ITEMS 27-29 MUST BE COMPLETED BY PHYSICIAN WHO PRONOUNCES DEATH:

27. TIME OF DEATH
Found
6:18  ☐ AM  ☒ PM

28. DATE PRONOUNCED DEAD (MO, DAY, YR)
3/5/91

29. WAS CASE REFERRED TO MEDICAL EXAMINER (YES OR NO)
Yes

CERTIFIER:
30A. CERTIFIER (CHECK ONLY ONE):
☐ CERTIFYING PHYSICIAN (Physician certifying cause of death when another physician has pronounced death and completed item 26) To the best of my knowledge, death occurred due to the cause(s) and manner as stated.
☐ PRONOUNCING AND CERTIFYING PHYSICIAN (Physician both pronouncing death and certifying the cause of death) To the best of my knowledge, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.
☒ MEDICAL EXAMINER
On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner as stated.

30B. SIGNATURE AND TITLE OF CERTIFIER
Richard _____ Assistant Medical Examiner

30C. LICENSE NUMBER
C1003252

30. DATE SIGNED (MO, DAY, YR)
March 7, 1991

31. NAME AND ADDRESS OF CERTIFIER WHO COMPLETED ITEM 30 (TYPE/PRINT)
Richard T. Callery, M.D., 200 South Adams Street, Wilm., DE 19801

32. WAS AN AUTOPSY PERFORMED?
☐ YES  ☒ NO

33. MANNER OF DEATH
☐ NATURAL
☐ ACCIDENT
☒ SUICIDE
☐ HOMICIDE
☐ PENDING INVESTIGATION
☐ UNDETERMINED

34. INJURY AT WORK?
☐ YES  ☒ NO

35. DATE OF INJURY (MO, DAY, YR)
3/5/91

36. DESCRIBE HOW INJURY OCCURRED
Reportedly hanged himself.

32B. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH?
☐ YES  ☐ NO

37. TIME OF INJURY
Found
6:18  ☐ AM  ☒ PM

38. PLACE OF INJURY (AT HOME, FARM, STREET, FACTORY, OFFICE BUILDING, ETC. (SPECIFY))
Garage of residence

39. LOCATION (STREET AND NUMBER OR RURAL ROUTE NUMBER, CITY OR TOWN, STATE)
Garage of residence

40. PART I DO NOT ENTER THE MODE OF DYING SUCH AS CARDIAC OR RESPIRATORY ARREST, SHOCK, OR HEART FAILURE. LIST ONLY ONE CAUSE PER EACH LINE.

IMMEDIATE CAUSE (FINAL DISEASE, INJURY OR CONDITION THAT IN YOUR OPINION CAUSED THE DEATH)
A) Asphyxia

APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

SEQUENTIALLY LIST CONDITIONS, IF ANY, LEADING TO IMMEDIATE CAUSE. ENTER UNDERLYING CAUSE (DISEASE OR INJURY WHICH INITIATED EVENTS RESULTING IN DEATH) LAST
DUE TO (B) Hanging
DUE TO (C)
DUE TO (D)

PART II OTHER SIGNIFICANT CONDITIONS →
A. CONTRIBUTING TO CAUSE OF DEATH
B. NOT RELATED TO CAUSE OF DEATH

REV 1/89

I certify this is an actual copy of the official record filed with this office.

Certified Copy Number         Date Issued

Wilmington, Delaware 19802

Place Issued

(SEAL)

075254 MAR 12 91

State Registrar
Division of Public Health

-207-